**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**DONNA CAVE,** *et al.*                                                                  **PLAINTIFFS**

**v.**                                          **Case No. 4:18-cv-00342 KGB**

**COLE JESTER, in his official capacity**
**as Secretary of State for the State of Arkansas**                         **DEFENDANT**

## OPINION AND ORDER

Before the Court are the motions for summary judgment filed by plaintiffs Anne Orsi, Gale Stewart, Eugene Levy, Teresa Grider, the American Humanist Association, the Freedom from Religion Foundation, and the Arkansas Society of Freethinkers[1] (the "Orsi plaintiffs") (Dkt. No. 254), Donna Cave and Pat Piazza (the "Cave plaintiffs") (Dkt. No. 264), and intervenor plaintiffs Erika Robbins, Doug Misicko,[2] and the Satanic Temple ("TST") (collectively "Intervenor plaintiffs") (Dkt. No. 268). Also before the Court is the motion for summary judgment filed by the Secretary of State Cole Jester, in his official capacity as Secretary of State for the State of Arkansas (Dkt. No. 257).[3] The parties have filed responses and replies to the motions for summary judgment (Dkt. Nos. 278, 284, 285, 289, 292, 294, 295, 296).

The Cave plaintiffs and the Orsi plaintiffs filed a notice of supplemental authority (Dkt. Nos. 328; 329). Secretary Jester responded to the Cave plaintiffs' notice of supplemental authority

---

[1] Rev. Victor H. Nixon has been properly dismissed from this action because he is deceased (Dkt. No. 279, ¶ 1).

[2] Mr. Misicko also goes by the names of Doug Mesner and Lucien Greaves (Dkt. No. 260-50, at 6).

[3] "A state official is amenable to suit to enjoin the enforcement of an unconstitutional state statute only if the officer has 'some connection with the enforcement of the act.'" *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960 (8th Cir. 2015) (citing *Ex Parte Young*, 209 U.S. 123, 157 (1908)). Here, Secretary Jester is the proper party to be sued because he is responsible for enforcement of the Display Act and Act 274, which are challenged in this matter (Dkt. Nos. 260-2; 260-37). Ark. Code Ann. §§ 22-3-221; 23-3-503.

(Dkt. No. 331).  The Cave plaintiffs filed a second notice of supplemental authority, to which Secretary Jester responded (Dkt. Nos. 335; 337).  The Cave plaintiffs then filed third and fourth notices of supplemental authority (Dkt. Nos. 338; 339).  Secretary Jester responded to the fourth notice (Dkt. No. 340).

For the following reasons, the Court grants the Orsi, Cave, and Intervenor plaintiffs' motions for summary judgment (Dkt. Nos. 254, 264, 268) and denies Secretary Jester's motion for summary judgment (Dkt. No. 257).

## I.      Overview Of Parties And Claims

In June 2017, a granite monument was erected on the grounds of the Arkansas State Capitol pursuant to the Ten Commandments Monument Display Act, Arkansas Code Annotated § 22-3-221 (2016) ("the Display Act"), enacted by the Arkansas General Assembly, but that monument was destroyed (Dkt. No. 1, ¶¶ 1-2).  Another granite monument ("the Ten Commandments Monument") was installed on April 26, 2018, "weighing three tons and standing over six feet high and three feet wide. . . on public property between the Arkansas State Capitol and Justice Building." (*Id.*).

The initial complaint in this action was filed by the Cave plaintiffs on May 23, 2018, very soon after the second Ten Commandments Monument was installed, and asserts a violation of the Establishment Clause of the First Amendment of the United States Constitution (Dkt. Nos. 1, ¶¶ 74–93; 286, ¶ 112).  The Cave plaintiffs request that the Court declare that the Display Act requiring the placement of the Ten Commandments Monument on State Capitol grounds is unconstitutional, declare that the display of the Ten Commandments Monument violates the constitutional rights of the Cave plaintiffs, and order permanent injunctive relief requiring

Secretary Jester immediately to remove the Ten Commandments Monument from the State Capitol grounds and enjoin Secretary Jester from enforcing the Display Act (Dkt. No. 1, at 30–31).[4]

On June 25, 2018, the Court granted a joint motion to consolidate the Cave plaintiffs' case with *Orsi, et al. v. Martin*, Case No. 4:18-cv-00343-JM, because the cases involved common questions of law and fact (Dkt. No. 14).  The Orsi plaintiffs challenged the constitutionality of the Ten Commandments Monument as violating the Establishment Clause of the First Amendment of the United States Constitution, as applied to Arkansas by the Fourteenth Amendment (*See Orsi*, Dkt. No. 1, at 3).  Additionally, the Orsi plaintiffs challenged the Ten Commandments Monument as violating the Constitution of the State of Arkansas (*Id.*, at 16).  The Orsi plaintiffs seek declaratory and injunctive relief (*Id.*, at 18).

On December 17, 2018, this Court granted Intervenor plaintiffs' amended motion to intervene (Dkt. No. 38), and Intervenor plaintiffs filed their amended complaint in intervention on December 24, 2018 (Dkt. No. 40).  Intervenor plaintiffs filed a second amended complaint in intervention on November 1, 2019 (Dkt. No. 89).  Intervenor plaintiffs offered to donate their own religious monument of Baphomet for placement on public grounds and submitted a formal application and architectural plans to this end (*Id.*, at 2).  Intervenor plaintiffs assert that the State's disparate treatment of the Baphomet monument and the Ten Commandments Monument violates the Equal Protection Clause of the United States Constitution (*Id.*, at 7–8).  Intervenor plaintiffs also assert a violation of the Establishment Clause of the First Amendment of the United States Constitution (*Id.*, at 8–9).  Intervenor plaintiffs seek declaratory and permanent injunctive relief in

---

[4]   The parties agree that all plaintiffs removed all claims for monetary relief in their amended complaints (Dkt. No. 102, ¶ 1).

the form of the placement of the Baphomet monument or, alternatively, removal of the Ten Commandments Monument (*Id*., at 2–3).

## II.    Procedural Background

By Order dated January 3, 2020, the Court granted Secretary Jester's motion for an extension to complete discovery and granted the parties' joint motion to move the case to a non-jury docket upon assurances by all parties that all claims for monetary damages have been dropped in amended complaints leaving only claims for declaratory and injunctive relief (Dkt. No. 103, at 2). On January 4, 2023, at the parties' request, the Court set a briefing and trial schedule (Dkt. No. 242).

The Orsi, Cave, and Intervenor plaintiffs, along with Secretary Jester, filed motions for summary judgment (Dkt. Nos. 254, 257, 264, 268). After the motions were fully briefed,[5] at the request of the Cave plaintiffs, the Court conducted a hearing during which the Court heard argument from the parties on the cross-motions for summary judgment (Dkt. No. 306).

After the hearing, the Court requested supplemental briefing responding to Secretary Jester's sovereign immunity argument as it related to the state constitutional claim (Dkt. No. 308). The Orsi plaintiffs responded with further briefing (Dkt. No. 310). After receiving the Orsi plaintiffs' briefing, the Court requested additional briefing from the Orsi plaintiffs and Secretary Jester on the issue of abstention (Dkt. No. 315). On November 3, 2023, the Orsi plaintiffs filed an

---

[5] The Orsi, Cave, and Intervenor plaintiffs filed motions for summary judgment (Dkt. Nos. 254, 264, 268). Secretary Jester responded to the Orsi, Cave, and Intervenor plaintiffs' motions for summary judgment (Dkt. No. 285). The Orsi, Cave, and Intervenor plaintiffs filed replies in support of their motions for summary judgment (Dkt. Nos. 292, 294, 296). Secretary Jester also filed a motion for summary judgment (Dkt. No. 257). The Orsi, Cave, and Intervenor plaintiffs responded to Secretary Jester's motion for summary judgment (Dkt. Nos. 278, 284, 289). Secretary Jester filed a reply in support of his motion for summary judgment (Dkt. No. 295).

unopposed motion to dismiss their claim based in state law, which the Court granted (Dkt. Nos. 316, 317).

The Court's Third Amended Scheduling Order set the case for a bench trial beginning the week of October 16, 2023 (Dkt. No. 246). Secretary Jester moved to continue the trial (Dkt. No. 309). The Court granted the motion (Dkt. No. 314).

### III.   Factual Background From Record Evidence[6]

#### A.   The Parties

Joan Dietz has been dismissed as a party (Dkt. No. 95). In addition, all claims by plaintiffs Walter Riddick, Susan Russell, Judith Lansky, and Rev. Nixon are properly dismissed because these plaintiffs are deceased (Dkt. Nos. 279, ¶ 1; 283, ¶ 1; 290, ¶ 1).

Ms. Orsi is an agnostic atheist who objects to the Ten Commandments Monument (Dkt. No. 287, ¶ 1). At the time of Ms. Orsi's deposition, she was president of the Arkansas Society of Freethinkers (*Id*., ¶ 2). Ms. Orsi is also a member of other similar organizations (Dkt. No. 255, ¶ 1).[7] Ms. Orsi visits the Arkansas State Capitol grounds for many purposes (*Id*.). Ms. Orsi attends

---

[6]   As set forth in this Opinion and Order, the factual background is taken from the Orsi plaintiffs' statement of undisputed facts (Dkt. No. 255); Secretary Jester's statement of undisputed material facts (Dkt. No. 261); the Cave plaintiffs' statement of undisputed material facts (Dkt. No. 266); and Intervenor plaintiffs' statement of undisputed facts (Dkt. No. 269), as well as the parties' responses to the others' statements of undisputed material facts (Dkt. Nos. 279, 280, 283, 286, 287, 288, 290).

[7]   Local Rule 56.1(b) of the *Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas* requires that a nonmoving party file a "separate, short and concise statement of the material facts as to which [he] contends a genuine dispute exists to be tried." Pursuant to Local Rule 56.1(c), "[a]ll material facts set forth in the statement filed by the moving party. . . shall be deemed admitted unless controverted by the statement filed by the non-moving party. . . ."

Further, a nonmoving party must support his denials with relevant, admissible evidence in the record before the Court as required by Federal Rule of Civil Procedure 56(c). *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to [support] properly an assertion of fact or fails to [address] properly another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion"). If a party relies on documents that have been previously

rallies (*Id*.).  Ms. Orsi goes to the History Commission in the "Big Mac" building to do historical and genealogy research (*Id*.).  Ms. Orsi goes to the solstice display on the median south of the Capitol building to celebrate the solstice (*Id*.).  Ms. Orsi goes to the Justice Building to file papers and attend meetings (*Id*.).  Ms. Orsi has testified at legislative committee meetings (*Id*.).  Ms. Orsi has walked past the monument and driven past the monument (*Id*.).  Ms. Orsi attended the installation ceremony of the Ten Commandments Monument to protest it (*Id*.).[8]

Rabbi Levy is a Rabbi who opposes the Ten Commandments Monument (Dkt. No. 287, ¶ 2).  Rabbi Levy was involved with Interfaith Arkansas, an organization involving members of various faiths, which was organized in response to the Central High School crisis (*Id*.).  Rabbi Levy was president of Interfaith Arkansas one year and treasurer for three or four years (*Id*.).  Rabbi Levy visits the State Capitol from time to time (Dkt. No. 255, ¶ 2).[9]  Rabbi Levy estimates that he has been to the Arkansas State Capitol grounds 25 or 30 times (*Id*.).  Rabbi Levy has been to the State Capitol grounds for political meetings, rallies, and meetings of the State Board of Education (*Id*.).

---

filed in the record, he must specifically refer to those documents by docket number and page.  *See Crossley v. Georgia-Pacific Corp.*, 355 F.3d 1112, 1113–14 (8th Cir. 2004) (affirming the grant of summary judgment because a plaintiff failed to refer properly to specific pages of the record that supported his position).

Any fact asserted by a moving party not specifically denied by a nonmoving party is deemed admitted by the Court pursuant to Local Rule 56.1 and Federal Rule of Civil Procedure 56.  Although Secretary Jester denies this statement, he fails to cite to any record evidence in support (Dkt. No. 287, at 1).  The fact is deemed admitted.

[8]  In response to many of these statements of fact regarding Ms. Orsi, Secretary Jester states only:  "Disputed that Orsi's visits are sufficient for standing." (Dkt. No. 287, at 1–2).  Secretary Jester's statement is argument; the facts are deemed admitted.

[9]  In response to many of these statements of fact regarding Rabbi Levy, Secretary Jester states only:  "Disputed that Levy's visits are sufficient for standing." (Dkt. No. 287, at 2).  Secretary Jester's statement is argument; the facts are deemed admitted.

Ms. Stewart is an ordained elder in the Presbyterian Church, U.S.A. who opposes the Ten Commandments Monument (Dkt. No. 287, ¶ 3).  Ms. Stewart has made many visits to the Arkansas State Capitol grounds, to picnic, to visit the Supreme Court library, to attend court proceedings, to go to public meetings, and to lobby for passage or failure of proposed legislation (Dkt. No. 255, ¶ 3).[10]  Ms. Stewart had been in and out of the Secretary of State's office doing research when it was on the State Capitol grounds; she has been to the Governor's office, to Game and Fish, and to many state agencies (*Id.*).  Ms. Stewart has been to rallies and demonstrations, and she has been to the Capitol grounds to see the tulip trees (*Id.*).  Ms. Stewart has seen the Ten Commandments Monument (*Id.*).

Ms. Gryder is a Wiccan who opposes the Ten Commandments Monument (Dkt. No. 287, ¶ 4).  Ms. Gryder is a member of the Arkansas Society of Freethinkers (Dkt. No. 255, ¶ 4).[11]  Ms. Gryder has been to the State Capitol grounds a lot (*Id.*).  Ms. Gryder has visited the Firefighters memorial (*Id.*).  Mr. Gryder and her family will drive through the grounds if they are in the area (*Id.*).  Ms. Gryder has applied for a job at the Parks Department (*Id.*).[12]

Ms. Cave has both undergraduate and graduate degrees in English, and she taught in the Pulaski County School District for 29 years (Dkt. No. 286, ¶ 1).  Ms. Cave is an agnostic (*Id.*, ¶ 2).  Ms. Cave considers the Ten Commandments Monument to be an insult to the people of Arkansas who do not follow the Judeo-Christian tradition (Dkt. No. 266, ¶ 3).  Ms. Cave disagrees

---

[10] In response to many of these statements of fact regarding Ms. Stewart, Secretary Jester states only:  "Disputed that Stewart's visits are sufficient for standing." (Dkt. No. 287, at 2). Secretary Jester's statement is argument; the facts are deemed admitted.

[11] Secretary Jester disputes this statement but provides no cite to record evidence in support of his denial.  The statement is deemed admitted; the record evidence cited by Orsi plaintiffs supports the statement (Dkt. No. 255, ¶ 4).

[12] In response to many of these statements of fact regarding Ms. Gryder, Secretary Jester states only:  "Disputed that Gryder's visits are sufficient for standing." (Dkt. No. 287, at 3). Secretary Jester's statement is argument; the facts are deemed admitted.

with the First Commandment displayed on the Ten Commandments Monument ("I am the Lord thy God") because she believes it is exclusionary and does not include her (*Id.*, ¶ 4).  Ms. Cave thinks it is wrong for the State of Arkansas to dictate religious belief by placing the Ten Commandments Monument on the grounds of the State Capitol (*Id.*, ¶ 5).[13]

Ms. Piazza lives in Arkansas.  She has a Bachelor of Arts in psychology and a Master's degree in social work (Dkt. No. 286, ¶ 6).  Ms. Piazza is agnostic (*Id.*, ¶ 7).  Ms. Piazza is committed to the principle of separation of church and state and does not believe that the State has any right to put up religious monuments on State Capitol grounds (*Id.*, ¶ 8).  To Ms. Piazza, the Ten Commandments Monument is divisive in that it says that everyone must believe only one thing (*Id.*, ¶ 9).[14]  Ms. Piazza sees the Ten Commandments Monument as telling people what they should think and believe and the rules by which they should live (*Id.*, ¶ 10).

Ms. Cave and Ms. Piazza are part of a group of women who regularly walk or bicycle together (Dkt. No. 266, ¶ 11).[15]  Several of the routes taken by this group go through the grounds of the Arkansas State Capitol (*Id.*, ¶ 12).[16]  The group passed by the second Ten Commandments Monument on one of the routes shortly after it was installed and stopped long enough to read it (Dkt. No. 286, ¶ 13).  Because both Ms. Cave and Ms. Piazza found the Ten Commandments

---

[13] Secretary Jester disputes this statement but provides no cite to record evidence in support of his denial.  The statement is deemed admitted; the record evidence cited by Cave plaintiffs supports the statement.  *See* Dkt. No. 266-1.  As to Secretary Jester's assertion of additional facts, the record speaks for itself.  Secretary Jester's attempt at summarizing the testimony is not consistent with the record; the Court relies on the record evidence.

[14] Secretary Jester disputes this statement but provides no cite to record evidence in support of his denial.  The statement is deemed admitted; the record evidence cited by Cave plaintiffs supports the statement (Dkt. No. 286, ¶ 9).  *See* Dkt. No. 266-2.

[15] The record evidence supports the statement.  *See* Dkt. Nos. 266-1; 266-2.

[16] The record evidence supports the statement.  *See* Dkt. Nos. 266-1; 266-2.

Monument to be so offensive and alienating, they have altered the walking and bicycling routes they take so that they no longer go past the monument (*Id*., ¶ 14).

The Arkansas Secretary of State is the legal custodian of the Arkansas State Capitol Building and the State Capitol grounds (*Id*., ¶ 15).

### B.      Arkansas State Capitol And Capitol Grounds

The Arkansas State Capitol is the seat of Arkansas state government (*Id*., ¶ 16).   The Arkansas State Capitol building houses the Governor's office, the Lieutenant Governor's office, the Secretary of State, the State Treasurer, the State Auditor, the Commissioner of State Lands' Executive Office and both chambers of the General Assembly (*Id*., ¶ 17).

Adjacent to the State Capitol Complex is the Justice Building, where the Arkansas Supreme Court and Court of Appeals sit; this property belongs to the State of Arkansas (*Id*., ¶ 18).   In a pamphlet published by the Secretary of State's office entitled, "A Walk on the Hill:  A self-guided tour of the Arkansas State Capitol grounds and monuments," both Secretary of State Thurston and his predecessor, Secretary Mark Martin, stated "[a]s Secretary of State, one of my most cherished responsibilities is the care of the building and surrounding grounds." (*Id*., ¶ 19).[17]  According to the Secretary of State, "[a]s the seat of state government, [the State Capitol] is a natural setting for memorials to groups, individuals and events." (*Id.*, ¶ 20).  Consistent with that theme, a number of permanent monuments are located on the State Capitol grounds (*Id*., ¶ 21).  These monuments include, for example:  (a) a Vietnam Veterans Memorial (honoring Arkansas soldiers killed or wounded during the Vietnam war), (b) Memorials to Arkansas law enforcement officers and

---

[17]  Secretary of State Jester began serving in the position in 2025 and succeeded Secretary of State Thurston.  Secretary of State Thurston served in the position from 2019 to 2025 and succeeded Secretary of State Martin.  Secretary of State Martin served in the position from 2011 to 2019.  *See* www.encyclopedia of Arkansas.net/office of secretary of state (last checked March 30, 2026).

firefighters who died in the line of duty, (c) a replica of the Liberty Bell to commemorate the American Bicentennial, (d) a boulder to mark a century of Arkansas statehood, (e) a sculpture honoring the nine school children credited with desegregating Little Rock's public schools, and (f) a marker in memory of the Union and Confederate prisoners who were held in a prison located on the grounds of what is now the State Capitol (*Id.*). A number of these monuments contain plaques and other information explaining the purpose of the display and the significance of the groups, individuals, and events that they depict (*Id.*, ¶ 22).

### C.    Secretary Of State's Pamphlet

Kelly Boyd served as Chief Deputy Secretary of State from 2015 through the end of Secretary of State Martin's term of office (*Id.*, ¶ 23). As Chief Deputy Secretary of State, Mr. Boyd had responsibility for the State Capitol building and the State Capitol grounds (*Id.*, ¶ 24).

Kerry Moody served as Deputy Secretary of State from January 2016 through the end of December 2018 under then Arkansas Secretary of State Martin (*Id.*, ¶ 25). During her tenure as Deputy Secretary of State, Ms. Moody oversaw the Communications and Education Division of the Arkansas Secretary of State's office (*Id.*, ¶ 26). In that capacity, Ms. Moody oversaw publications about the Arkansas State Capitol put out by the Arkansas Secretary of State, including "A Walk on the Hill" and "Through These Doors." (*Id.*, ¶ 27).

The pamphlet published by the Secretary of State's office entitled "A Walk on the Hill: A self-guided tour of the Arkansas State Capitol grounds and monuments," purports to contain both a listing of the monuments that are located on the State Capitol grounds and a picture and description of each of those monuments (Dkt. No. 266, ¶ 28).[18] Since 2018 through May 8, 2023,

---

[18] Secretary Jester disputes this statement (Dkt. No. 286, ¶ 28), but he provides no cite to record evidence in support of his denial. The statement is deemed admitted; the record evidence

the date of summary judgment briefing closing in this case (*see* Dkt. No. 242), each version of this pamphlet has listed and displayed all of the monuments constructed before 2017 (Dkt. No. 286, ¶ 29).  The online publication entitled "A Walk on the Hill" is revised when it needs to be revised, so that if anything changes on the grounds, the pamphlet is updated to show what is on the capitol grounds (Dkt. No. 266, ¶ 30).[19]  As of the date of Ms. Moody's deposition in June 2019, the most recent revision to this publication was in February 2019 (Dkt. No. 286, ¶ 31).  The Ten Commandments Monument was dedicated in April 2018 (*Id*.).  Through May 8, 2023, the date of summary judgment briefing closing in this case (Dkt. No. 242), the Secretary of State's office publication "A Walk on the Hill" did not include—and never had included—the Ten Commandments Monument either in the list of monuments that appear on the State Capitol grounds or in the pictures and descriptions of each of those monuments (Dkt. No. 266, ¶ 32).[20]

### D.    Capitol Arts And Grounds Commission

The Capitol Arts and Grounds Commission ("the Capitol Commission") is charged with the duty to review and recommend to the Secretary of State the location of monuments, memorials, fountains, and similar improvements on the State Capitol grounds (Dkt. No. 286, ¶ 33).

The Secretary of State or the Secretary's designee serves as Chair of the Capitol Commission (*Id*., ¶ 34).  If a proposed monument would be located on the Capitol Grounds, it falls within the jurisdiction of the Capitol Commission (*Id*., ¶ 35).  The Capitol Commission has a multi-

---

cited by Cave plaintiffs supports the statement.  *See* Dkt. No. 260-55, at 17-21; 266-6, at 40–44, 61–65).

[19] The statement is deemed admitted; the record evidence supports the statement.  *See* Dkt. No. 266-6.  As to Secretary Jester's assertion of additional facts (Dkt. No. 286, ¶ 30), the record speaks for itself.  Secretary Jester's attempt at summarizing the testimony is not consistent with the record; the Court relies on the record evidence.

[20] Secretary Jester disputes this statement (Dkt. No. 286, ¶ 32), but he provides no cite to record evidence in support of his denial.  The statement is deemed admitted; the record evidence cited by Cave plaintiffs supports the statement.  *See* Dkt. No. 266-6.

step application and hearing process for considering requests to place monuments on the State Capitol grounds (*Id.*, ¶ 36). In considering the location of proposed monuments, the Capitol Commission relies on the Capitol Master Plan Monument Site Plan. That plan displays the sites of all existing monuments on the State Capitol grounds and pre-selected sites for future monuments (*Id.*, ¶ 37). In total, there are approximately 23 monument sites on the Capitol Master Plan Monument Site Plan; of those, there are only a very limited number of sites remaining (*Id.*, ¶ 38).

An applicant requesting to place a monument on the Capitol Grounds may select from one of the remaining pre-approved sites (Dkt. No. 286, ¶ 39).[21] In considering an application for a proposed monument, the Capitol Commission has total discretion to select the location of the proposed monument, some discretion over design, and discretion to ensure that the appearance of the monument fits within the Capitol (*Id.*, ¶ 40).[22] Although the Capitol Commission has the power and duty to recommend the location of a particular monument to the Secretary of State, the Secretary retains the discretion not to accept that recommendation (Dkt. No. 286, ¶ 41). Once a monument is installed on the State Capitol grounds, the monument becomes part of the Capitol for perpetuity, and the State assumes responsibility for the maintenance, repairs, and cleaning of the monument (Dkt. No. 286, ¶ 42).[23] Costs of maintaining the monument are paid out of the Capitol Grounds Monument and Memorial Preservation Fund, which is funded by the private donors of the monuments (*Id.*).[24]

---

[21] The record evidence supports the statement. *See* Dkt. No. 260-24.
[22] The record evidence supports the statement. *See* Dkt. No. 260-24.
[23] The record evidence supports the statement. *See* Dkt. No. 260-24.
[24] The record evidence supports the statement. *See* Dkt. No. 260-24.

### E.    Ten Commandments Monument Display Act

Former State Senator Jason Rapert (hereinafter "Senator Rapert") was the primary sponsor of the bill that became the Display Act (Dkt. No. 286, ¶ 43).[25]  Senator Rapert served in the Arkansas State Senate from 2010 to 2022 (*Id.*, ¶ 113).

The original bill introduced by Senator Rapert in the Arkansas Legislature contained the following legislative findings:

LEGISLATIVE FINDINGS.  The General Assembly finds that:

(1)    The Ten Commandments, found in the Bible at Exodus 20:1-17 and Deuteronomy 5:6-21, are an important component of the moral foundation of the laws and legal system of the United States of America and of the State of Arkansas;

(2)    The courts of the United States of America and of various states frequently cite the Ten Commandments in published decisions;

(3)    The Ten Commandments represent a philosophy of government held by many of the founders of this nation and by many Arkansans and other Americans today, that God has ordained civil government and has delegated limited authority to civil government, that God has limited the authority of civil government, and that God has endowed people with certain unalienable rights, including life, liberty, and the pursuit of happiness;

(4)    In order that they may understand and appreciate the basic principles of the American system of government, the people of the United States of America and of the State of Arkansas need to identify the Ten Commandments, one of many sources, as influencing the development of what has become modern law; and

(5)    The placing of a monument to the Ten Commandments on the grounds of the Arkansas State Capitol would help the people of the United States and of the State of Arkansas to know the Ten Commandments as the moral foundation of the law.

(Dkt. No. 286, ¶ 44).[26]  These legislative findings are not part of the Display Act that was codified into law (*Id.*, ¶ 45).

---

[25]    Senator    Rapert    officially    left    office    in    January    2023.    *See* https://www.arkleg.state.ar.us/Legislators (last checked March 31, 2026).

[26]  The record evidence supports the statement.  *See* Dkt. No. 266-8.

After the bill was passed by the Arkansas Senate, it went to the Arkansas House of Representatives for consideration; then-Representative Kim Hammer was the primary sponsor for the legislation in the House of Representatives (*Id.*, ¶ 46).  In addition to being a State Representative, Mr. Hammer has been a chaplain with hospice and a pastor of a church (*Id.*, ¶ 47).[27]  After the bill was passed by both chambers of the Arkansas Legislature, former Governor Asa Hutchison signed it into law in April 2015 (*Id.*, ¶ 48).  Other than the absence of the legislative findings, the final bill signed into law is identical to the bill introduced by Senator Rapert (*Id.*, ¶ 49).[28]

As codified, the Display Act specifies the precise text of the Ten Commandments that is to appear on the Ten Commandments Monument placed on the State Capitol grounds.  That text reads as follows:

"The Ten Commandments

I AM the LORD thy God.

Thou shalt have no other gods before me.

Thou shalt not make to thyself any graven images.

Thou shalt not take the Name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

---

[27]  The record evidence supports the statement.  *See* Dkt. No. 266-8.
[28]  The record evidence supports the statement.  *See* Dkt. No. 266-8.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's."

(*Id.*, ¶ 51).  *See* Ark. Code Ann. § 22-3-221.

Other than the text of the Ten Commandments, the Display Act does not specify any other language that must appear on the face of the monument (*Id.*, ¶ 52).  Nothing in the Display Act requires that the State of Arkansas provide any explanation about the purpose of the Ten Commandments Monument or the manner in which the Ten Commandments provide the basic principles of the American system of government, although the legislative findings in the enacted Display Act include a finding that the Ten Commandments are one of many sources influencing the development of what has become modern law (Dkt. Nos. 266, ¶ 53; 287, ¶ 8).

According to Senator Rapert, the primary sponsor of the legislation that became the Display Act, the "God" that is in the prescribed text of the Ten Commandments that appears on the Ten Commandments Monument is the God of the Old Testament who appeared and spoke to Moses as described in the Old Testament Book of Exodus (Dkt. No. 286, ¶ 54).[29]  According to Senator Rapert, the primary sponsor of the legislation that became the Display Act, the word "commandment" is synonymous with the word "order." (*Id.*, ¶ 55).[30]

### F.    Approval Of The Ten Commandments Monument

Under the Display Act, the Secretary of State was required to permit and arrange for the placement of a Ten Commandments Monument on the State Capitol grounds (*Id.*, ¶ 56).  Pursuant to the Display Act, on March 10, 2016, Mr. Boyd, Chief Deputy Secretary of State, contacted

---

[29]  The record evidence supports the statement.  *See* Dkt. No. 266-8.
[30]  The record evidence supports the statement.  *See* Dkt. No. 266-8.

Senator Rapert and transmitted the documents "necessary for submitting your request to the []Commission." (*Id*., ¶ 57).

The American History and Heritage Foundation ("Foundation") submitted the preliminary application request for the Ten Commandments Monument to the Arkansas Secretary of State in early August 2016 (*Id*., ¶ 58).  In its application, the Foundation represented that it "has already had the [Ten Commandments M]onument in question prepared for installation pending approval by the Secretary of State." (*Id*., ¶ 59).[31]  Because the Display Act specified the text to be used for the Ten Commandments, the Capitol Commission had no discretion to alter those words (*Id*., ¶ 60).  Because the Display Act did not specify the precise location for the Ten Commandments Monument, the Capitol Commission retained discretion with regard to what location could be selected among the pre-approved sites shown on the Capitol Master Plan Monument Site Plan (*Id*., ¶ 61).

Representatives from the Foundation initially sought to place the Ten Commandments Monument in front of the Capitol (*Id*., ¶ 62).[32]  The Arts and Grounds Commission Subcommittee rejected that request (*Id*.).  The Foundation's application requested one of two locations on the Master Plan Monument Site Plan (*Id*.).  Because the site the Foundation preferred no longer existed, the Arts and Grounds Commission Subcommittee[33] selected a different location (*Id*.).  The

---

[31]  The record evidence supports the statement.  *See* Dkt. No. 266-8.

[32]  The record evidence supports the statements in paragraph 62.  *See* Dkt. Nos. 260-24; 260-30; 260-31; 266-8.

[33]  The Court understands the "Capitol Commission subcommittee" to refer to the Arkansas Capitol Arts and Grounds Commission subcommittees.  Secretary Jester includes in the record evidence transcripts of certain meetings of the Review Subcommittee of the Arts and Grounds Commission (Dkt. Nos. 260-31; 260-32; 260-33; 260-34; 260-35; 260-36; 260-38; 260-39; 260-40).  The Court determines that this record evidence could be presented at trial in an admissible form.  *See* Fed. R. Civ. P. 56(c)(2).  In its analysis in this Opinion and Order, the Court refers to the "Arts and Grounds Commission Subcommittee."

Arts and Grounds Commission Subcommittee never considered placing the monument at any other location (*Id.*).  The Capitol Commission also retained discretion regarding the color and probably other parts of the design of the Ten Commandments Monument (*Id.*, ¶ 63).  The proposed design of the Ten Commandments Monument submitted by the Foundation is the same as the monument that was installed on the State Capitol grounds (*Id.*, ¶ 64).  Mr. Boyd could not recall the Capitol Commission proposing any changes to the design of the Ten Commandments Monument, proposing that any of the designs be removed, proposing that any designs be added, or that any additional text be added to the monument (*Id.*, ¶ 65).  Mr. Boyd became aware during the Arts and Grounds Commission Subcommittee meeting process to approve the Ten Commandments Monument that the Monument had already been constructed (*Id.*, ¶ 66).[34]

Mr. Boyd understood from reading the Display Act that the Ten Commandments Monument would be placed on the State Capitol grounds in perpetuity (*Id.*, ¶ 67).  Once a permanent monument is erected on the State Capitol grounds, it becomes the property of the State of Arkansas, is listed under the State's insurance policy, and the State assumes the responsibility for its maintenance and upkeep (*Id.*, ¶ 68).

The Display Act provided the specific language of the "Ten Commandments" that was to appear on the monument (Dkt. No. 287, ¶ 7).  The legislative findings in the Display Act include a finding that the Ten Commandments are one of many sources influencing the development of what has become modern law (*Id.*, ¶ 8).[35]  The Ten Commandments are religious in nature; they

---

[34] The record evidence supports the statement.  *See* Dkt. No. 260-24.

[35] Orsi plaintiffs assert that there is no historical basis for the statement that the Ten Commandments are one of many sources influencing the development of what has become modern law (Dkt. No. 255, ¶ 9).  Secretary Jester disputes this (Dkt. No. 287, ¶ 9).  To the extent a factual finding on this issue is necessary to resolve this dispute, the Court addresses it in the legal analysis section of this Opinion and Order.

are a sacred text in the Jewish and Christian faiths (*Id.*, ¶ 10). Different religions state the "Ten Commandments" differently (*Id.*, ¶ 11). In particular, there are different versions recognized by Jews, Roman Catholics, and most Protestant denominations (*Id.*).[36] The wording selected by the General Assembly is a combination of various religious versions of the Ten Commandments (*Id.*, ¶ 12).[37] As a result of the attempt to accommodate various religious versions of the Ten Commandments, the Ten Commandments Monument actually contains 11 separate commands (*Id.*, ¶ 13).[38]

A monument containing the wording prescribed by the General Assembly was proposed by the Foundation (*Id.*, ¶ 24). During the same time period, other monuments were suggested (*Id.*, ¶ 25). Formal proposals for three additional monuments were made (*Id.*). Less thorough proposals were made for other monuments (*Id.*). Among the three formal proposals were the Gold Star Families monument, the Satanic Temple's Baphomet monument, and the Saline Atheist and Skeptic Society's Wall of Separation acknowledging the separation of church and state (*Id.*, ¶ 26).

The Foundation was formed after the statute prescribing the monument was passed in 2015 (Dkt. No. 255, ¶ 27).[39] The Foundation had not performed any charitable or eleemosynary function before it became involved in raising funds for the monument (*Id.*, ¶ 28).[40]

---

[36] Secretary Jester disputes this statement (Dkt. No. 287, ¶ 11). Secretary Jester provides no cite to record evidence in support of his denial, and his objection is nonresponsive to the statement. The statement is deemed admitted.

[37] Secretary Jester disputes this statement (Dkt. No. 287, ¶ 12), but Secretary Jester's objection is nonresponsive to the statement. The statement is deemed admitted.

[38] Secretary Jester disputes this statement (Dkt. No. 287, ¶ 13), but he provides no cite to record evidence in support of his denial. The statement is deemed admitted; the record evidence supports the statement. *See* Dkt. No. 260-24.

[39] The record evidence supports the statement. *See* Dkt. No. 266-8, at 50, Dep. 92:14-19.

[40] Secretary Jester disputes this statement (Dkt. No. 287, ¶ 28), but he provides no cite to record evidence in support of his denial. The statement is deemed admitted; the record evidence supports the statement. *See* Dkt. No. 266-8.

Senator Rapert has made other public statements acknowledging the religious nature of the monument, including a guest editorial for the *Arkansas Democrat-Gazette* in which he stated in what he claims was his personal capacity, "I am guilty as charged for supporting the Ten Commandments and write today to take full responsibility for being so bold as to believe that our state and our nation would be better off if people simply honored, followed and adhered to the Ten Commandments given by God Himself to Moses on Mount Sinai." (*Id.*, ¶ 29).[41]

### G.   Installation Of The First Ten Commandments Monument

The application request for the Ten Commandments Monument submitted by the Foundation described the monument to include an upright tablet 44" wide, 8" thick, 76" tall, and a base 56" long, 14" wide and 6" thick, and weighing approximately 6,000 pounds (Dkt. No. 286, ¶ 69).

The first Ten Commandments Monument was installed on June 27, 2017 (Dkt. Nos. 286, ¶ 70; 288, ¶ 4).   After the installation, Senator Rapert was filmed in front of the Ten Commandments Monument with Scott Stewart, the Pastor of Agape Church, in a video that later was posted on YouTube (Dkt. No. 286, ¶ 71).

The first Ten Commandments Monument was destroyed within 24 hours (Dkt. Nos. 286, ¶ 105; 287, ¶ 31).  Less than 24 hours after the first Ten Commandments Monument was installed, an individual used his vehicle to destroy it (Dkt. No. 286, ¶¶ 73, 105).

### H.   Ceremony For The Second Ten Commandments Monument

The second Ten Commandments Monument has the same size, weight, and dimensions as the first Ten Commandments Monument (Dkt. No. 286, ¶ 74).  On April 26, 2018, a second Ten Commandments Monument was placed; the placement included barriers to prevent intentional

---

[41] The record evidence cited by the parties supports the statement.  *See* 254-1, at 17.

destruction (Dkt. No. 287, ¶ 32). On April 26, 2018, the second Ten Commandments Monument was dedicated at a ceremony ("the Ceremony") (Dkt. Nos. 261, ¶ 31; 286, ¶ 75; 287, ¶ 32). Both supporters and protestors appeared (Dkt. No. 255, ¶ 33). At least one of the Orsi plaintiffs, one of the Orsi plaintiffs' counsel, and one of the Intervenor plaintiffs were present at the protest (*Id.*).

The Secretary of State's office provided a podium and microphone for the Ceremony dedicating the Ten Commandments Monument (Dkt. No. 286, ¶ 76). Senator Rapert contacted the Secretary of State's office and asked that former Secretary Martin appear at the Ceremony (*Id.*, ¶ 77). As Deputy Secretary of State, Ms. Moody was present at the Ceremony as the Secretary of State's representative (*Id.*, ¶ 78).[42] In one photograph of the Ceremony, Ms. Moody stood at the front near the podium and facing the audience who attended; in another photograph, Ms. Moody stood on the "far left" side of the podium facing Senator Rapert (*Id.*, ¶ 79).[43] Ms. Moody stood next to members of the pastoral team from Agape Church, including Pastor Scott Stewart, during part of the Ceremony; Ms. Moody did not know Pastor Stewart at the time (*Id.*, ¶ 80).[44] Representatives Hammer and Jim Dotson also stood at the front near the podium at the Ceremony for the Ten Commandments Monument (*Id.*, ¶ 81).[45] Several individuals associated with the Arkansas Family Council also stood at the front near the podium next to the Ten Commandments Monument (*Id.*, ¶ 82).[46]

---

[42] The record evidence cited by the parties supports this statement. *See* Dkt. No. 266-6, at 16, Dep. 60:17–18; 20, Dep 65:16–17; 22–23, Dep. 68:24–69:5.

[43] The record evidence cited by the parties supports this statement. *See* Dkt. No. 266-6, at 98.

[44] The record evidence supports these statements. *See* Dkt. Nos. 266-6, at 30-31, Dep. 79:10–80:5; 266-6, at 98.

[45] The record evidence cited by the parties supports this statement. *See* Dkt. Nos. 266-6, at 26, 98–99; 266-8, at 65, Dep. 126:20–127:19; 67, Dep. 128:1–4.

[46] The record evidence cited by the parties supports this statement. *See* Dkt. No. 260-63.

The Arkansas Family Council's stated mission is to "promote, protect, and strengthen traditional family values found and reflected in the Bible by impacting public opinion and public policy in Arkansas." (*Id*., ¶ 83). See https://familycouncil.org/?page_id=13 (last accessed March 30, 2026).[47]

Ms. Moody was present at the Ceremony as a representative of the Secretary of State's office; Ms. Moody shook Senator Rapert's hand at the podium (*Id*., ¶ 84).[48] After the Ceremony, Ms. Moody had her photograph taken with the Agape Church pastoral team (*Id*., at 85).[49]

## I.     Initial Fundraising For The Ten Commandments Monument

On July 8, 2015, three months after former Governor Hutchison signed the Display Act into law, Senator Rapert posted on his Twitter page ("Sen. Jason Rapert @jasonrapert"), "[i]f you would like to donate to the Ark. Ten Commandments Monument project, please email senator.jason.rapert@gmail.com." (*Id*., ¶ 87). On February 17, 2016, Senator Rapert created a GoFundMe page on the internet on behalf of the Foundation to raise money for the Ten Commandments Monument (*Id*., ¶ 88). The Foundation was the primary private entity that assumed financial responsibility for raising the money for the Ten Commandments Monument (*Id*., ¶ 89).

On February 17, 2016, Senator Rapert posted on his Twitter page ("Sen. Jason Rapert @jasonrapert"), "I'm raising money for Ten Commandments Monument," with a link to

---

[47] Secretary Jester disputes this statement (Dkt. No. 286, ¶ 83), but he provides no cite to record evidence in support of his denial. The statement is deemed admitted; the record evidence supports the statement.

[48] The record evidence cited by the parties supports this statement. *See* Dkt. No. 266-6, at 28, Dep. 77:12–16.

[49] The record evidence cited by the parties supports this statement. *See* Dkt. Nos. 266-6, at 29–30, Dep. 78:8–10; 79:10–23; 100–101; 260-63.

GoFundMe page he created (*Id.*, ¶ 90). On February 29, 2016, Senator Rapert announced that the Ten Commandments Monument was funded, and the page on GoFundMe.com reflected that a total of $18,280.00 had been donated (*Id.*, ¶ 91).[50]

From the list of donors and the amounts of their donations shown on GoFundMe.com, it appears that of the $18,280.00, $12,600.00 (roughly 69%) was donated by Agape Church in Little Rock and its Executive Administrator John "Randy" Williamson (*Id.*, ¶ 92).[51]

### J.    PureFlix Entertainment Donation Ceremony

On July 6, 2017, an event was held at the Rotunda of the Arkansas State Capitol at which time the executive producers of the "God's Not Dead" film series and PureFlix Entertainment presented a check for $25,000.00 to the Foundation for the reconstruction of the Ten Commandments Monument (*Id.*, ¶ 93).[52] PureFlix Entertainment described itself as "a Christian movie studio" whose vision is "to influence the global culture for Christ through media" and whose mission is to "to strive to make a difference for His name." (*Id.*, ¶ 94).[53]

---

[50] Secretary Jester disputes this statement (Dkt. No. 286, ¶ 91), but he provides no cite to record evidence in support of his denial. The statement is deemed admitted; the record evidence supports the statement. *See* Dkt. No. 266-11. To the extent Secretary Jester objects to the record evidence, the Court overrules his objection based on the controlling legal standard at this stage of the proceeding. Fed. R. Civ. P. 56(c)(2).

[51] Secretary Jester disputes this statement (Dkt. No. 286, ¶ 92), but he provides no cite to record evidence in support of his denial. The statement is deemed admitted; the record evidence supports the statement. *See* Dkt. No. 266-12. To the extent Secretary Jester objects to the record evidence, the Court overrules his objection based on the controlling legal standard at this stage of the proceeding. Fed. R. Civ. P. 56(c)(2).

[52] The record evidence cited by the parties supports this statement. *See* Dkt. Nos. 266-6, at 15, Dep. 57:18–21; 266-8, at 54–55, Dep. 104:20–105:19, 106:6-9.

[53] Secretary Jester disputes this statement (Dkt. No. 286, ¶ 94), but he provides no cite to record evidence in support of his denial. The statement is deemed admitted; the record evidence supports the statement. *See* Dkt. No. 266-13. To the extent Secretary Jester objects to the record evidence, the Court overrules his objection based on the controlling legal standard at this stage of the proceeding. Fed. R. Civ. P. 56(c)(2).

If someone wants to hold a press conference inside the Arkansas State Capitol building and needs equipment from the Secretary of State's office, such as a podium or microphone, then they need to contact the Secretary's Event Coordinator (*Id.*, ¶ 95).  Consistent with that practice, in advance of the July 6, 2017, event, Senator Rapert requested that the Secretary of State's office provide a podium, a PA system, and chairs.  The Secretary's Event Coordinator, in turn, arranged for a podium to be provided (*Id.*, ¶ 96).  The podium provided by the Secretary of State's office for this event shows the Seal of the State of Arkansas (*Id.*, ¶ 97).

The event was held in front of a portrait of former Governor Mike Huckabee (*Id.*, ¶ 98).  In addition to representatives from PureFlix, State Senators Rapert and Gary Stubblefield and Representatives Hammer, Jack Fortner, and Bob Ballinger all stood at the front of the event to accept the check from PureFlix; other members of the Arkansas General Assembly also were in attendance (*Id.*, ¶ 99).

### K.      Opposition To The Ten Commandments Monument

The headline of an *Arkansas Democrat-Gazette* article when the Display Act was passed was "Bill Passes to display holy rules at Capitol." (Dkt. No. 287, ¶ 14).  Objections to the placement of the Ten Commandments Monument—as well as statements in support of the monument—were voiced at public hearings (*Id.*, ¶ 15).  At the hearings, one packet of over three hundred letters in support of the monument, all identical except for the signature, were presented to former Secretary Thurston (*Id.*, ¶ 16).[54]  The form letter signed by the three hundred supporters all contained language evincing an understanding of the religious nature of the monument (*Id.*, ¶ 17).[55]

---

[54]  The record evidence supports this statement.  *See* Dkt. No. 260-24, at 168-70.
[55]  The record evidence supports this statement.  *See* Dkt. Nos. 254-1, at 293; 260-24, at 168-70.

There was some objection to the symbolism on the monument, such as the all-seeing eye (*Id*., ¶ 18). Objections to—as well as statements in support of—the placement of the monument were also sent to the Secretary of State (*Id*., ¶ 19).

There was publicity in the media both for and against the monument between 2016 and 2017 (*Id*., ¶ 23).

When the Arkansas General Assembly considered the bill that became the Display Act some legislators voted against the measure (Dkt. No. 286, ¶ 100).[56] While the Ten Commandments Monument was being considered by the Arts and Grounds Commission Subcommittee, the Secretary of State received a fair amount of mail about the monument, including mail from people who were opposed to the monument (*Id*., ¶ 101). At the public hearings held by the Arts and Grounds Commission Subcommittee, people spoke both for and against the monument (*Id*., ¶ 102). At one meeting held in December 2016, of the 31 people who spoke about the Ten Commandments Monument, 17 people spoke in favor of the monument and 14 people spoke against it (*Id*.). During the time that the Arts and Grounds Commission Subcommittee was considering the Ten Commandments Monument, certain groups threatened litigation if the monument was erected (*Id*., ¶ 103). During the State's deliberative process, citizens wrote letters to the editors of various newspapers speaking out against having a Ten Commandments Monument at the State Capitol, and certain newspapers wrote editorials against having a Ten Commandments Monument placed on the State Capitol grounds (*Id*., ¶ 104).

Senator Rapert and his family received personal threats arising from his sponsorship of the Ten Commandments Monument, some of which he took to law enforcement (*Id*., ¶ 106). Mr.

---

[56] The record evidence cited by the parties supports this statement. *See* Dkt. No. 266-8, at 43–44, Dep. 80:23–81:13.

Boyd received certain emails from individuals about the Ten Commandments Monument that concerned him enough that he contacted the Capitol State Police (*Id*., ¶ 107).[57]

Despite this public opposition to the Ten Commandments Monument, Mr. Boyd is not aware whether anyone in either the Governor's Office or the Office of the Secretary of State questioned whether the Ten Commandments Monument should be placed at the State Capitol (*Id*., ¶ 108).[58]  Mr. Boyd does not recall any member of the Arts and Grounds Commission Subcommittee in a meeting raising a question as to whether there should be a Ten Commandments Monument on the State Capitol grounds (*Id*., ¶ 109).[59]

Mr. Boyd established a hotline for members of the public to call to give comments on the Baphomet monument, the Saline Atheists and Skeptics Society monument, the Gold Star Families monument, and the Ten Commandments Monument (*Id*., ¶ 110).[60]  The hotline was established before the first Ten Commandments Monument was erected and stayed open through June 2017 (*Id*.).  There were so many telephone calls about the Ten Commandments Monument that Mr. Boyd was concerned that the Secretary of State's office could lose control of people's comments (Dkt. Nos. 287, ¶ 20; 288, ¶ 10).  According to records maintained by the Secretary of State's office, 157 people called the hotline to comment in favor of the Ten Commandments Monument and 68 spoke against the monument (Dkt. No. 286, ¶ 111).

---

[57] The record evidence cited by the parties supports this statement.  *See* Dkt. Nos. 266-7, at 41–42, Dep. 121:16–122:23; 266-7, at 60–62.

[58] The record evidence cited by the parties supports this statement.  *See* Dkt. No. 266-7, at 43–44, Dep. 123:20–124:7.

[59] The record evidence cited by the parties supports this statement.  Dkt. No. 266-7, at 44–45, Dep. 124:23–125:2.

[60] The record evidence cited by the parties supports this statement.  Dkt. No. 266-7, at 46–47, Dep. 130:23–131:2.

Mr. Boyd listened to the comments and created a spreadsheet about the comments (Dkt. No. 287, ¶ 20). Mr. Boyd documented roughly 823 calls. Some callers expressed multiple opinions, all of which were documented (*Id.*, ¶ 21). Of all the callers, one referenced the Code of Hammurabi, but otherwise nobody stated a need for a monument to the law (*Id.*, ¶ 22).[61]

### L.    Senator Rapert's Background And Public Statements Regarding The Display Act

The Arkansas State Legislature Member Profile webpage for Senator Rapert listed his occupation as "Rapert Financial & Associates, Inc.," listed his mailing address and listed his phone number (Dkt. No. 286, ¶ 114). Senator Rapert created a separate website when he ran for reelection in 2018 (*Id.*, ¶ 115). On the page of that website listing the ways in which people could donate to Senator Rapert's campaign, the mailing address was shown as Jason Rapert for Senate but matched the mailing address for his business (*Id.*). Senator Rapert also is an ordained minister (*Id.*, ¶ 116). Senator Rapert and his wife founded a group called Holy Ghost Ministries in which they do evangelical and missionary work (*Id.*, ¶ 117). The Holy Ghost Ministries' website, on the page designated "Donate," shows the same mailing address as the mailing address for Senator Rapert's business and for Jason Rapert for Senate (*Id.*, ¶ 118). The Holy Ghost Ministries' website, on the page designated "Contact Us," shows the same mailing address as the mailing address for Senator Rapert's business and for Jason Rapert for Senate but includes a phone number different from the business phone number (*Id.*, ¶ 119).

---

[61] Secretary Jester disputes this statement (Dkt. No. 287, ¶ 22), but he provides no cite to record evidence in support of his denial. The statement is deemed admitted; the record evidence supports the statement. *See* Dkt. No. 260-24, at 176.

Senator Rapert also is a financial advisor (Dkt. No. 266, ¶ 120).[62]  Senator Rapert was the Founder and President of Rapert Financial & Associates and, as of the date of his deposition, was still associated with the ongoing business (*Id.*, ¶ 121).[63]  On the biographical portion of the website for Rapert Financial & Associates, Senator Rapert identified himself, among other things, as "an elected state senator in the Arkansas Legislature." (Dkt. No. 286, ¶ 122).  The website for Rapert Financial & Associates showed a mailing address and phone number (*Id.*, ¶ 123).

Senator Rapert also is an officer and director of the Foundation, an Arkansas non-profit corporation (*Id.*, ¶ 124).  According to the records maintained by the Arkansas Secretary of State, the address for the Foundation is the same mailing address as Senator Rapert's business mailing address (*Id.*, ¶ 125).  The Foundation website, on the pages designated "about" and "donate" show pictures of Senator Rapert standing with the first Ten Commandments Monument installed on the grounds of the Arkansas State Capitol (*Id.*, ¶ 126).  The Foundation website, on the page designated "donate," shows the following address: American Heritage and History Foundation at the same mailing address as Senator Rapert's business mailing address (*Id.*, ¶ 127).[64]  The Foundation website, on the page designated contact, lists Jason Rapert as the Founder and President and shows a phone number and the email senator.jason.rapert@gmail.com (*Id.*, ¶ 128).

Senator Rapert also was the founder and president of the National Association of Christian Lawmakers, an organization that Senator Rapert made a name reservation for in November 2018

---

[62]  Secretary Jester disputes this statement (Dkt. No. 286, ¶ 120), but he provides no cite to record evidence in support of his denial.  The statement is deemed admitted; the record evidence supports the statement.  *See* Dkt. No. 266-8, at 5, Dep. 15.

[63]  Secretary Jester disputes this statement (Dkt. No. 286, ¶ 121), but he provides no cite to record evidence in support of his denial.  The statement is deemed admitted; the record evidence supports the statement.  *See* Dkt. No. 266-8, at 5, Dep. 15.

[64]  The record evidence cited by the parties supports this statement.  *See* Dkt. No. 266-8, at 3, Dep. 21.

and that was incorporated in April 2019 (*Id.*, ¶ 129).[65]    To announce the formation of this organization, Senator Rapert sent out a letter or email to all legislators serving in state legislatures all over the country (*Id.*, ¶ 130).   The letter was signed by "Sen. Jason Rapert, Arkansas State Senate," and the letter showed a mailing address, phone number and email address for Senator Rapert    that    matched    Senator    Rapert's    business    mailing    address    and senator.jason.rapert@gmail.com (*Id.*, ¶ 131).   In describing the organization, Senator Rapert said, "The concept is that we would debate and discuss issues and formulate model statutes, ordinances and resolutions based upon a biblical world view for introduction in cities, counties, states and nationally at the federal level. . . .   [I]t is important that Christian lawmakers come together to consider Biblical principles and how to better incorporate them into our society to honor God." (*Id.*, ¶ 132).   Senator Rapert stated, "I understand that this association will not be supported by every legislator or lawmaker in the country, but for those who understand the importance of protecting our Judeo-Christian history and heritage we invite you to help launch the organization as a charter member in 2019." (*Id.*, ¶ 133).

In July 2019, Senator Rapert created a GoFundMe page on the internet on behalf of the National Association of Christian Lawmakers (*Id.*, ¶ 134).   The "Background, Status and Leadership" portion of that initial page reads, in part, "the NACL is also in the process of applying for 501(c)(3) nonprofit tax exempt status from the IRS.   Until that tax exempt status is officially approved, Holy Ghost Ministries, Inc. (HGM) is serving as a FISCAL SPONSOR for the NACL while the organization is in the startup phase." (*Id.*, ¶ 135).   The same portion of the initial GoFundMe page concludes, "You may send correspondence through the U.S. postal service to both Holy Ghost Ministries, Inc. and the National Association of Christian Lawmakers, Inc. to:"

---

[65] The record evidence cited by the parties supports this statement.

28

with the same mailing address listed as Senator Rapert's business mailing address (*Id*., ¶ 136). "You can contact Senator Rapert directly by e-mail at: senator.jason.rapert@gmail.com." (*Id*.).

Senator Rapert has stated, "I am well known that I stand up for God and country and I take a stand for Judeo-Christian values in our country." (*Id*., ¶ 137).  On his Twitter account, Senator Rapert has repeatedly posted that "[n]o matter what the liberal revisionists may claim—they cannot ever erase America's JudeoChristian heritage.  We will never let it happen." (*Id*., ¶ 138).

In February 2015—one month before he introduced the Display Act in the Arkansas Legislature—Senator Rapert posted on his Twitter account, "To deny America was founded upon Judeo-Christian values is willful ignorance. #arleg #God #AppealtoHeaven." (*Id*., ¶ 139).[66]  The same post quoted from an 1864 book entitled, "The Christian Life and Character" that "[t]his is a Christian nation. . . . It is preeminently the land of the Bible, of the Christian Church, and of the Christian Sabbath." (*Id*.).

In March 2015–at roughly the same time he introduced the Display Act–Senator Rapert posted on his Twitter account, "[t]he late Sen Robert Byrd (D) wasn't afraid to honor the Judeo-Christian heritage of our nation. #AppealToHeaven." (*Id*., ¶ 140).  In an editorial that appeared in January 2017, Senator Rapert wrote in what he claims was his personal capacity "that our state and our nation would be better off if people simply honored, followed and adhered to the Ten Commandments given by God Himself to Moses on Mt. Sinai." (*Id*., ¶ 141).[67]  On June 17, 2017–ten days before the installation of the first Ten Commandments Monument—Senator Rapert

---

[66] The record evidence cited by the parties supports this statement.  *See* Dkt. No. 266-8, at 70.

[67] The record evidence cited by the parties supports the statement.  *See* Dkt. No. 254-1, at 17.

tweeted, "Thank god we have a clear record of our Judeo-Christian history. May the @ACLU @FFRF NEVER wipe it away. #ThanksgivingDay #Lincoln #arpx." (*Id.*, ¶ 142).

As of the time of Senator Rapert's deposition, Holy Ghost Ministries also had both a Facebook page and a Twitter account (*Id.*, ¶ 143). The Facebook page for Holy Ghost Ministries contained postings identifying Jason Rapert as "Sen. Jason Rapert." (*Id.*, ¶ 144).[68] Senator Rapert posted things on the Facebook account for Holy Ghost Ministries that he also posted on his personal Facebook account (*Id.*, ¶ 145).[69]

On Sunday, September 25, 2016, Senator Rapert's name appeared in an advertisement that was published in several national newspapers entitled "Declaration of Dependence Upon God and His Holy Bible." (*Id.*, ¶ 146). In 2018, Senator Rapert was interviewed by Charisma News. In that article, which appeared in July 2018, Senator Rapert was quoted as follows:

> When our state took a stand for the Ten Commandments in 2015, when we passed the strongest abortion prohibition in the country at the time in 2013, when our Secretary of State allowed me to have the Washington Cruiser(s) Flag hoisted and formally flown on Washington's birthday in 2015, when we passed strong pro-Israel legislation in 2017, and every other time our state takes a stand for something that honors God and the Bible, it definitely sends a signal to everyone in the spiritual realm that Arkansas seeks to honor God and invites his blessing.

(*Id.*, ¶ 147).

In August 2018, Intervenor plaintiffs temporarily brought a statute of Baphomet onto the Arkansas State Capitol grounds (*Id.*, ¶ 148). At that time—barely four months after he presided over the dedication ceremony for the second Ten Commandments Monument—Senator Rapert

---

[68] The record evidence supports the statement. *See* Dkt. No. 266-8, at 164.

[69] Secretary Jester disputes this statement (Dkt. No. 286, ¶ 145), but he provides no cite to record evidence in support of his denial. The statement is deemed admitted; the record evidence supports the statement. *See* Dkt. No. 266-8, at 69, Dep. 140.

stated, "It will be a very cold day in hell before an offensive statue will be forced upon us to be permanently erected on the grounds of the Arkansas State Capitol." (*Id.*).

### M.    Orsi Plaintiffs' Undisputed Statement Of Facts[70]

The only expert reports in this matter were the reports of Dr. Hall on behalf of Secretary Jester and Dr. Green on behalf of the Orsi Plaintiffs (Dkt. No. 287, ¶ 46). Ten Commandments monuments are a mid-twentieth century phenomenon (*Id.*, ¶ 49).[71] The Fraternal Order of the Eagles were involved in placing about 140-150 granite Ten Commandments monuments throughout the country (*Id.*, ¶ 51).[72] The Fraternal Order of the Eagles' specific wording and emblems appeared on the monuments (*Id.*). The Fraternal Order of the Eagles are a non-governmental association well-known for their charitable and eleemosynary activities (*Id.*, ¶ 52). During the founding period, one finds occasional references to the Ten Commandments or Mosaic law, most commonly in sermons where clergy drew parallels to Old Testament Israel (*Id.*, ¶ 56).

### N.    Intervenor Plaintiffs' Undisputed Facts

Between 2013 and 2015, Oklahoma State courts encountered a theocratic effort to endorse the Ten Commandments as the officially-preferred set of religious orders by emplacing it on Oklahoma State Capitol grounds (Dkt. No. 288, ¶ 1). The controversy culminated in an Oklahoma

---

[70] Orsi plaintiffs make several assertions in paragraphs 34 through 45 (Dkt. No. 255, ¶¶ 34-45). Secretary Jester disputes these assertions (Dkt. No. 287, ¶¶ 34-45). To the extent a factual finding on any of these assertions is necessary to resolve this dispute, the Court addresses the assertions in the legal analysis section of this Opinion and Order.

[71] Secretary Jester disputes this statement (Dkt. No. 287, ¶ 49), but the Court determines the record evidence cited by Orsi plaintiffs supports the statement. *See* Dkt. Nos. 254-1, at 422; 260-3, at 45–58.

[72] Orsi plaintiffs make several assertions in paragraphs 53 through 55 and portions of paragraph 56 through 58 (Dkt. No. 255, ¶¶ 53-58). Secretary Jester disputes these assertions (Dkt. No. 287, ¶¶ 53-58). To the extent a factual finding on any of these assertions is necessary to resolve this dispute, the Court addresses the assertions in the legal analysis section of this Opinion and Order.

31

Supreme Court order that the Ten Commandments monument shall be removed as an affront to the Oklahoma Constitution's analog to the Establishment Clause (*Id.*). *Prescott v. Okla. Capitol Pres. Comm'n*, 2015 OK 54, at ¶ 6, 373 P.3d 1032, 1034 (Okla. 2015) (per curiam).[73]

In response to the Oklahoma Ten Commandments monument controversy, TST created the Baphomet monument for inclusion on Oklahoma Capitol grounds (Dkt. No. 269, ¶ 2).[74] Baphomet is an occultic figure of religious import to TST (*Id.*). The figurehead is a reconciliation of opposites: simultaneously male and female, human and beast, angel and demon (*Id.*). The concept of Baphomet comes from the now-infamous inquisition against the Knights Templar, who were all tortured to death on trumped-up charges of heresy (*Id.*). To TST's membership, Baphomet represents both harmonic balance and serves as a memorial to the victims of demonization (*Id.*). TST's Baphomet monument refutes the self-asserted supremacy of the God of Abraham and retorts that governmental preference for Christianity has inevitably ended in outgroup demonization, promptly followed by outgroup persecution (*Id.*).[75]

The Display Act bill was enacted on April 7, 2015 (Dkt. No. 288, ¶ 3). The first Ten Commandments Monument was installed on June 27, 2017 (*Id.*, ¶ 4). After the installation of the

---

[73] The Display Act was part of the same lobbying effort that resulted in an identical Ten Commandments Monument being permanently affixed to the Oklahoma Capitol grounds. The Oklahoma statute and the Arkansas statute both designate Liberty Legal Institute as defense counsel. *See* Okl. St. Ann. tit. 74, § 4110(c); Ark. Code Ann. § 22-3-221(c). Further, both statutes rely on the United States Supreme Court case of *Van Orden v. Perry*, 545 U.S. 677 (2005); *see* Okl. St. Ann. tit. 74, § 4110(b); Ark. Code Ann. § 22-3-221(b). The Oklahoma Ten Commandments Monument was determined to violate the Oklahoma constitution, enjoined, and ordered removed. *See Prescott v. Oklahoma Capitol Preservation Commission*, 373 P.3d 1032 (Okla. July 27, 2015).

[74] Secretary Jester disputes this statement (Dkt. No. 288, ¶ 2), but the Court determines the record evidence cited by the parties supports the statement.

[75] Intervenor plaintiffs make several assertions in paragraph 2 that Secretary Thurston disputes (Dkt. No. 288, ¶ 2). To the extent a factual finding on any of these assertions is necessary to resolve this dispute, the Court addresses the assertions in the legal analysis section of this Opinion and Order. *See* Dkt. Nos. 260-41, at 36-37, Dep. 137-41; 260-43, at 3–10.

first Ten Commandments Monument, Senator Rapert was filmed in front of the Ten Commandments Monument with Pastor Stewart, of the Agape Church, in a video that later was posted on YouTube (*Id.*, ¶ 5). Agape Church donated significant financial contributions to the Ten Commandments Monument (*Id.*, ¶ 6).[76]

Meanwhile, with the Oklahoma Ten Commandments Monument no longer requiring a refutation, TST applied to emplace its Baphomet monument on Arkansas Capitol grounds (*Id.*, ¶ 7). The Arts and Grounds Commission Subcommittee reviewed the Baphomet monument and found it "sufficient" for advancement to the next phase of the process, structurally proper, of appropriate design, and that the materials fit within the Master Plan for the Arkansas Capitol grounds (*Id.*, ¶ 7).[77] After TST received the Arts and Grounds Commission Subcommittee's blessing, the next step was for a public comment period. Before the public comment period was had, Senator Rapert posted a video-recorded statement on his government-official Facebook page (*Id.*, ¶ 8). The statement explains that it is politically impossible for TST to obtain a favorable act in the General Assembly and assures his viewers, "[I]t will be a very cold, cold day in the pits of Hell before you ever see a statue from The Satanic Temple, or some other group like that, at the Arkansas Capitol." (*Id.*).[78]

---

[76] The record evidence supports this statement. *See* Dkt. No. 266-12. To the extent Secretary Jester objects to the record evidence, the Court overrules his objection based on the controlling legal standard at this stage of the proceeding. Fed. R. Civ. P. 56(c)(2).

[77] The record evidence cited by the parties supports this statement. *See* Dkt. No. 269-1, at 53–56, 212, 215).

[78] Secretary Jester disputes this statement (Dkt. No. 288, ¶ 8), but the Court determines the record evidence, including that cited by Intervenor plaintiffs, supports the statement. *See, e.g.,* Dkt. No. 269-1, at 127, 142, 165. To the extent Secretary Jester objects to the record evidence, the Court overrules his objection based on the controlling legal standard at this stage of the proceeding. Fed. R. Civ. P. 56(c)(2).

Two days later, Senator Rapert and State Representative Hammer ran the bill which would become Act 274 of 2017 ("Act 274") (*Id.*, ¶ 9).[79]  Act 274 modified the procedure to require an Act of the General Assembly as a condition precedent for the Arts and Grounds Commission Subcommittee to vet monument applications and make recommendations concerning them to the Secretary of State (*Id.*).[80]   Act  274 also included an "emergency clause," which put it into effect immediately upon enactment (*Id.*).[81]  It was enacted on February 22, 2017 (*Id.*).[82]  As a result, Act 274 precluded the public comment period for the Baphomet monument (*Id.*).[83]  For a period of time, the Secretary of State's office maintained a hotline for callers to voice their opinions about various monuments (*Id.*, ¶ 10).

Because of Act 274, Mr. Misicko issued requests to each of the members of the General Assembly (*Id.*, ¶ 11).  Ten members of the General Assembly responded (*Id.*).  None would support a bill to emplace the Baphomet monument (*Id.*).[84]

The Ten Commandments Monument was first emplaced on June 28, 2017 (Dkt. No. 288, ¶ 12).  There was no unveiling ceremony for the first Ten Commandments Monument (*Id.*).  This monument was promptly destroyed (*Id.*).  The second Ten Commandments Monument was erected

---

[79]  Act 274 amended Arkansas Code Annotated § 22-3-503(c).

[80]  The record evidence supports this statement.  *See* Dkt. No. 269-1, at 51–52, 212, 215.

[81]  The record evidence supports this statement.  *See* Dkt. No. 269-1, at 52.

[82]  The record evidence supports this statement.  *See* Dkt. No. 269-1, at 57.

[83]  The record evidence supports this statement.  *See* Dkt. No. 269-1, at 212, Dep. 18:6–17; 215, Dep. 21:15–25.

[84]  Secretary Jester disputes this statement (Dkt. No. 288, ¶ 11), but the Court determines the record evidence, including that cited by Intervenor plaintiffs, supports the statement.  *See* Dkt. No. 269-1, at 58-75.  To the extent Secretary Jester objects to the record evidence, the Court overrules his objection based on the controlling legal standard at this stage of the proceeding.  Fed. R. Civ. P. 56(c)(2).

on April 26, 2018 (*Id.*).  TST members Ms. Robbins and Mr. Hargett attended the unveiling ceremony (*Id.*).[85]

On August 16, 2018, TST held a rally for religious freedom at the Arkansas Capitol (*Id.*, ¶ 13).  In advance of the rally, several members of the public complained to the Arkansas State Police about TST's right to speak on these public grounds (*Id.*).[86]

During the pendency of this litigation, Senator Rapert has been vocal about the religious nature and purpose of the Ten Commandments Monument (*Id.*, ¶ 14).  Senator Rapert has encouraged voters to compel "all" to "honor the tenets of the Ten Commandments." (*Id.*).  Senator Rapert has complained about the federal judiciary's enforcement of the Establishment Clause, as attacks against "God's word." (*Id.*).  In Senator Rapert's sermons, he advocates for Christian "dominion and authority over everything in the Earth" through the political branches (*Id.*).[87]

### O.    Secretary Jester's Statement Of Facts

#### 1.    Standing

Ms. Cave and Ms. Piazza learned of the proposed Ten Commandments Monument in connection with news reports of the General Assembly's consideration of legislation authorizing it (Dkt. No. 283, ¶ 2).  Before that time, Ms. Cave and Ms. Piazza had no knowledge of the display because no Ten Commandments Monument existed at the State Capitol (*Id.*).  Ms. Cave and Ms.

---

[85] The record evidence supports this statement. *See* Dkt. No. 269-1, at 188-89, Dep. 67:12–68:5, 8–22; 199–200, Dep. 88:14–89:3.

[86] Secretary Jester disputes this statement (Dkt. No. 288, ¶ 13), but he provides no cite to record evidence in support of his denial.  The statement is deemed admitted; the record evidence supports the statement.

[87] Secretary Jester disputes this statement (Dkt. No. 288, ¶ 14), but he provides no cite to record evidence in support of his denial.  The statement is deemed admitted; the record evidence, including that cited by Intervenor plaintiffs, supports the statement.  To the extent Secretary Jester objects to the record evidence, the Court overrules his objection based on the controlling legal standard at this stage of the proceeding.  Fed. R. Civ. P. 56(c)(2).

Piazza each opposed the monument proposal, in part, because they believed it was inconsistent with the "separation of church and state"; their opposition also had other bases (Dkt. No. 261, ¶ 3; 283, ¶ 3).[88]  Ms. Cave and Ms. Piazza each wanted to see the Ten Commandments Monument, and each went to the monument for the purpose of seeing it (Dkt. No. 283, ¶ 4).

Ms. Orsi, Ms. Stewart, Rabbi Levy, and Ms. Gryder each learned of the proposed Ten Commandments Monument in connection with reports of the General Assembly's consideration of legislation authorizing it (Dkt. No. 279, ¶ 5).  Ms. Orsi, Ms. Stewart, Rabbi Levy, and Ms. Gryder each opposed the proposed monument, in part, because they believed it was inconsistent with the separation of church and state; their opposition also had other bases (*Id.*, ¶ 6).[89]  Ms. Orsi, Ms. Stewart, Rabbi Levy, and Ms. Gryder agree that some of their interactions with the Ten Commandments Monument were for the purpose of seeing it, but each also have had other interactions with the monument based on record evidence (Dkt. Nos. 261, ¶ 7; 279, ¶ 7).[90]  Ms. Stewart does not find the Ten Commandments themselves offensive or alienating, but she is offended by the Ten Commandments Monument at issue in this litigation because it is an expression of a particular type of religion (Dkt. No. 261, ¶ 8).[91]  Rabbi Levy opposed the Ten Commandments Monument (*Id.*, ¶ 9).[92]

Mr. Misicko is a resident of Somerville, Massachusetts (Dkt. No. 290, ¶ 11).  Mr. Misicko had no prelitigation visits to the Capitol grounds except in connection with the TST's efforts to oppose the Ten Commandments Monument (*Id.*).  He learned of the proposed Ten Commandments

---

[88]  This statement is supported by the record evidence.  *See* Dkt. Nos. 266-1, 266-2.

[89]  This statement is supported by the record evidence.  *See* Dkt. No. 254-1, at 394–267.

[90]  This statement is supported by the record evidence.  *See* Dkt. No. 254-1, at 451.

[91]  This statement is supported by the record evidence.  *See* Dkt. No. 260-59, at 9, Dep. 29.

[92]  This statement is supported by the record evidence.  *See* Dkt. No. 260-60, at 19-23, Dep. 72-88.

Monument while attending a conference in another state (*Id.*). Ms. Robbins learned of the proposed Ten Commandments Monument from news reports of the General Assembly's consideration of legislation authorizing it (*Id.*, ¶ 12). Mr. Misicko and Ms. Robbins each went to the monument for the purpose of seeing it (*Id.*).[93]

## 2.    Public Displays Of The Ten Commandments

The Court observes that many of the statements in this section are not well-taken as statements of fact,[94] are objectionable,[95] or are unsupported by the record evidence cited.

---

[93] This statement is supported by the record evidence. *See* Dkt. Nos. 260-51, at 9-10, Dep. 30-36; 260-64 (referencing Def.'s Ex. 49, the Ten Commandments Monument Installation Video).

[94] To the extent Secretary Jester's statements in paragraphs 13 and 14 rely on quotations or extrapolations from case law, these are not statements of fact supported by citation to materials in the record evidence (Dkt. No. 261, ¶¶ 13-14). *See* Fed. R. Civ. P. 56(c)(1). Further, Dr. Hall in his expert report does not rely on evidentiary material in the record to support his conclusions but rather relies on legal authority (Dkt. No. 260-3, ¶¶ 99, 101, 103, 104, 106). Cave and Orsi plaintiffs and Intervenor plaintiffs dispute these statements (Dkt. Nos. 279, ¶¶ 13-14; 283, ¶¶ 13-14; 290, ¶¶ 13-14). The citations to exhibits by Secretary Jester do not support his statement, as none depict the Ten Commandments Monument at issue in this litigation (Dkt. Nos. 260-4, 260-5, 260-7, 260-8, 260-9, 260-10, 260-11). To the extent a factual finding on any of these assertions is necessary to resolve this dispute, the Court addresses the assertions in the legal analysis section of this Opinion and Order.

[95] To the extent Secretary Jester's statements in paragraph 15 rely on quotations or extrapolations from case law, these are not statements of fact supported by citation to materials in the record evidence (Dkt. No. 261, ¶ 15). *See* Fed. R. Civ. P. 56(c)(1).

To the extent Secretary Jester's statements in paragraphs 15 and 16 rely on the declaration of Judge E.J. Ruegemer, Cave and Orsi plaintiffs and Intervenor plaintiffs object to the Court's consideration of the affidavit (Dkt. No. 261, ¶¶ 15, 16; *see* (Dkt. Nos. 279, ¶¶ 15-16; 283, ¶¶ 15-16; 290, ¶¶ 15-16)). The Court sustains the objections. The standard that guides the Court's consideration of evidence at the summary judgment stage of the proceeding is not whether the evidence would be admissible at trial—but "is whether it *could* be presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker,* 684 F.3d 785, 793 (8th Cir. 2012). Rule 56 of the Federal Rules of Civil Procedure permits a party to object to evidence cited by the other party at the summary judgment stage and requires the Court to determine whether the evidence could be presented at trial in an admissible form. *See* Fed. R. Civ. P. 56(c)(2).

Here, the declarant is deceased and is unavailable to testify at trial. The 20-year-old declaration of Judge Ruegemer contains personal recollections that he will not be available to testify to at trial, as well as out-of-court statements that are hearsay and do not fall within an exception to the hearsay rule. Secretary Jester is offering the statements to prove the truth of the matter asserted. Based on the Court's review, no exception under Federal Rule of Evidence 804

Arkansas has on public display four Heerwagen Murals, completed in 1914, over the grand staircases in the Capitol that portray the themes of "Education," "Justice," "War," and "Religion." (Dkt. Nos. 261, ¶ 17; 279, ¶ 17; 283, ¶ 17; 290, ¶ 17).[96] Dating from 1950, the Liberty Bell in the American Revolution Bicentennial contains an Old Testament quotation from Leviticus 25:10, "Proclaim liberty throughout all the land unto all the inhabitants thereof," and the travertine canopy facing the Capitol building displays the words "IN GOD WE TRUST." (Dkt. Nos. 261, ¶ 18; 279, ¶ 18; 283, ¶ 18; 290, ¶ 18).[97] Dating from 1958, the Arkansas Supreme Court Justice Building contains a wall sculpture, and "Moses, Daniel and Solomon" are in one of the "figures represent[ing] the development of the law throughout ancient history." (Dkt. No. 261, ¶ 19; 279, ¶ 19; 283, ¶ 19; 290, ¶ 19).[98] Dedicated on January 9, 1976, the Arkansas Supreme Court courtroom

---

applies, and Secretary Jester cites none. The statements in Judge Ruegemer's declaration are inadmissible hearsay, and the declaration cannot be relied upon to support Secretary Jester's motion for summary judgment. *See Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008) ("When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment.") (quoting *Brooks v. Tri–Systems, Inc.,* 425 F.3d 1109, 1111 (8th Cir. 2005)).

Secretary Jester attempts to utilize this inadmissible hearsay by offering Dr. Hall as an expert witness who purportedly has relied upon the inadmissible hearsay in formulating his opinion in this case as offered in his report. Pursuant to Federal Rule of Evidence 703, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Admission of the facts or data if otherwise inadmissible is subject to a Federal Rule of Evidence 403 analysis before the facts or data may be disclosed to the finder of fact. Fed. R. Evid. 703. Secretary Jester does not address or make argument regarding these evidentiary hurdles in response to the objections raised by the Cave and Orsi plaintiffs and Intervenor plaintiffs, including that the evidence is irrelevant given the great divide between the facts presented here and those opined on in the inadmissible declaration of Judge E.J. Ruegemer.

Here, in making findings of fact, the Court will give Dr. Hall's opinion, and the inadmissible hearsay evidence upon which he purports to rely in formulating his opinion, the weight the Court deems appropriate in the exercise of its sound and considerable discretion.

To the extent a factual finding on any of these assertions is necessary to resolve this dispute, the Court addresses the assertions in the legal analysis section of this Opinion and Order.

[96] This statement is supported by the record evidence. *See* Dkt. No. 260-23, at 34.

[97] This statement is supported by the record evidence. *See* Dkt. No. 260-22, at 1–7.

[98] This statement is supported by the record evidence. *See* Dkt. No. 260-12.

contains a large tapestry behind the Justices' bench displaying the wings of Shekinah, a visual allusion to God's protection, drawn from various passages in the Hebrew Bible (Dkt. Nos. 261, ¶ 19; 260-12).  Inside the Capitol building is a stained glass rendering of the Great Seal of the State of Arkansas, which includes, among other elements, Libertas, the Goddess of Liberty, standing in the clouds and encircled in stars and rays of light, as well as an angel of mercy (Dkt. No. 261, ¶ 21).

The Ten Commandments Monument is one of 17 monuments on Arkansas's Capitol grounds (*Id.*, ¶ 22).

### 3.    Ten Commandments Monument

The Ten Commandments Monument is a duplicate of the Ten Commandments monument placed on the Texas State Capitol grounds, except for the description of the donor (*Id.*, ¶ 24).[99]

No monument on the Capitol grounds, whether existing or potential, has to satisfy any requirements from the Capitol Zoning Commission (Dkt. Nos. 261, ¶ 26; 279, ¶ 26; 283, ¶ 26).[100]

The Ten Commandments Monument was not exempted from any requirements that the Baphomet monument had to meet (Dkt. No. 261, ¶ 27 (citing Dkt. Nos. 260-41, at 15–16; 260-24, at 178–81)).  In his deposition as TST's Federal Rule of Civil Procedure 30(b)(6) representative, Mr. Misicko could not identify any requirement that the Ten Commandments Monument was exempted from that the Baphomet monument had to meet (*Id.*, ¶ 28).[101]

---

[99]    The Court omits from this Opinion and Order Secretary Jester's initial statement in paragraph 23 because that is argument and not a statement of fact (Dkt. No. 261, ¶ 23).  The remainder of the statement is supported by the record evidence.  *See* Dkt. No. 260-33, at 9-10; Dep. 8-9.

[100]    The statement in paragraph 24 is supported by the record evidence.  *See* Dkt. No. 260-24, at 180-81.  The statement in paragraph 25 is not supported by the record evidence.  *See* Dkt. Nos. 283, ¶ 25; 290, ¶ 25.

[101]    Secretary Jester makes an assertion in paragraph 29 (Dkt. No. 261, ¶ 29); Cave plaintiffs and Intervenor plaintiffs object to this assertion (Dkt. Nos. 283, ¶ 29; 290, ¶ 29).  To the extent a

The Ten Commandments is sometimes used to symbolize law or moral conduct (Dkt. No. 261, ¶ 30).

### 4.      Monument Applications And Commission Proceedings

The Foundation submitted an application to the Arts and Grounds Commission Subcommittee concerning a Ten Commandments Monument on the Capitol grounds (*Id*., ¶ 32).[102] Applications to place a monument on the Capitol grounds were submitted by TST concerning the Baphomet monument and by the Marine Corp League and Arkansas Run for the Fallen concerning the Gold Star Families monument (Dkt. Nos. 261, ¶ 33; 279, ¶ 33; 283, ¶ 33; ¶ 290, ¶ 33).[103, 104]

### 5.      Act 274

In late 2015, there was increased interest in placing monuments on the few locations that remained in the Capitol Master Plan Monument Site Plan (Dkt. No. 261, ¶ 40).  Applications were submitted to place the Ten Commandments, Baphomet with Children, Gold Star Families, and Wall of Separation monuments, and other groups made inquiries proposing monuments honoring Martin Luther King, Jr. (*Id*.).[105]

---

factual finding on this assertion is necessary to resolve this dispute, the Court addresses the assertion in the legal analysis section of this Opinion and Order.

[102]   The statement is supported by the record evidence.  *See* Dkt. No. 260-27, at 6–8.

[103]   The statements in paragraphs 34 and 35 are not supported by the record evidence.  *See* Dkt. Nos. 279, ¶ 35; 283, ¶¶ 34-35; 290, ¶¶ 34-35.

[104]   The Court omits Secretary Jester's statements in paragraphs 36, 37, 38, and 39 (Dkt. No. 261, ¶¶ 36-39); the statements are not supported by citation to materials in the record as required by Federal Rule of Civil Procedure 56(c)(1).

[105]   The statement in paragraph 40 is supported by the record evidence (Dkt. No. 261, ¶ 40).  The Court omits Secretary Jester's statement in paragraph 41 (Dkt. No. 261, ¶ 41); that statement is not supported by citation to materials in the record as required by Fed. R. Civ. P. 56(c)(1).  The statements in paragraphs 42 are 43 not supported by the record evidence (Dkt. No. 261, ¶¶ 42-43); the statements are disputed by Orsi plaintiffs and Intervenor plaintiffs (Dkt. No. 279, ¶¶ 42-43; 290, ¶¶ 42-43).  Cave plaintiffs take no position, maintaining these assertions are not material to their dispute (Dkt. No. 283, ¶¶ 42-43).

## 6.    TST's Standing[106]

In the past, TST expressly sought to place the Baphomet monument where there was a preexisting Ten Commandments Monument (Dkt. No. 290, ¶ 48).  After a Ten Commandments monument was erected on the Oklahoma Capitol grounds, TST "meticulously contrived a legal argument for the inclusion of the Baphomet on the Oklahoma Capitol grounds" that it believed "paralleled the 10 Commandments' Bill in every way," (Dkt. No. 260-50, at 133), and applied to erect the Baphomet monument there (Dkt. No. 290, ¶ 49).  After the Oklahoma Supreme Court ordered the removal of the Oklahoma Ten Commandments monument on state-law grounds, *see Prescott*, 2015 OK 54, ¶ 6, 373 P.3d at 1034 (Okla. 2015), TST withdrew its request to place the Baphomet monument in Oklahoma (Dkt. No. 290, ¶ 50).[107]  The for-profit commercial enterprise United Federation of Churches, LLC, the fundraising nonprofit Reason Alliance, Ltd., the nonprofit The Satanic Temple, Inc., and another for-profit commercial enterprise, Cinephobia, LLC, are "all part of the larger—The Satanic Temple Organization." (*Id*., ¶ 52).[108]  Since at least

---

[106]  Cave plaintiffs and Orsi plaintiffs take no position on Secretary Jester's statements of fact in paragraph numbers 44 through 73 (Dkt. Nos. 279, at 17; 283, ¶¶ 44-73).  Accordingly, the Court will only discuss Intervenor plaintiffs' responses to these statements of fact.

The Court has removed Secretary Jester's statement in paragraph 44 (Dkt. No. 261, ¶ 44); the statement is objected to by Intervenor plaintiffs and is only supported by a newspaper article, which is inadmissible hearsay when offered to prove the truth of the matter asserted.  *Nooner v. Norris*, 594 F.3d 592, 603 (8th Cir. 2010) ("Newspaper articles are 'rank hearsay.'" (quoting *Miller v. Tony & Susan Alamo Found.*, 924 F.2d 143, 147 (8th Cir. 1991)).  The Court sustains Intervenor plaintiffs' objection (*see* Dkt. No. 290, ¶ 44).

The statement in paragraph 45 is not supported by the record evidence and is disputed (Dkt. No. 261, ¶ 45; *see* Dkt. No. 290, ¶ 45).

[107]  Intervenor plaintiffs dispute the statement of fact made by Secretary Jester in paragraph number 51 (Dkt. Nos. 261, ¶ 51; 290, ¶ 51).  In the prayer for relief in their Second Amended Complaint In Intervention, Intervenor plaintiffs seek an injunction to place Baphomet for the same period of time that the Ten Commandments Monument has been placed (*see* Dkt. No. 290, ¶ 51 (citing Dkt. No. 89, at 9)).  Accordingly, the Court has not included in the statement of undisputed facts Secretary Jester's statement in paragraph number 51.

[108]  Intervenor plaintiffs dispute the statement of fact made by Secretary Jester in paragraph number 53 because TST's corporate status is that of a public charity, so it contends that it has

August 2015, TST has not claimed that Satan or any supernatural being exists (*Id.*, ¶ 54).  Rather, TST claims belief in a "metaphorical Satanic construct," and "actively fights for . . . secular values." (*Id.*, ¶ 54 (citing Dkt. Nos. 260-42, at 38; 260-50, at 44–45, 164)).

Mr. Misicko and Ms. Robbins think of religion as a metaphorical narrative construct (Dkt. No. 290, ¶ 55).  The fictional world of Harry Potter is a metaphorical narrative construct (*Id*, ¶ 56).[109]  TST expects that members will disagree on a large number of important issues ranging "from politics to metaphysics." (*Id.*, ¶ 60).[110, 111, 112]

Ms. Robbins and Mr. Hargett joined TST by entering an email address to receive an email newsletter (*Id.*, ¶ 64).  Neither Ms. Robbins nor Mr. Hargett recalled having to affirm TST's tenets

---

oversight and accountability from the IRS, the attorneys general of the State, and the donating public (Dkt. No. 290, ¶ 53).  Accordingly, the Court has not included this paragraph in the statement of undisputed facts (Dkt. No. 261, ¶ 53).

[109] Secretary Jester makes assertions in paragraphs 57, 58, and 59 (Dkt. No. 261, ¶¶ 57-59); Intervenor plaintiffs object to these assertions (Dkt. No. 290, ¶¶ 57-59).  To the extent a factual finding on these assertions is necessary to resolve this dispute, the Court addresses these assertions in the legal analysis section of this Opinion and Order.

[110] The Court omits Secretary Jester's statement in paragraph 61 (Dkt No. 261, ¶ 61); the statement is not supported by citation to materials in the record as required by Federal Rule of Civil Procedure 56(c)(1).

[111] Intervenor plaintiffs dispute the statements of fact made by Secretary Jester in paragraph 62 because TST's canonical works included the "Seven Tenets," Paradise Lost, and Revolt of the Angels (Dkt. No. 290, ¶ 62 (citing Dkt. No. 260-41, at 58–59)).  Accordingly, the Court has not included paragraph 62 in the statement of undisputed facts (Dkt. No. 261, ¶ 62).

[112] Intervenor plaintiffs dispute the statement of fact made by Secretary Jester in paragraph 63 because TST did not require any payment or an email to become a member of TST (Dkt. No. 290, ¶ 63 (citing Dkt. No. 260-51, at 15–16)).  Additionally, the Court notes that the article referenced by Secretary Jester in support of the proposition in paragraph 63 describes TST's plans to erect a monument in Oklahoma and was published on February 4, 2014.  Accordingly, the Court has not included this paragraph in the statement of undisputed facts (Dkt. No. 261, ¶ 63).

to become a member (*Id.*).  During the time period relevant to the facts underlying this lawsuit, TST had no required rituals (*Id.*, ¶ 65).[113, 114, 115, 116]

In a letter addressed to the Arkansas Secretary of State dated August 31, 2015, TST stated that the Baphomet monument has a "wholly secular purpose" (*Id.*, ¶ 71).  On August 13, 2016, TST submitted an application to place the Baphomet monument on Arkansas's Capitol grounds. The application stated that the Baphomet monument represents "pluralism" founded on "secular law" (*Id.*, ¶ 72).

### 7.       TST's Failure To Obtain Legislative Approval

On February 27, 2017, Mr. Hargett sent an email from his Gmail account to members of the General Assembly threatening that "the legislature's failure to approve the Baphomet monument will likely result in costly litigation at the taxpayer's expense." (*Id.*, ¶ 75).[117]  The email sent from Mr. Hargett's account contained no personal contact information, other than Mr.

---

[113] Intervenor plaintiffs dispute the statement of fact made by Secretary Jester in paragraph 66 stating that, as of about 2018, TST began having weekly services and still has weekly services (Dkt. No. 290, ¶ 66 (citing Dkt. No. 269-1, at 234, ¶ 5)).  Accordingly, the Court has not included this paragraph in the statement of undisputed facts (Dkt. No. 261, ¶ 66).

[114] Intervenor plaintiffs dispute the statement of fact made by Secretary Jester in paragraph 67 stating that, in January 2020, TST announced its official holidays (Dkt. No. 290, ¶ 67 (citing Dkt. No. 260-41, at 16)).  Accordingly, the Court has not included this paragraph in the statement of undisputed facts (Dkt. No. 261, ¶ 67).

[115] Intervenor plaintiffs dispute the statement of fact made by Secretary Jester in paragraph 68 stating that TST has a formalized ministry (Dkt. No. 290, ¶ 68 (citing Dkt. No. 269-1, at 234, ¶ 4)).  Accordingly, the Court has not included this paragraph in the statement of undisputed facts (Dkt. No. 261, ¶ 68).

[116] Secretary Jester makes assertions in paragraphs 69 and 70 (Dkt. No. 261, ¶¶ 69-70); Intervenor plaintiffs object to these assertions (Dkt. No. 290, ¶¶ 69-70).  To the extent a factual finding on these assertions is necessary to resolve this dispute, the Court addresses these assertions in the legal analysis section of this Opinion and Order.

[117] Secretary Jester makes assertions in paragraph 74 (Dkt. No. 261, ¶ 74); Intervenor plaintiffs object to the assertions (Dkt. No. 290, ¶ 74).  To the extent a factual finding on these assertions is necessary to resolve this dispute, the Court addresses these assertions in the legal analysis section of this Opinion and Order.

Hargett's personal email account, and did not seek to arrange a personal meeting with legislators but merely "request[ed] that you contact us before the end of the current Legislative session as to whether you wish to sponsor our monument proposal or not," and was signed, "Love, Lucien Greaves." (*Id.*, ¶ 76).

TST made no other efforts to obtain legislative support for the Baphomet monument in the General Assembly until, nearly two months later, when Mr. Misicko sent a second mass email, threatening that if the legislators did not sponsor the Baphomet monument, then "the 10 Commandments monument will be deemed illegal and will come down." (*Id.*, ¶ 77).   Mr. Misicko's email stated, "We are simply establishing our due diligence," and it was signed, "Love, Lucien Greaves." (*Id.*).   TST made no effort to seek legislative support during the 2017 legislative session or any subsequent legislative session (*Id.*, ¶ 78).   One legislator stated that she lacked the political capital to get legislation supporting the Baphomet monument passed (*Id.*, ¶ 79).[118]

## IV.     Legal Standard For Summary Judgment

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Group Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56).   Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   "In ruling on a motion for summary judgment, '[t]he district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'"   *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923–24 (8th Cir. 2004) (internal citations omitted).   "Where the record taken as a whole could not lead a rational

---

[118]  This statement is supported by the record evidence. *See*. Dkt. No. 269-1, at 66–67.

trier of fact to find for the non–moving party, there is no genuine issue for trial." *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A factual dispute is genuine if the evidence could cause a reasonable fact finder to return a verdict for either party.  *See Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *See Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *See Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998).  "The evidence of the non–movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

### V.    Standing

Secretary Jester challenges the standing of the Orsi, Cave, and Intervenor plaintiffs to maintain their claims in this action.

### A.    Standard

To establish Article III standing, a plaintiff must satisfy three requirements:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Third,

it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations omitted).

Further, even if a plaintiff meets the Article III standing requirements, a plaintiff may still be denied standing:

> if he runs afoul of certain judicially-constructed prudential limits on standing. These prudential concerns include limiting standing to cases where the plaintiff asserts his own rights and interests, not those of third parties, and where the complaint falls within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." The final prudential limitation on standing teaches that a plaintiff has no standing to assert "abstract questions of wide public significance which amount to generalized grievances, pervasively shared and most appropriately addressed in the representative branches."

*ACLU Nebraska Found. v. City of Plattsmouth, Neb.*, 358 F.3d 1020, 1027 (8th Cir. 2004) (*"Plattsmouth"*), *reh'g granted and opinion vacated* (Apr. 6, 2004), *on reh'g en banc sub nom.* *ACLU Nebraska Found. v. City of Plattsmouth, Neb.*, 419 F.3d 772 (8th Cir. 2005) (internal citations omitted). "The standing inquiry is not, however, an assessment of the merits of a plaintiff's claim." *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1023 (8th Cir. 2012) (("*Freethinkers I*") (citing *ASARCO Inc. v. Kadish*, 490 U.S. 605, 624 (1989)), *reh'g and reh'g en banc denied*, 764 F.3d 948 (8th Cir. 2014).

### B.       Summary Of The Standing Arguments

Secretary Jester asserts that the Orsi, Cave, and Intervenor plaintiffs lack standing (Dkt. No. 258, at 15–20). Secretary Jester argues that the Orsi, Cave, and Intervenor plaintiffs cannot establish injury-in-fact because they assert "offended-observer" standing, which he contends the United States Supreme Court has not adopted (*Id*., at 16). Secretary Jester also argues that, even under the offended-observer standard, the Orsi, Cave, and Intervenor plaintiffs' intentional encounters with the Ten Commandments Monument cannot confer standing because personal

contact cannot be "manufactured for the purpose of litigation" (*Id.*, at 16–17 (citing *Barber v. Bryant*, 860 F.3d 345, 354 (5th Cir. 2017); *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 541 (5th Cir. 2019)). Secretary Jester also contends that the Freedom from Religion Foundation, American Humanist Association, and Arkansas Society of Freethinkers lack associational standing. Finally, Secretary Jester claims that TST and its members lack standing (*Id.*, at 20).

In response to Secretary Jester's standing arguments, the Orsi and Cave plaintiffs contend that Secretary Jester's argument that the United States Supreme Court has not recognized what is referred to as offended-observer standing is not supported by the case law (Dkt. Nos. 282, at 4–7; 284, at 5–6). The Orsi, Cave, and Intervenor plaintiffs argue that Secretary Jester's attempt to link this form of standing to *Lemon v. Kurtzman*, 403 U.S. 602 (1971), fails (Dkt. Nos. 282, at 4–7; 284, at 5–6; 289, at 5–7). The Orsi and Cave plaintiffs contend that they have standing because they came into direct, unwelcome contact with the Ten Commandments Monument, and they further assert that they would have standing even if all of their contacts with the Ten Commandments Monument were intentional (Dkt. Nos. 282, at 7–13; 284, at 6–8). The Orsi and Cave plaintiffs maintain that, because they have standing and are members of the Freedom From Religion Foundation, American Humanist Association, and Arkansas Society of Freethinkers, each of those organizations also has standing. *See Plattsmouth*, 358 F.3d at 1031; *Hunt*, 432 U.S. at 343. Intervenor plaintiffs contend that they have standing, including associational standing, to assert their Establishment Clause and Equal Protection claims (Dkt. Nos. 289, at 2–10; 293, at 15).

The Court will address each of Secretary Jester's standing arguments in turn.

47

C.        Standing:  Establishment Clause Claims

1.        Injury-In-Fact Requirement

a.        Offended-Observer Standing

"The injury-in-fact requirement 'serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem.'" *Plattsmouth*, 358 F.3d at 1028 (quoting *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689 n.14 (1973)).  The Eighth Circuit Court of Appeals determined that "direct and unwelcome personal contact" with a Ten Commandments monument is, by itself, a sufficient injury for standing purposes to maintain a claim pursuant to the Establishment Clause. *Freethinkers I*, 679 F.3d at 1023.  Specifically, the Eighth Circuit Court of Appeals determined that members of the Freethinkers Association who lived in Fargo, North Dakota, had individual standing to challenge a permanent Ten Commandments monument.  *Id*. at 1023-24.  According to the Eighth Circuit, because individuals who "encountered the [Ten Commandments] monument were caused 'to feel isolated and unwelcome in the city,'" they had suffered an injury-in-fact sufficient for standing purposes.  *Id*. at 1023–24.  The Eighth Circuit specifically determined that the Freethinkers, who did not allege that any of their members altered their behavior to avoid the Ten Commandments monument, had standing due to "direct and unwelcome personal contact." *Id.* at 1023.

This Court is bound by controlling Eighth Circuit precedent, in the absence of a controlling United States Supreme Court case overruling that precedent or an *en banc* decision of the Eighth Circuit overruling that precedent.  Secretary Jester cites neither, and the Court is unpersuaded by Secretary Jester's arguments made in an effort to defeat offended-observer standing.

Secretary Jester challenges the Eighth Circuit precedent by pointing to a concurrence by Justice Gorsuch and joined only by Justice Thomas in *American Legion v. American Humanist Association*, that hypothesizes about the future of "offended observer" standing and claims that it has no basis in the law.  588 U.S. 29, 84–88 (2019) (Gorsuch, J., concurring).  Justice Gorsuch's concurring opinion is not, however, controlling precedent.  *See School District of Abington Township v. Schempp*, 374 U.S. 203, 224–25 (1963) (determining that a student had standing to challenge a public school's daily Bible reading and prayer practice despite "the fact that individual students may absent themselves upon parental request.").

Secretary Jester's argument made in an effort to defeat offended-observer standing also relies on his assertion that the United States Supreme Court "expressly overruled" the *Lemon* test for assessing the merits of an Establishment Clause claim in its majority opinion in *Kennedy v. Bremerton School District*, 597 U.S. 507, 535–36 (2022).  The United States Supreme Court has acknowledged that it abrogated its decision in *Lemon* but has not stated that *Lemon* has been expressly overruled.  *See Groff v. DeJoy*, 600 U.S. 447, 460 (2023).

Further, the majority's opinion in *Kennedy* does not mention standing, and *Lemon* is not a case where standing was premised on direct unwelcome contact; it is a taxpayer standing case where standing was premised on the idea that a person who pays a tax that goes to support a religious establishment has standing to challenge that establishment.  *See* 403 U.S. 602, 611 (1971) ("Lemon also alleges that he purchased a ticket at a race track and thus had paid the specific tax that supports the expenditures under the Act."); *Lemon*, 310 F. Supp. 35, 41–42 (E.D. Pa. 1969) (granting Lemon "standing as a taxpayer," granting all plaintiffs standing as taxpayers as to some claims, and rejecting alternative theories of standing to challenge the act on Equal Protection grounds because "[n]one of the other plaintiffs' allegations point to any interest, parental or

otherwise, which has been or may be affected by the alleged discriminatory practices"). Moreover, standing based upon direct unwelcome contact could not have been at issue in *Lemon* because the suit in *Lemon* concerned a challenge to a statute, not a challenge to any establishment with a physical or auditory manifestation with which a person could have direct unwelcome contact.

As an additional indication that the United States Supreme Court has not rendered offended-observer standing inapplicable, Justice Thomas noted in his dissenting opinion in *City of Ocala, Florida v. Rojas*, that the Eighth Circuit Court of Appeals and other circuits with precedent recognizing offended-observer standing in Establishment Clause cases are still bound by their own precedent to apply offended-observer standing in Establishment Clause cases. *See City of Ocala, Florida v. Rojas*, 598 U.S. ___, 143 S.Ct. 764, 768 (2023) ("those Courts of Appeals that recognize the apparent illegitimacy of offended observer standing now find themselves bound by Circuit precedent to apply it").

This Court applies controlling Eighth Circuit precedent and finds the Orsi, Cave, and Intervenor plaintiffs have suffered an injury-in-fact sufficient to maintain their Establishment Clause claims (*See* Dkt. Nos. 255, ¶¶ 1–4; 261, ¶¶ 3, 7–9; 266, ¶¶ 3–5, 11–12; 279, ¶¶ 5–7; 283, ¶¶ 2, 4; 286, ¶¶ 1–2, 6–10, 13–14; 287, ¶¶ 1–4; 290, ¶¶ 11-12).

### b.      Manufactured Standing

Secretary Jester also claims in an effort to defeat standing that the individual plaintiffs in this case have "manufactured" standing because they encountered intentionally the Ten Commandments Monument. However, Secretary Jester's position is contrary to recent United States Supreme Court precedent, where the Supreme Court determined that a plaintiff who voluntarily exposes herself to a religious practice that she finds offensive does not strip herself of standing to bring an Establishment Clause claim. *Fed. Election Comm'n v. Cruz*, 596 U.S. 289,

297 (2022) ("[W]e have made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred."); *see also Rojas*, 40 F.4th at 1351 (plaintiff who "voluntarily attended the prayer vigil and knew she would encounter religious practices she found offensive" had standing to bring Establishment Clause claim).

Further, Secretary Jester's position is not consistent with or supported by the facts in the record before the Court. Based on record evidence construed in the light most favorable to the non-moving party, there is no record evidence support for the theory that the Cave plaintiffs took a sudden interest in the State Capitol only after the Ten Commandments Monument was installed or visited the Ten Commandments Monument on a single occasion to manufacture their claims in this lawsuit (Dkt. No. 284, at 4). Ms. Cave and Ms. Piazza are both part of a walking, running, and biking group that participated regularly in outings between three and four times a week for more than 20 years that regularly included a route that passed through State Capitol grounds and the site where the Ten Commandments Monument now sits (*Id*., at 3–4). Shortly after the Ten Commandments Monument was installed, they stopped long enough to read it (*Id*.). Because both Ms. Cave and Ms. Piazza found the Ten Commandments Monument to be so offensive and alienating, they have altered the walking/bicycling routes to avoid going past the Ten Commandments Monument again (*Id.*). Both Ms. Cave and Ms. Piazza have suffered injuries personal to them.

Similarly, the record evidence construed in the light most favorable to the non-moving party establishes that Ms. Orsi, Rabbi Levy, Ms. Stewart, and Ms. Gryder all visited the State Capitol grounds and surrounding buildings from time to time for many purposes other than to observe specifically the Ten Commandments Monument (Dkt. No. 287, ¶¶ 1-4). The Orsi

plaintiffs' regular contact with the State Capitol grounds demonstrates that it is reasonably certain that the Orsi plaintiffs will come into direct contact with the Ten Commandments Monument in the future.

If Secretary Jester is claiming that the individual plaintiffs needed to avoid making voluntary contact with the Ten Commandments Monument in order to maintain standing, then such an unconstitutional requirement runs against the United States Supreme Court's statement that "we have made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." *Fed. Election Comm'n*, 596 U.S. at 297; *see also Rojas*, 40 F.4th at 1351.

With respect to the Intervenor plaintiffs, Mr. Misicko and Ms. Robbins deny they "wanted" to see the Ten Commandments Monument (Dkt. No. 290, ¶ 12).  They maintain that they were there in protest (*Id.*).  Ms. Robbins states "we specifically went to look at the 10 Commandments monument." (Dkt. No. 260-51, at 9).  She says there were protesters there, but she did not join the protest (*Id.*, at 10).

Accordingly, based on the record before it, the Court finds that the Orsi, Cave, and Intervenor plaintiffs have suffered an injury-in-fact sufficient to bring their Establishment Clause claims.

### 2.    Causation And Redressability

With respect to the Establishment Clause claims, two elements of standing remain—causation and redressability.  A plaintiff must prove that the defendant caused its injury, and it must be likely that a favorable judicial decision will redress the plaintiff's injury.  *Lujan*, 504 U.S. at 560-61.  For causation, the plaintiff need not prove proximate cause but still must prove a "fairly

traceable" connection between the defendant's challenged conduct and the plaintiff's alleged injury. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125, 132–33 n.6 (2014). The injury must not have resulted from the "independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. The injury also must not have resulted from conduct or legal provisions not before the court. Redressability is often linked with causation; if there is no causation, then a favorable decision directed toward the challenged conduct will not likely redress the plaintiff's injury. In other words, if "[a] plaintiff . . . would have been no better off had the defendant refrained from" the challenged acts, then the plaintiff "does not have standing." *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015) (citation omitted).

Based on the record evidence with all reasonable inferences drawn in favor of the non-moving party, the Court determines that the Orsi, Cave, and Intervenor plaintiffs have satisfied the causation element of standing against Secretary Jester by asserting that he is responsible for enforcing the allegedly unconstitutional laws that caused their injuries-in-fact. *See Freethinkers I*, 679 F.3d at 1025 (allegations that defendant displayed a Ten Commandments monument, enacted an ordinance prohibiting the removal of that monument, and had a policy of not accepting other monuments was sufficient to establish that the claimed injury was "fairly traceable" to defendant's acts).

Further, Ms. Orsi, Ms. Stewart, Rabbi Levy, and Ms. Gryder each opposed the proposed monument, in part, because they believed it was inconsistent with the separation of church and state. The record evidence also shows that their opposition was based on other grounds (Dkt. Nos. 261, ¶¶ 8–9; 279, ¶ 6). Ms. Cave and Ms. Piazza find the Ten Commandments Monument offensive and alienating, and they oppose it for several reasons based on record evidence (Dkt. Nos. 261, ¶ 3; 266, ¶¶ 3–5, 11–12; 283, ¶¶ 2, 4; 286, ¶¶ 2, 8–10, 13–14).

TST's Establishment Clause complaint is directed towards the Display Act.  TST contends that the right of the people to be free from government favoritism to particular religious beliefs extends to all who are "directly affected by the laws and practices against which their complaints are directed." *Schempp*, 374 U.S. at 224 n.9 (standing under the Establishment Clause does "not include proof that particular religious freedoms are infringed").

Moreover, there is record evidence before the Court that TST's membership is directly affected by the Display Act because it has at least 25 actively-meeting members in the State of Arkansas, and two of its members testified to being offended after personally visiting the monument.  Ms. Robbins and Mr. Hargett, with Mr. Hargett serving as TST's Federal Rule of Civil Procedure 30(b)(6) representative, testified that they both live in Little Rock and regularly visit the Capitol Grounds (Dkt. Nos. 260-51, at 9; 260-52, at 14).  Ms. Robbins and Mr. Hargett both testified that they were offended by the Ten Commandments Monument (Dkt. Nos. 260-51 at 6, 11; 260-52, at 19).  Ms. Robbins testified that "[b]eing on public grounds, [she] was immediately offended," and she further explained that the offense arose from the commandment to believe in God (Dkt. No. 260-51, at 6).  Mr. Misicko, who does not live in Arkansas but visits regularly, also testified that he was offended by the Ten Commandments Monument (Dkt. Nos. 260-50, at 61).  Mr. Misicko testified, "[Y]es, I am offended by that monument" (Dkt. No. 260-51, at 61).  TST has met the requirements for standing.  *Freethinkers I*, 679 F.3d at 1023.

The Orsi and Cave plaintiffs have also established that removal of the Ten Commandments Monument from the State Capitol grounds would redress their injury under the Establishment Clause because the Orsi, Cave, and Intervenor plaintiffs assert that the display is causing their injuries (*See* Dkt. No. 20, at 30–31; Case No. 4:18-cv-00343, Dkt. No. 1, at 18 (regarding requests for relief)).  The Court understands that Intervenor plaintiffs advocate either for placement of the

54

Baphomet Monument or removal of the Ten Commandments Monument and a permanent ban on enforcement of the Ten Commandments Monument Display Act in the future (*See* Dkt. No. 89, at 9 (regarding request for relief)).

Based on the record evidence with all reasonable inferences drawn in favor of the non-moving party, the Court determines that the Orsi, Cave, and Intervenor plaintiffs have satisfied the redressability element of standing sufficient to maintain their claims.

### D.    TST's Status As A Legal Entity

The Court acknowledges that, like the Orsi and Cave plaintiffs, the Intervenor Plaintiffs bring Establishment Clause claims; the Intervenor plaintiffs also bring a separate Equal Protection claim (Dkt. No. 89).  In his brief in support of his motion for summary judgment, Secretary Jester asserts separate standing arguments as to Intervenor plaintiffs (Dkt. No. 258, at 20–22).  The Court pauses to address a separate standing argument as to TST, one of the Intervenor plaintiffs.  As a threshold matter, Secretary Jester claims that TST lacks standing because it is not a "real entity" (Dkt. No. 258, at 20).  Secretary Jester contends that TST is a name for a number of affiliated entities, which are not parties to this lawsuit (*Id.*).

At the time Intervenor plaintiffs filed their motion to intervene and amended motion to intervene, TST claimed associational standing (Dkt. Nos. 17, at 8; 25, at 8).  The Court granted the motion to intervene (Dkt. No. 38), and the amended complaint in intervention was filed on December 24, 2018 (Dkt. No. 40).  In that amended complaint in intervention, TST described itself as "an organized religion" with an "organizational mission to encourage benevolence and empathy among all people." (*Id.*, at 3, ¶¶ 5–6).  Further, TST identified two of its members as individual plaintiffs—Mr. Misicko and Ms. Robbins (*Id.*, ¶¶ 7–8).

On the record before the Court, counsel for TST explained:

> "The Satanic Temple" is an umbrella term for a religion which is given legal structure by a constellation of affiliate entities.  There is no entity named "The Satanic Temple" anymore because the errantly-named "The Satanic Temple" corrected its name to "The Satanic Temple, Inc."

(Dkt. No. 217, at 19–20).  In the statement of facts, Secretary Jester and TST admitted certain legal entities were "all part of the larger—The Satanic Temple Organization." (Dkt. No. 290, ¶ 52).[119]

Further, TST filed Articles of Amendment with the Massachusetts Secretary of State (Dkt. No. 217-1).  The Articles of Amendment establish that TST is a legal entity (Dkt. No. 217-1).  The documents establish the Articles of Organization for the entity's name change were adopted at a meeting held on May 23, 2019 (*Id.*), and TST filed an unopposed second amended complaint in intervention in this case on November 1, 2019 (Dkt. No. 89).

Secretary Jester's argument that TST is not a "real entity" is not well taken based on the undisputed record evidence before the Court.  Moreover, to the extent Secretary Jester argues that either the Establishment Clause or Equal Protection Clause claims, like those asserted by TST, may not go forward in this action, the Court rejects that argument.   As set forth above, this Court has determined that TST is a "real entity."  Further, the Court has determined that the individual

---

[119]  This Court acknowledges that a "d/b/a" or "doing business as" designation "does not create a separate business entity."  *See Edgley v. Lappe,* 342 F.3d 884, 889 (8th Cir. 2003) (applying Minnesota law and noting that the majority of states that have considered the issue have held that using a separate d/b/a does not create a separate entity that is amenable to suit).  However, the record before the Court establishes that certain legal entities were all part of the Satanic Temple Organization (Dkt. No. 290, ¶ 52).

Although in his answers to the complaints in intervention, Secretary Jester denied assertions regarding TST and asserted lack of standing as an affirmative defense (Dkt. Nos. 43, at 8; 92, at 7), Secretary Jester did not move to dismiss the complaints in intervention on this basis.  Further, it is a well-established principle that "the district court has authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1)."  *Osborn v. United States*, 918 F.2d 724, 728 n.4 (8th Cir. 1990); *see also Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 41 (D.D.C. 2011) (citation omitted) (a "court may consider such materials outside the pleadings *as it deems appropriate* to resolve the question whether it has jurisdiction in the case") (emphasis added).

members of TST, Mr. Misicko and Ms. Robbins who are also named as plaintiffs in the unopposed second amended complaint in intervention, have standing. (*Id.*).

### E.   Standing:  Equal Protection Claims

#### 1.   TST's Injury

With respect to the Intervenor plaintiffs' Equal Protection claims, Secretary Jester asserts that TST caused its own injury because it failed to get approval of the Baphomet monument "not because the Capitol Commission discriminated against it" (Dkt. No. 258, at 21).  To the extent Secretary Jester intends for this argument to challenge standing as to TST's Equal Protection claim, as opposed to an attempt to argue the merits of the case, the Court rejects the argument as to TST's standing to maintain its Equal Protection claim.  Further, the Court rejects the argument whether Secretary Jester intends for the argument to address injury-in-fact or causation.

When the Court granted Intervenor plaintiffs' motion to intervene it found that Intervenor plaintiffs had standing to bring their Equal Protection claim (Dkt. No. 38, at 12).  In that Order, the Court found that TST had sufficiently demonstrated an "opportunity injury" that qualifies as an injury-in-fact (Dkt. No. 38, at 8).  As this Court pointed out in the Order permitting intervention, in the context of an Equal Protection claim:

> [w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.

*Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

"The inability to compete on equal footing is an injury in fact" for Article III standing purposes.  *McDaniel v. Precythe*, 897 F.3d 946, 950 (8th Cir. 2018) (citing *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003)).  "Where an organization incurs expenditures to counter the effects of a

defendant's alleged unlawful conduct, an organization sustains an injury in fact." *Animal Legal Defense Fund v. Reynolds*, 297 F. Supp. 3d 901, 913 (S.D. Iowa 2018) (citing *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1096–97 (D.C. Cir. 2015)). Furthermore, "[a] religious organization likewise satisfies the injury-in-fact requirement when it alleges that the government has excluded the organization from an opportunity for government benefits based on its religious character." *McDaniel*, 897 F.3d at 950 (citing *Trinity Lutheran Church of Columbia Inc. v. Comer*, 582 U.S. 449, 463 (2017)).

Based on the undisputed record evidence before the Court regarding TST's application to emplace its Baphomet monument on Arkansas Capitol grounds, the Arts and Grounds Commission Subcommittee's review, and the enactment of Act 274 (Dkt. Nos. 269, ¶¶ 7–9, 11; 288, ¶ 7; 290, ¶¶ 75–79), the Court determines that TST satisfies the requirement for standing to bring its Equal Protection claim.

### 2.    Mr. Misicko And Ms. Robbins' Injuries

Secretary Jester also argues that Mr. Misicko and Ms. Robbins have not personally been denied equal treatment because they did not personally apply to place the Baphomet monument on the Capitol grounds (Dkt. No. 258, at 21). Secretary Jester asserts that, at most, Mr. Misicko and Ms. Robbins have a "generalized psychological injury" causing offense, but he asserts that they have not alleged that they were offended and asserts that this is not enough for standing in Equal Protection cases (*Id.* (citing *Allen v. Wright*, 468 U.S. 737, 755 (1984)). Whether Secretary Jester intends for the argument to address the injury-in-fact or causation requirements for standing, the Court rejects the argument.

As set forth in the Court's Order granting intervention, Mr. Misicko and Ms. Robbins have sufficiently demonstrated an "opportunity injury" that qualifies as an injury-in-fact, and the facts

have not changed as they have been developed through the course of this litigation (Dkt. No. 38, at 17–18).  As discussed above, "[t]he inability to compete on equal footing is an injury in fact" for Article III standing purposes.  *McDaniel*, 897 F.3d at 950.  Furthermore, in an Equal Protection case, for standing purposes, the plaintiff need not allege that he or she would have obtained the benefit but for the government's discrimination but instead must only show that the discrimination itself denied the plaintiff an equal opportunity to compete.  *Id*. (citing *Ne. Fla. Chapter of the Associated Gen. Contractors of Am.*, 508 U.S. at 666).

The requirement of an injury-in-fact mandates that the injury must be "concrete and particularized," as well as "actual or imminent."  *Carney v. Adams*, 592 U.S. 53, 58 (2020) (internal citation omitted).  The Supreme Court has interpreted this rule in discriminatory barrier cases to require that plaintiffs are "able and ready" to pursue the opportunity at issue.  *Carney*, 592 U.S. at 60.  This requirement ensures an injury in fact is concrete and particular and guards against the airing of generalized grievances.  *See Loffman v. California Dep't of Educ.*, 119 F.4th 1147, 1159 (9th Cir. 2024) (discussing these requirements).

Mr. Misicko and Ms. Robbins have asserted that the State's discrimination denied them an equal opportunity to compete for placement of the Baphomet monument on the Capitol grounds. Record evidence sufficiently establishes that Mr. Misicko and Ms. Robbins were each "able and ready" to pursue the opportunity at issue as a member of TST.  Record evidence demonstrates that Mr. Misicko actually took steps to do so on behalf of TST (Dkt. No. 260-50, at 28–30 (discussing Mr. Misicko's attendance at meetings with the Arts and Grounds Commission Subcommittee regarding the Baphomet monument where he made a presentation and answered questions about the monument); 260-50 at 63–76; 260-36 (transcript from January 25, 2017, meeting of the Arts and Grounds Commission Subcommittee)).  The same is true of Ms. Robbins (Dkt. No. 260-51, at

13; 15; 18 (discussing Ms. Robbin's attendance at the Arts and Grounds Commission Subcommittee meetings)). The Court finds that Mr. Misicko and Ms. Robbins have established sufficient standing to maintain their Equal Protection claims.

### 3.    TST's Alleged Injuries And The Relief Requested

Further, Secretary Jester argues that the Intervenor plaintiffs lack standing because removing the Ten Commandments Monument would not remedy the Intervenor plaintiffs' alleged injury (Dkt. No. 258, at 22). Secretary Jester states that tearing down the Ten Commandments Monument would not "magically erect" the Baphomet monument (*Id*.).

The Court understands that Intervenor plaintiffs advocate either for placement of the Baphomet Monument or removal of the Ten Commandments Monument and a permanent ban on enforcement of the Ten Commandments Monument Display Act in the future (*see* Dkt. Nos. 89, at 9 (regarding request for relief); 271, at 32 (same); 289, at 26–27 (same); 294, at 22 (same)). "When the constitutional violation is unequal treatment, . . . a court theoretically can cure that unequal treatment either by extending the benefits or burdens to the exempted class, or by nullifying the benefits or burdens for all." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 632 (2020); *see also Heckler v. Mathews*, 465 U.S. 728, 737–40 (1984) (plaintiff suffering unequal treatment had standing to seek "withdrawal of benefits from the favored class"). The Court rejects Secretary Jester's argument.

For the reasons set forth above, the Court determines that TST has sufficiently demonstrated that its Equal Protection injuries are "fairly traceable" to Secretary Jester and that the relief sought by TST would redress its alleged injury-in-fact. *See Duit Construction Co. v. Bennett*, 796 F.3d 938, 940–41 (8th Cir. 2015) (addressing test for causation and redressability in actions against state officials).

60

F.    **Associational Standing**

Secretary Jester also challenges associational standing of certain named plaintiffs.  An association has standing to bring suit on behalf of its members when:  (1) its members would otherwise have standing to sue in their own right, (2) the interests at stake are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *Plattsmouth*, 358 F.3d at 1031 (affirming earlier standing decision).  In *Plattsmouth*, the Eighth Circuit found that the American Civil Liberties Union ("ACLU") had associational standing to challenge a Ten Commandments monument because "the interests at stake are germane to the ACLU's purpose of defending citizens' constitutional rights," "[n]either the claim asserted nor the relief requested require the participation of ACLU members," and the ACLU's members would have had standing to bring the same claims as the ACLU itself.  358 F.3d at 1031.

As to the Orsi and Cave plaintiffs, the Court has concluded that Ms. Orsi has standing to sue in her own right, and she is a member of the Freedom from Religion Foundation, American Humanist Association, and Arkansas Society of Freethinkers (Dkt. No. 260-58, at 6).  The Court has also determined that Ms. Gryder has standing in her own right, and she is also a member of the Arkansas Society of Freethinkers (Dkt. No. 260-61, at 7–8).  The claims asserted in the lawsuit do not require the participation of individual members.  However, the organizations have members who are participating as plaintiffs in the lawsuit nonetheless.  Construing the record evidence in the light most favorable to the non-moving party, the Court determines that the Freedom from Religion Foundation, American Humanist Association, and Arkansas Society of Freethinkers have associational standing.

Secretary Jester next contends that, because TST is suing solely in an associational capacity and because Secretary Jester argues that Mr. Misicko and Ms. Robbins do not have standing to bring an Equal Protection claim, Secretary Jester maintains that TST does not either (Dkt. No. 258, at 21-22). As set forth above, the Court has determined that Mr. Misicko and Ms. Robbins have standing to bring an Equal Protection claim. Accordingly, TST has associational standing because (1) the interests at stake are germane to TST's purpose, and (2) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Plattsmouth*, 358 F.3d at 1031 (affirming earlier standing decision).

### G. Conclusion: Standing

For all of these reasons, the Court determines that (1) the Orsi, Cave, and Intervenor plaintiffs satisfy the standing requirements to maintain their Establishment Clause claims, and (2) the Intervenor plaintiffs satisfy the standing requirements to maintain their Equal Protection claims.

### VI. Establishment Clause Challenge

The First Amendment reads, "Congress shall make no law respecting an establishment of religion[.]" U.S. Const. amend. 1. That rule also binds state governments through the Fourteenth Amendment. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 14–15 (1947). The Court examines the parties' Establishment Clause claims that challenge the Display Act and challenge the Ten Commandments Monument.

### A. Laches

Secretary Jester, in his reply in support of his motion for summary judgment, raises the issue of laches and asserts that the Orsi, Cave, and Intervenor plaintiffs should be barred by the doctrine of laches from challenging the Display Act as a violation of the Establishment Clause

(Dkt. No. 295, at 3).  Laches is considered an affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), and generally the burden of persuasion on an affirmative defense rests with the party invoking the defense.  Secretary Jester does not satisfy what the law demands of the litigants who seek to invoke the doctrine of laches.  Even if Secretary Jester had satisfied those demands, this Court would not exercise its discretion under the circumstances of this case to apply the equitable doctrine to bar Establishment Clause challenges to the Display Act.

The doctrine of laches is an equitable defense, and "the existence of laches is a question primarily addressed to the discretion of the trial court."  *Gardner v. Panama Railroad Co.*, 342 U.S. 29, 30 (1951).  This does not mean, however, that the Court's decision is unfettered by appropriate standards or shielded from thorough appellate review.  *See Albermarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975).

The basic elements of laches are well established.  For the doctrine of laches to bar a lawsuit, the plaintiff must be guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant.  *Gardner*, 342 U.S. at 31; *Russell v. Todd*, 309 U.S. 280, 287 (1940); *Southern Pacific Co. v. Bogert*, 250 U.S. 483, 490 (1919).  In other words, the equitable doctrine of laches may permit dismissal of a claim if there is both an unreasonable delay and some change in position in reliance upon the delay which makes maintenance of the claim inequitable.  *In re Panther Mountain Land Dev., LLC,* 686 F.3d 916, 927 (8th Cir. 2012).  Here, Secretary Jester points to no change in position that would make it inequitable to permit the challenge now.  Moreover, Secretary Jester points to no reliance upon the delay that would make a challenge now inequitable.  For this reason, Secretary Jester fails to satisfy the doctrine's requirements.

In applying the doctrine of laches, this Court acknowledges that an important consideration is the appropriate role of an analogous statute of limitations.  Secretary Jester argues that a three-

year statute of limitations would be analogous here (Dkt. No. 295, at 3). However, this Court would abuse its discretion if it were to apply mechanically the analogous statute of limitations. *Gardner*, 342 U.S. at 31. Further, this Court rejects any suggestion that the running of an analogous statute of limitations should give rise to a presumption of prejudice on which Secretary Jester may rely to invoke the doctrine. *See Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804–06 (8th Cir. 1979) (discussing lower federal courts' approaches to this issue and adopting the approach that considers this as one factor among others to be considered). As the Supreme Court has observed:

> Traditionally and for good reasons, statutes of limitation are not controlling measures of equitable relief. Such statutes have been drawn upon by equity solely for the light they may shed in determining that which is decisive for the chancellor's intervention, namely, whether the plaintiff has inexcusably slept on his rights so as to make a decree against the defendant unfair.

*Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946) (citation omitted). Equity has acted on the principle that "laches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced,–an inequity founded upon some change in the condition or relations of the property or the parties." *Id*. at 396 (quoting *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892)).

The determination of whether a delay is inexcusable is closely intertwined with the issue of whether a defendant suffered prejudice from the delay. If only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice required before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required. *Goodman*, 606 F.2d at 807–08.

The undisputed record evidence establishes that the Display Act was signed into law in April 2015 (Dkt. No. 286, ¶ 48). The Ten Commandments Monument at issue in this case is the

second one (*Id.*, ¶ 74).  The first Ten Commandments monument was installed on June 27, 2017 (Dkt. Nos. 286, ¶ 70; 288, ¶ 4).  Less than 24 hours after the first Ten Commandments monument was installed, an individual used his vehicle to destroy it (Dkt. No. 286, ¶¶ 73, 105).  On April 26, 2018, a second Ten Commandments Monument, the one at issue in this case, was placed; the placement included barriers to prevent intentional destruction (Dkt. No. 287, ¶ 32).  The current lawsuits were filed less than a month later on May 23, 2018 (Dkt. No. 1).

Secretary Jester does not wrestle with these undisputed facts when invoking laches in an effort to thwart the challenge to the Display Act (*see* Dkt. No. 285, at 3).  Having considered the law and arguments made, the Court determines that Secretary Jester has not made the sort of showing necessary to invoke the doctrine of laches.  He has not demonstrated prejudice, and this Court declines to presume prejudice on these facts.  Further, even if Secretary Jester could satisfy the laches doctrine's demands, this Court would not exercise its discretion under the circumstances to apply the equitable doctrine to bar Establishment Clause challenges to the Display Act.  The Court rejects the defense.

### B.   Overview Of The Motions For Summary Judgment On The Establishment Clause Claim

The Orsi, Cave, and Intervenor plaintiffs move for summary judgment on their Establishment Clause claims (Dkt. Nos. 254; 264; 268).  The Orsi plaintiffs argue that they are entitled to summary judgment on their Establishment Clause claim because the historical evidence demonstrates that the Establishment Clause was designed to prohibit the government from wielding its power to commit the type of legislative act at issue in this case to elevate one religion's beliefs to favored status (Dkt. No. 256, at 11–19).  According to the Orsi plaintiffs, there is no established history of laws ratifying the Ten Commandments (Dkt. No. 256, at 19–29).

The Cave plaintiffs argue that they are entitled to summary judgment on their Establishment Clause claim because there is no historical basis for singling out the Ten Commandments as having a significant role in the foundation of American law and government (Dkt. No. 265, at 17–32). Further, the Cave plaintiffs argue that the Ten Commandments Monument conveys a message that religion is favored or preferred in violation of the Establishment Clause (*Id.*, at 32–50).

Intervenor plaintiffs move for summary judgment on their Establishment Clause claim (Dkt. No. 271, at 25–29). Intervenor plaintiffs contend that the Display Act violates the Establishment Clause because it has predominately religious purpose (*Id.*, at 25, (citing *McCreary County, Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844 (2005)). Intervenor plaintiffs argue that the Ten Commandments Monument is new, prompted a religious controversy, and endorses a particular set of religious beliefs (*Id.*, at 26–29).

Secretary Jester moves for summary judgment on the Orsi, Cave, and Intervenor plaintiffs' Establishment Clause claims (Dkt. No. 258, at 22–24). Secretary Jester argues that plaintiffs' complaints are "framed in terms of the obsolete *Lemon* and 'endorsement' tests," and "[i]n place of *Lemon* and the endorsement test, [the Supreme] Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings." (*Id.*, at 22–23 (quoting *Kennedy*, 597 U.S. at 535)). According to Secretary Jester, the Orsi, Cave, and Intervenor plaintiffs cannot claim "that the Ten Commandments [M]onument falls outside of the longstanding tradition of publicly recognizing our nation's religious and moral heritage." (*Id.*, at 23). Finally, quoting *American Legion*, Secretary Jester states that "[t]here is no 'evidence of discriminatory intent in the selection of the design of the memorial or the decision of [Secretary Thurston] to

maintain it' . . . or evidence it was designed to 'deliberately disrespect[]' others." (*Id*. (citing *Am. Legion*, 588 U.S. at 63)).

### C.    Overview Of The Law

Because of this country's "history and tradition of religious diversity that dates from the settlement of the North American Continent," the Founders included in the Bill of Rights an Establishment Clause which prohibits any law "respecting an establishment of religion." *Cnty. of Allegheny v. Am. C.L. Union Greater Pittsburgh Chapter,* 492 U.S. 573, 589 (1989); U.S. Const. amend. 1.  As the United States Supreme Court stated in *American Legion*, "pinning down the meaning of a 'law respecting an establishment of religion' has proved to be a vexing problem." *American Legion*, 588 U.S. at 48.

The Establishment Clause constrains government speech only.  *See Bd. of Educ. v. Mergens ex rel. Mergens*, 496 U.S. 226, 250 (1990).  The Supreme Court has held that permanent monuments are government speech, regardless of whether a private party sponsored them. *Pleasant Grove City v. Summum*, 555 U.S. 460, 470–71 (2009) ("Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land."); *see also Felix v. City of Bloomfield*, 841 F.3d 848, 855 (10th Cir. 2016).

The Supreme Court has instructed that for First Amendment purposes religion includes non-Christian faiths and those that do not profess belief in the Judeo–Christian God; indeed, it includes the lack of any faith.  *Wallace v. Jaffree,* 472 U.S. 38, 52–53 (1985) ("[T]he Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all.") (footnote omitted); *Torcaso v. Watkins,* 367 U.S. 488, 495 (1961) ("We repeat and again reaffirm that neither a State

nor the Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion.' Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs.").

For Establishment Clause claims, the Supreme Court initially developed a test that focused on the purpose and effects of a challenged government action. *See Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971). The test determined: (1) whether the government action had a secular legislative purpose; (2) whether the government action had a primary effect that neither advanced nor inhibited religion; and (3) whether the government action avoided excessive government entanglement with religion. *See Lemon,* 403 U.S. at 612–13.[120] Under *Lemon*, a "[s]tate action violate[d] the Establishment Clause if it fail[ed] to satisfy any of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).

In *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), the Supreme Court applied the *Lemon* test and, at step one, found that a state law requiring the Ten Commandments to be posted in public school classrooms had "no secular legislative purpose" and was "therefore unconstitutional." 449 U.S. at 41. The Supreme Court stated that "[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact." *Id*. The Supreme Court concluded that the statute violated the first part of the *Lemon* test and thus violated the Establishment Clause. *Id*. at 42-43. The Court is not aware that the United States Supreme Court has overruled *Stone*.

---

[120] The Court understands that in *Groff v. DeJoy*, 600 U.S. 447, 460 (2023), a Title VII case, the United States Supreme Court acknowledged that, in deciding *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), the Supreme Court "abrogated" its decision in *Lemon*.

In *McCreary County, Kentucky v. American Civil Liberties Union of Kentucky*, 545 U.S. 844 (2005) ("*McCreary County*"), the United States Supreme Court again addressed a Ten Commandments case. The Supreme Court noted the determinations in *Stone* that the Ten Commandments are "sacred text" in the Jewish and Christian faiths and of the "predominantly religious purpose in the government's posting of the Commandments, given their prominence as 'an instrument of religion.'" *McCreary County*, 545 U.S. at 859 (quoting *Stone*, 449 U.S. at 41 n.3) (other citation omitted)). Applying the *Lemon* test, the Supreme Court declared the displays of the Ten Commandments in two Kentucky county courthouses an unconstitutional violation of the Establishment Clause. *Id*. at 881.

In *Van Orden*, the United States Supreme Court upheld a Ten Commandments display on the Texas state capitol grounds. 545 U.S. 677 (2005). The Court determined that the *Lemon* test was "not useful" in dealing with the sort of "passive monument" that Texas had erected on its capitol grounds and instead analyzed the monument based on "our Nation's history." *Id*. at 686. In *Van Orden*, the Court upheld a Ten Commandments monument which had stood legally uncontested for 40 years. *Id*. at 702 (Breyer, J., concurring). The Supreme Court reasoned that the fact that the monument in *Van Orden* had stood for 40 years without objection showed that "few individuals, whatever their system of beliefs, [were] likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion," which had not, for example been the case with *McCreary County*, which drew a prompt litigation response. *Id*.

In *Town of Greece v. Galloway*, 572 U.S. 565 (2014), the United States Supreme Court addressed whether the town's practice of opening the town's board meetings with prayer was a violation of the Establishment Clause. The Supreme Court determined, consistent with *Marsh v.*

69

*Chambers*, 463 U.S. 783 (1983), that the practice did not violate the Establishment Clause. *Town of Greece*, 572 U.S. at 569. In *Marsh*, the Supreme Court determined that there was no First Amendment violation in the Nebraska legislature's practice of opening its session with a prayer delivered by a chaplain paid from state funds. *Id.* at 575. In *Marsh*, the Supreme Court had not applied any of the "formal tests" because the Supreme Court determined that "history supported the conclusion that legislative invocations are compatible with the Establishment Clause." *Id.* In *Town of Greece*, the Supreme Court concluded that in the light of *Marsh* "[a]ny test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Id.* at 577 (citing *Cnty. of Allegheny*, 492 U.S. at 670 (opinion of J. Kennedy); *Schempp*, 374 U.S. at 294)). The Supreme Court determined that the town of Greece did not violate the Establishment Clause by opening its meetings with prayer. *Id.* at 591–92.

In *New Doe Child #1 v. United States*, 901 F.3d 1015 (8th Cir. 2018), the Eighth Circuit Court of Appeals considered a case challenging the inscription of the national motto "In God We Trust" on United States currency. The Eighth Circuit did not cite to *Lemon* but analyzed the plaintiff's Establishment Clause claim "under the guidance of new Supreme Court precedent" in *Town of Greece*. 901 F.3d at 1019. The Eighth Circuit noted the United States Supreme Court's directive that the "Establishment Clause *must* be interpreted by reference to historical practices and understandings'" in a manner that "faithfully reflects the understanding of the Founding Fathers." *Id.* at 1020 (quoting *Town of Greece*, 572 U.S. at 577). The Eighth Circuit asked two questions in *New Doe Child #1* in an attempt to comply with the Supreme Court's mandate. First, it asked what do historical practices indicate about the constitutionality of placing the national motto on money? *Id.* at 1021. Second, it asked whether the motto is impermissibly coercive? *Id.*

70

In *American Legion v. American Humanist Association*, 588 U.S. 29 (2019), the United States Supreme Court considered whether a 90-year-old display of a 32-foot Bladensburg Cross on public land, which was erected as a memorial to soldiers who died serving in World War I, violated the Establishment Clause. The Supreme Court determined that the Bladensburg Cross did not violate the Establishment Clause. *American Legion*, 588 U.S. at 63. The Supreme Court noted the long history of the Latin cross's use in war memorials. *Id*. at 57–60. The Supreme Court observed that "retaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones." *Id*. at 63–64. The Supreme Court reasoned that "the passage of time gives rise to a strong presumption of constitutionality." *Id*. at 57.

In *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), without expressly overruling *Lemon*, the United States Supreme Court stated that the Establishment Clause must be interpreted by "'reference to historical practices and understandings.'" *Kennedy*, 597 U.S. at 535 (quoting *Town of Greece*, 572 U.S. at 756; *see also American Legion*, 588 U.S. at 60). Quoting *Town of Greece*, the Supreme Court in *Kennedy* stated that "'[t]he line' that courts and governments 'must draw between the permissible and the impermissible' has to 'accor[d] with history and faithfully reflec[t] the understandings of the Founding Fathers.'" *Id*. (citing *Town of Greece*, 572 U.S. at 577 (quoting *Schempp*, 374 U.S. at 294)).

### D.    Government Speech

The Court concludes that the speech challenged by the Orsi, Cave, and Intervenor plaintiffs is government speech to which the Establishment Clause applies. *See Bd. of Educ.*, 496 U.S. at 250; *Summum*, 555 U.S. at 470–71. The Court reaches this conclusion based on the undisputed record evidence, including that, as codified, the Display Act specifies the precise text of the Ten Commandments that is to appear on the Ten Commandments Monument; the Ten Commandments

71

Monument is to be placed on the State Capitol grounds as a permanent monument in perpetuity that becomes property of the State; and regardless of whether private parties sponsored or paid for the monument (*See* Dkt. No. 286, at ¶¶ 23, 43, 46, 48, 51, 58, 60, 64, 67, 69–70, 87, 89–91, 105 (detailing the involvement of Senator Rapert, Representative Hammer, Mr. Boyd, and Secretary of State Jester in the events surrounding the passage of the Display Act, the placement of the first Ten Commandments monument, and the permanent placement of the second Ten Commandments Monument on State Capitol Grounds).

### E.      Application Of The *Lemon* Test

As the parties have suggested, the Supreme Court and the Eighth Circuit have found it unnecessary to rely on *Lemon* in deciding more recent Establishment Clause cases.  *See, e.g., Van Orden*, 545 U.S. at 686; *Marsh*, 463 U.S. at 786–95; *New Doe Child #1*, 901 F.3d, at 1019.   In *Groff v. DeJoy*, 600 U.S. 447, 460 (2023), the Supreme Court acknowledged that *Lemon* was abrogated by the Court's ruling in *Kennedy*.  *See Kennedy*, 597 U.S. at 535; *see also Rojas*, 143 S.Ct. at 764; *St. Augustine Sch. v. Underly*, 78 F.4th 349, 353 (7th Cir. 2023) (acknowledging that *Lemon* has been abrogated by the U.S. Supreme Court); *Virden v. Crawford County, Ark.*, Case No. 2:23-cv-2071, 2023 WL 5944154, *5, n.1 (W.D. Ark. 2023) (recognizing abrogation of *Lemon* by the Supreme Court in *Kennedy* and *Groff*).

Although the parties do not advocate for the application of the *Lemon* test, the Court will begin its analysis by analyzing the Display Act under *Lemon* because the United States Supreme Court has not expressly overruled *Lemon*.  This Court is bound by controlling precedent, in the absence of a controlling United States Supreme Court case overruling that precedent.  It is for the United States Supreme Court to say whether an abrogation of *Lemon* in the context of the *Kennedy* decision, as recognized by *Groff*, equates to an express overruling of *Lemon* in all contexts.

To survive an Establishment Clause challenge under the *Lemon* test, a government action must:  (1) have a secular legislative purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion.  *See Lemon,* 403 U.S. at 612–13.

The Display Act passed by the Arkansas legislature required that the Ten Commandments Monument include the full text of the Ten Commandments (Dkt. No. 286, ¶ 51).  *See* Ark. Code Ann. § 22-3-221.  Nothing on the Ten Commandments Monument explains that a purpose of the monument is allegedly to provide basic principles of the American system of government (Dkt. No. 266, ¶ 53; 266-10) (photograph of current Ten Commandments Monument)).  "Where the text is set out, the insistence of the religious message is hard to avoid in the absence of a context plausibly suggesting a message going beyond an excuse to promote the religious point of view." *McCreary County*, 545 U.S. at 868.

Here, however, a message going beyond the text that might explain how this is not simply the promotion of a particular religious point of view is not included on or near the monument (Dkt. No. 266-10) (photograph of current Ten Commandments Monument).  As Mr. Boyd explained at the October 12, 2016, meeting of the Arts and Grounds Commission Subcommittee when discussing the placement of monuments, Arkansas has "a long and enduring history here of placing monuments by themselves. . . .  [T]hey may be 20 or 30 feet of each other. . . but we don't place them side by side." (Dkt. No. 260-31, at 44).  The only other words that appear on the Ten Commandments Monument besides the text of the Ten Commandments are:  "Presented to the People of Arkansas by the American History and Heritage Foundation." (Dkt. Nos. 266, ¶ 75; 266-10 (photograph of current Ten Commandments Monument)).  There is no explanation on or near

the Ten Commandments Monument as to what this organization is, who its members are, or the reason why it presented this monument.

To the extent Secretary Jester attempts to rely on undisputed record evidence about other public displays (*See* Dkt. Nos. 260-12; 261, ¶¶ 17–19, 21; 279, ¶¶ 17–18; 283, ¶¶ 17–18; 290, ¶¶ 17, 19), these displays do not include a government mandate that the full text of the Ten Commandments be displayed, and they are not included on or near the Ten Commandments Monument on the Arkansas State Capitol grounds (Dkt. No. 266-10).

Moreover, at the time the parties briefed the summary judgment issues in this case, the Ten Commandments Monument was not included in former Secretary Thurston's pamphlet about the Arkansas State Capitol grounds entitled "A Walk on the Hill:  A self-guided tour of the Arkansas State Capitol; Grounds and monuments" nor was it included on the website in order to clarify any context or message going beyond an excuse to promote the religious point of view (Dkt. No. 266-6, at 34–53).[121]

As the Supreme Court stated in *McCreary County*, "the original text viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject

---

[121] At some time after the close of summary judgment briefing in this matter, the Arkansas Secretary of State appears to have updated information provided for self-guided tours.  *See* https://www.sos.arkansas.gov/state-capitol/state-capitol-tour-information/ (last visited March 30, 2026).  While recognizing the possibility of curative action, the *McCreary* Court dismissed the government's curative measures there as insufficient to negate the initial endorsement of religion and set a high bar.  545 U.S. at 873–74.  This Court determines that a government cure should be "(1) purposeful, (2) public, and (3) at least as persuasive as the initial endorsement of religion.  It should be purposeful enough for an objective observer to know, unequivocally, that the government does not endorse religion.  It should be public enough so that people need not burrow into a difficult-to-access legislative record for evidence to assure themselves that the government is not endorsing a religious view.  And it should be persuasive enough to countermand the preexisting message of religious endorsement."  *Felix v. City of Bloomfield*, 841 F.3d 848, 863–64 (10th Cir. 2016) (emphasis in original) (examining and rejecting curative efforts).  The Court finds this publicly available change currently on Secretary Jester's website insufficient.

74

to religious sanction." *McCreary County*, 545 U.S. at 869.  Additionally, in *Stone*, the Supreme

Court stated:

> The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness.  *See* Exodus 20:12–17; Deuteronomy 5:16–21.  Rather, the first part of the Commandments concerns the religious duties of believers:  worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day.  *See* Exodus 20:1–11; Deuteronomy 5:6–15.

449 U.S. at 41–42.  As the United States Supreme Court determined in *Stone*, the language of the

Ten Commandments has the effect of excluding the beliefs of nonadherents.[122]

Undisputed record evidence establishes that some plaintiffs are nonadherents.  Ms. Cave

and Ms. Piazza are both agnostic (Dkt. No. 266, ¶¶ 2, 7).  Plaintiff Ann Orsi is an agnostic atheist,

and Ms. Gryder is a Wiccan (Dkt. No. 287, ¶ 4).  Mr. Misicko and Ms. Robbins are both members

of TST (Dkt. Nos. 260-51, at 18; 260-52, at 5).

Senator Rapert was one of the organizers of the Foundation, which proposed the wording

of the Ten Commandments Monument that was prescribed by the General Assembly in the Display

Act.  The Foundation also raised money to build the Ten Commandments Monument (Dkt. No.

254-1, at 372).  As explained in this Opinion and Order, *see infra*, Senator Rapert has repeatedly

made comments regarding the religious nature of the Ten Commandments Monument and the

---

[122]   Throughout this Order, the Court will utilize the word "nonadherents" based on Supreme Court precedent in the context of the Establishment Clause:

> "A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion," *Committee for Public Ed. & Religious Liberty v. Nyquist,* 413 U.S. 756, 792–793 (1973), favoring neither one religion over others nor religious adherents collectively over nonadherents.  *See Epperson v. Arkansas,* 393 U.S. 97, 104 (1968).

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994).

view, among others, that the State of Arkansas should take "a stand for something that honors God and the Bible. . . ." (Dkt. No. 254-1, at 358). *See Edwards,* 482 U.S., at 586–588 (relying on a statute's text and the detailed public comment of its sponsor, when the Supreme Court sought to determine the purpose of a state law requiring creationism to be taught alongside evolution).

Senator Rapert made these types of comments prior to and at the time he introduced the Display Act (Dkt. Nos. 286, ¶¶ 139–140). The headline in the statewide newspaper the *Arkansas Democrat Gazette* on the date the Display Act passed read "Bill Passes to display holy rules at Capitol," thus acknowledging the public's perception that the Display Act mandated the display of a religious monument (Dkt. Nos. 254-1, at 22–23; 287, ¶ 14). The Foundation was then formed, and Senator Rapert began fundraising for the Ten Commandments Monument, publicly posting his efforts to do so (Dkt. Nos. 255, ¶ 28; 286, ¶¶ 87–90). The Arkansas General Assembly chose to pass the Display Act, understanding Senator Rapert was a sitting member of the Arkansas General Assembly when the Display Act was proposed and enacted and when the Foundation engaged in fundraising for the Ten Commandments Monument.

The Arkansas General Assembly chose to pass the Display Act even over community members' objections. At public hearings, supporters and opponents of the Ten Commandments Monument voiced their opinion, but most speakers perceived the monument as religious and spoke in favor of it because of its religious attributes (Dkt. Nos. 254-1, at 25–28, 476–478, 491–494; 286, ¶¶ 102–104, 110–111; 287, ¶¶ 15–17, 20–22; 288, ¶¶ 10–11). At those public hearings, some citizens voiced objections to the placement of the Ten Commandments Monument (Dkt. No. 254-1, at 479–481).

Even after the passage of the Display Act, citizens voiced objections at the Arts and Grounds Commission Subcommittee public hearing about the placement of the Ten

76

Commandments Monument (Dkt. No. 260-39). At that hearing, Senator Rapert spoke "on behalf of the Arkansas Legislature" and advised the Arts and Grounds Commission Subcommittee that they "don't have to decide whether you do put up this monument or not." (*Id*., at 77–78). Senator Rapert told the members of the Commission that all the public comment were just ways to "intimidate the commission about what its duties are" but that the bill had already passed, that the Governor had already signed it, and that it was "the law in the State of Arkansas." (*Id*.).

Further, as explained in this Opinion and Order, *see infra*, the public comment period scheduled for February 10, 2017, for the Baphomet monument never occurred after the Arkansas General Assembly passed Act 274 with an emergency clause so that Act 274 became effective immediately on February 22, 2017, and halted the process of the Baphomet monument before the Arts and Grounds Commission Subcommittee (Dkt. Nos. 260-36, at 11-12; 266-33, at 17 (Boyd acknowledging passage of Act 274); 269-1, at 51–52, 55). In other words, even after the local newspaper's account of the Display Act, even after community members objected, and even after Senator Rapert more pointedly commented on the Baphomet monument (Dkt. Nos. 269-1 at 245; 288, ¶¶ 8–9), the Arkansas General Assembly stood by the Display Act and passed Act 274 with an emergency clause (Dkt. No. 269-1, at 51–52; 266-33, at 17).

In reaching this decision, the Court has considered the evidence of the circumstances surrounding the unveiling of the first Ten Commandments Monument (Dkt. No. 286, ¶¶ 70–71, 142; 288, ¶¶ 4–5); the destruction of that monument (Dkt. Nos. 254-1, at 29–36; 286, ¶¶ 73, 105; 287, ¶ 31); the fundraising for the second Ten Commandments Monument and the announcement of that (Dkt. Nos. 254-1, at 12–13; 286, ¶¶ 93–99); and the unveiling of the second Ten Commandments Monument, which is the subject of this challenge (Dkt. Nos. 254-1, at 39–41; 255, ¶ 33; 261, ¶ 31; 286, ¶¶ 75–85; 287, ¶ 32).

Based on the undisputed record evidence as a whole, this Court concludes in the context of this case, that (1) the primary purpose of the Display Act was to promote the Ten Commandments, and (2) the effect of the Display Act was to advance one religion over others and over nonadherence, not to comment about the development of law in history. By placing the Ten Commandments Monument as required by the Display Act, Secretary Jester failed to avoid excessive government entanglement with religion. *See Lemon,* 403 U.S. at 612–13. The Display Act and the Ten Commandment Monument violate the Establishment Clause under the test set forth in *Lemon.*[123]

### F.    *Van Orden* And *Plattsmouth*

In *Van Orden v. Perry*, 545 U.S. 677 (2005), a plurality of the United States Supreme Court determined that the *Lemon* test was "not useful in dealing with the sort of passive monument that

---

[123] Some courts apply *Lemon*, as refined by Justice O'Connor's concurrence in *Lynch v. Donnelly*, 465 U.S. 668, 687–94 (1984). *See Felix v. City of Bloomfield*, 841 F.3d 848, 856 (10th Cir. 2016). Justice O'Connor's modification, the so-called "endorsement test," applies to the first and second prongs of *Lemon*. Under this modification, the government impermissibly endorses religion if its conduct has either the purpose or the effect of conveying a message that religion or a particular religious belief is favored or preferred. The focus of the endorsement test is on the message objectively communicated by the government's conduct, and how that message might cause some community members to feel like outsiders. *See Lynch*, 465 U.S. at 687 (O'Connor, J., concurring) ("Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."). If an objective observer has a reasonable impression that government conduct was religiously motivated, then the official action is more likely to have the "effect" of sending a message that nonadherents are "outsiders, not full members of the political community." *Id.* Accordingly, a government's motivation—as perceived by an objective observer—is relevant to whether the action had an effect of endorsing religion. Based on the text and design of the Ten Commandments Monument; its placement on the State Capitol grounds; the circumstances of its installation, financing, and unveiling; and the timing of this litigation, the Court determines that an objective observer would have the impression of official religious endorsement, and the Display Act and the Ten Commandments Monument would violate the Establishment Clause under the *Lemon* test as refined by the endorsement test.

Texas erected on its Capitol grounds." *Id*. at 686.  The Supreme Court disregarded the endorsement test and instead employed an analysis "driven both by the nature of the monument and by our Nation's history." *Id*. (plurality opinion).  Justice Breyer concurred in the judgment, noting that "the Court has found no single mechanical formula that can accurately draw the constitutional line in every case" and declaring that in borderline cases he sees "no test-related substitute for the exercise of legal judgment." *Id.* at 699–700 (Breyer, J., concurring).

In *Van Orden,* the monument at issue, which included the text of the Ten Commandments, stood on the Texas Capitol grounds for 40 years, and Thomas Van Orden encountered the monument frequently for six years before he sued numerous state officials seeking a declaration that the monument violated the Establishment Clause.  *Id*. at 682.  The challenged monument stood alongside 17 other monuments and 21 historical markers "commemorating the '*people*, ideals, and events that compose Texan identity.'"  *Id*. at 681.  The Supreme Court noted that the limited legislative record surrounding the State's acceptance of the monument indicated that it accepted it from the Fraternal Order of Eagles of Texas "a national social, civic, and patriotic organization." *Id*. at 682.  The Supreme Court determined that "Texas has treated its Capitol grounds monuments as representing the several strands in the State's political and legal history."  *Id.* at 691.  The Supreme Court observed that the inclusion of the Ten Commandments monument had "a dual significance, partaking of both religion and government," and determined that the monument was permissible under the Establishment Clause.  *Id.*

In *Plattsmouth*, the Eighth Circuit Court of Appeals applied the analysis in *Van Orden* and considered whether a Ten Commandments display in a city park violated the Establishment

79

Clause. *Plattsmouth*, 419 F.3d at 773–774.[124]  The Eighth Circuit determined that "[l]ike the Ten Commandments monument at issue in *Van Orden,* the Plattsmouth monument makes passive— and permissible—use of the text of the Ten Commandments to acknowledge the role of religion in our Nation's heritage." *Plattsmouth,* 419 F.3d at 776–78 n.8.  The Eighth Circuit stated:

> Like the monument at issue in *Van Orden,* the Ten Commandments monument installed in Memorial Park by the City of Plattsmouth is a passive acknowledgment of the roles of God and religion in our Nation's history.  Moreover, as was the case in *Van Orden,* decades passed during which the Ten Commandments monument stood in Plattsmouth's Memorial Park without objection. *See id.* at 2864 (Rehnquist, C.J.), 2870 (Breyer, J., concurring in judgment).  Although the text of the Ten Commandments has undeniable religious significance, "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *Id.* at 2863; *see Lynch,* 465 U.S. at 680, 687; *Marsh,* 463 U.S. at 792; *McGowan v. Maryland,* 366 U.S. 420; *Walz v. Tax Comm'n of New York,* 397 U.S. 664, 678 (1970). While there are limits to government displays of religious messages or symbols, a fact well-illustrated by *Van Orden's* companion case, *McCreary County,* 545 U.S. 844, we cannot conclude that Plattsmouth's display of a Ten Commandments monument is different in any constitutionally significant way from Texas's display of a similar monument in *Van Orden*.

*Id*. at 778.

This case is factually distinguishable from both *Van Orden* and *Plattsmouth*.  Perhaps most notably here, the Ten Commandments Monument is new, and the Orsi, Cave, and Intervenor plaintiffs did not wait many years before challenging the monument.  *See, e.g., Red River Freethinkers v. City of Fargo*, 764 F.3d 948, 949–51 (8th Cir. 2014) (upholding 40-year old Ten Commandments monument); *Plattsmouth*, 419 F.3d at 774, 778 (upholding nearly 50-year old Ten Commandments monument); *Card v. City of Everett*, 520 F.3d 1009, 1021 (9th Cir. 2008) (concluding that complaints about Ten Commandments monument "did not surface until the

---

[124]  "In 1965, the Fraternal Order of Eagles (Eagles) donated to the City of Plattsmouth an approximately five-foot-tall and three-foot-wide granite monument inscribed with a nonsectarian version of the Ten Commandments." *Plattsmouth*, 419 F.3d at 773.

monument had been in place for over thirty years" was "determinative"); *see also Green v. Haskell Cnty. Bd. of Comm'rs,* 568 F.3d 784, 806 (10th Cir. 2009), and determining that "years of tranquility 'suggest more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor a particular religious sect, primarily to promote religion over nonreligion'") (quoting *Van Orden,* 545 U.S. at 702 (Breyer, J., concurring). The Orsi and Cave plaintiffs brought their lawsuit within one month of the installation of the Ten Commandments Monument on Arkansas State Capitol grounds (Dkt. No. 1). *See Orsi v. Martin*, Case No. 4:18-cv-343-JM (Dkt. No. 1, at 3).[125] As Justice Breyer stated in *Van Orden*, "a more contemporary state effort to focus attention upon a religious text is certainly likely to prove divisive in a way that [a] longstanding, pre-existing monument has not." *Van Orden*, 545 U.S. at 703 (Bryer, J., concurring); *see also Glassroth v. Moore*, 335 F.3d 1282, 1300 (11th Cir. 2003) ("a new display of the Ten Commandments is much more likely to be perceived as an endorsement of religion by the government than one in which there is a legitimate preservationist perspective") (internal quotation marks and citation omitted).

Additionally, unlike in *Van Orden* and *Plattsmouth* where the Ten Commandments monuments were funded by the Fraternal Order of the Eagles, a civic organization with the secular purpose to reduce juvenile delinquency, here the Ten Commandments Monument was funded by a GoFundMe account set up by Senator Rapert through the Foundation with major funding from Agape Church in Little Rock and PureFlix Entertainment, whose stated purpose as a "Christian

---

[125]    Based on undisputed record evidence, less than 24 hours after the first Ten Commandments Monument was installed, an individual used his vehicle to destroy it (Dkt. No. 286, ¶¶ 73, 105; 287, ¶ 31). The Ten Commandments Monument at issue in this case is the second one (Dkt. No. 286, ¶ 74). For reasons explained in this Opinion and Order, the Court rejects Secretary Jester's argument regarding laches. See the discussion, *supra*, regarding laches.

Movie Studio" is "to influence the global culture for Christ through media" and whose mission is to "to strive to make a difference for His name." (Dkt. No. 266, ¶ 94).

Also, the context of the passage of the Display Act giving rise to the Ten Commandments Monument is different from the context of the monuments in *Van Orden* and *Plattsmouth*. The passage of the Display Act itself indicates that the Display Act favors religion in violation of the Establishment Clause. The Display Act mandates that the Arkansas Secretary of State "arrange for the placement on the State Capitol grounds of a suitable monument commemorating the Ten Commandments." Ark. Code Ann. § 22-3-221(b)(1). At that time, in Arkansas no other Act had mandated the display of a monument on State Capitol grounds without first being approved by the Arts and Grounds Commission Subcommittee. See the discussion *infra* regarding statutory construction.

Further, the Arkansas General Assembly's stated purpose for passing the Display Act was not to commemorate the State's religious heritage or the development of the law or any other secular idea. Instead, the Arkansas General Assembly's stated purpose in passing legislation to mandate the placement of a new, stand-alone monument on State Capitol grounds was "commemorating the Ten Commandments." Ark. Code Ann. § 22-3-221(b)(1). In that mandate, the Display Act requires that the full text of the Ten Commandments be displayed on the monument. Ark. Code Ann. § 22-3-221(b)(1).

The Display Act states that the Ten Commandments Monument "shall be placed on the State Capitol grounds where there are other monuments." Ark. Code Ann. § 22-3-221(b)(2)(B). However, in the instant case unlike in *Van Orden*, the Ten Commandments Monument is isolated from the other monuments on the roughly 40 acres that makes up the State Capitol grounds (Dkt. No. 260-30; 260-31, at 44; 266-10). The monument has no visual relationship to any other

monument such that the message of other monuments can affect the message of the Ten Commandments (*Id.*).  To the extent Secretary Jester attempts to rely on undisputed record evidence about other public displays (*see* Dkt. Nos. 260-12; 261, ¶¶ 17–19, 21; 279, ¶¶ 17–18; 283, ¶¶ 17–18; 290, ¶¶ 17, 19), these displays do not include a government mandate that the full text of the Ten Commandments be displayed, and they are not included on or near the Ten Commandments Monument on the Arkansas State Capitol grounds.  Moreover, at the time the parties briefed the summary judgment issues in this case, a pamphlet published by former Secretary Thurston called "A Walk on the Hill" describing most of the monuments on the State Capitol grounds—did not mention—the Ten Commandments Monument.  This confirms that there was no subject matter relationship between the Ten Commandments Monument and any of the other monuments on the State Capitol grounds (Dkt. No. 266-6, at 34–53).[126]

Further, most of the other monuments on the State Capitol grounds are memorials to soldiers who died in military conflicts, honor military units or soldiers, or pay tribute to other classes of people, such as law enforcement officers, firefighters, public officials, pioneer women, and children (*Id.*).  Two monuments relate specifically to Arkansas history and industry, and two honor specific historical events (*Id.*).  No monument honors any belief about religion other than the Ten Commandments Monument.

This Court also considers the undisputed record evidence regarding Senator Rapert's comments and actions taken before and during the passage of the Display Act and during the

---

[126] At some time after the close of summary judgment briefing in this matter, the Arkansas Secretary of State appears to have updated information provided for self-guided tours.  *See* https://www.sos.arkansas.gov/state-capitol/state-capitol-tour-information/ (last visited March 30, 2026).  For the reasons explained in this Opinion and Order, *supra*, the Court finds this publicly available change currently on Secretary Jester's website insufficient.

installation of the Ten Commandment Monuments, both the first one that was destroyed within a day of its placement and the second one that is the subject of this litigation.  See *supra* and *infra*.

As Justice Breyer pointed out in *Van Orden*, the Texas display served "a mixed but primarily nonreligious purpose," has "stood apparently uncontested for nearly two generations," and is "unlikely to prove divisive."  545 U.S. at 703 (Breyer, J., concurring).  The Display Act passed by the Arkansas General Assembly, on the other hand, has proven to be a divisive piece of legislation.  It placed the Ten Commandments Monument, funded by religious entities and bearing a religious text, i.e., the Ten Commandments, in front of a population with many different religious and nonreligious fundamental beliefs.  It did so for the purpose of "commemorating the Ten Commandments," Ark. Code. Ann. § 22-3-221(b), not to commemorate the state's religious heritage or the development of the law.  The Orsi, Cave, and Intervenor plaintiffs immediately challenged the Display Act that resulted in the placement of the second Ten Commandments Monument, after the first was destroyed within a day of being placed.  Based on the undisputed record evidence before the Court, including but not limited to the text and design of the Ten Commandments Monument; its placement on the State Capitol grounds; the circumstances of its installation, financing, and unveiling; and the timing of this litigation, the Court concludes that this case is distinguishable from *Van Orden* and from *Plattsmouth*.  For these reasons, and based on the undisputed record evidence taken as a whole, the Court also concludes that the Display Act and the Ten Commandment Monument on State Capitol grounds violate the Establishment Clause.

### G.   *Kennedy v. Bremerton School District* And *New Doe Child #1 v. United States*

In their brief supporting their motions for summary judgment, the Orsi and Cave plaintiffs apply the test set forth in the United States Supreme Court's more recent decision, *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), where the United States Supreme Court suggested

that the Establishment Clause must be interpreted by "reference to historical practices and understandings." *Id*. at 535 (quoting *Town of Greece*, 572 U.S. at 576). The Supreme Court suggested that the line "'between the permissible and the impermissible' has to 'accord with history and faithfully reflec[t] the understandings of the Founding Fathers.'" *Id*. at 535–36 (quoting *Town of Greece*, 572 U.S. at 577).

In *New Doe Child # 1 v. United States*, the Eighth Circuit expanded upon the United States Supreme Court's instruction that the Establishment Clause "*must* be interpreted by reference to historical practices and understandings" in a manner that "faithfully reflects the understanding of the Founding Fathers." 901 F.3d 1015 at 1020 (quoting *Town of Greece*, 572 U.S. at 577). The Eighth Circuit broke this into a two-part analysis. *Id*. Accordingly, the Court will look first at what historical practices indicate about the constitutionality of an act through which the State of Arkansas issued a government mandate for a display of the text of the Ten Commandments "commemorating the Ten Commandments," Ark. Code Ann. § 22-3-221, and mandated the placement of the Ten Commandments Monument on State Capitol grounds. The Court then will consider whether the placement of the Ten Commandments Monument on State Capitol grounds is impermissibly coercive. *Id*.

### 1. What Do Historical Practices Indicate About The Constitutionality Of The Display Act?

#### a. Standard

The Eighth Circuit Court of Appeals has determined that the analysis begins by looking to historical practices. Where "history shows that the specific practice is permitted," we typically need go no further; the Establishment Clause claim fails. *New Doe Child #1*, 901 F.3d at 1021 (citing *Town of Greece*, 572 U.S. at 576–77); *see also Town of Greece*, at 602–03 (Alito, J., concurring). "But where history has not spoken to the 'specific practice' at hand, [*Town of Greece*]

indicates that we look to the historical understandings of the Establishment Clause as informed by other relevant practices." 901 F.3d at 1021 (quoting *Town of Greece*, 572 U.S. at 577 (majority opinion)).

### b.    Arguments Of The Parties

The Orsi plaintiffs assert that, historically, the Establishment Clause has unconditionally prohibited legislative action that elevates one religion or sectarian belief to favored status (Dkt. No. 256, at 11–19). The Orsi plaintiffs maintain that the vision of the Framers of our Constitution and the Bill of Rights was to safeguard religious freedom for all by prohibiting the comingling of secular and religious power (*Id.*, at 11–14 (citing Dkt. No. 256-1, at 5–39)). According to the Orsi plaintiffs, the First Amendment was designed to prohibit governmental preference for any faith or religion (Dkt. No. 256, at 14–16). The Orsi plaintiffs maintain that there is no established history of laws ratifying the Ten Commandments and that the religious divisiveness caused by the Display Act is precisely the type of harm the Establishment Clause was meant to prevent (*Id.*, at 19–29). The Orsi plaintiffs argue that the undisputed record evidence in this case is akin to that in *McCreary County* in that the enactment of the Display Act led to immediate and vocal public backlash (*Id.*, at 29).

The Cave plaintiffs argue that sources of law for the American colonies and later the United States were broad and varied, including common and statutory law of England, Roman law, the civil law of continental Europe in the post-Roman period, private international law, and Germanic tribal law (*Id.*, at 23 (citing generally Lawrence M. Friedman, A History of American Law 33–104 (2nd ed. 1985)). The Cave plaintiffs list documents and texts that they assert figured prominently in developments of the law including, but not limited to, the Magna Carta, the Declaration of Independence, and the *Federalist Papers*. The Cave plaintiffs maintain that each of these

86

documents had a far greater influence on America's laws than the Ten Commandments and that these documents do not reference the Ten Commandments (Dkt. No. 265, at 23–24). For example, the Magna Carta makes no reference to the Ten Commandments (*Id*., at 25). The Declaration of Independence includes references to the "Laws of Nature and of Nature's God," a "Creator," and to "divine Providence," but these are all non-biblical references (*Id*., at 29). In the Declaration of Independence, Thomas Jefferson appealed to notions of popular sovereignty and self-determination, but he did not invoke God's name or even "nature's God" as justification (*Id*.). Jefferson did not claim that the new nation was formed based on biblical law but asserted that "[g]overnments are instituted among Men, deriving their just Powers from the Consent of the Governed." (*Id*.). The Declaration of Independence does not reference either the Bible or the Ten Commandments.

Finally, according to the Cave plaintiffs, neither the "Bible" nor "Scripture," nor the "Ten Commandments," appears in the index to the *Federalist Papers* (*Id*., at 31). The Cave plaintiffs note that there are passing references in the *Federalist Papers* to "God" the "Almighty" and to religion, but no author who participated in the debates called upon the Ten Commandments as authority for his position (*Id*., at 31–32).

The Intervenor plaintiffs contend that, under *American Legion*, the Court should look to the age of the Ten Commandments monument, which in this case is new (Dkt. No. 271, at 26). The Intervenor plaintiffs contend that this Ten Commandments Monument is distinguishable from the ones at issue in *Van Orden* and *American Legion* but indistinguishable from the one at issue in *McCreary County* (*Id*., at 26–27).

According to Secretary Jester, to require that a Ten Commandments display be traced back "200-plus years to the Founding" would be "imposing more stringent First Amendment limits on

the States than the draftsmen imposed on the Federal Government." (Dkt. No. 285, at 8 (quoting *Marsh*, 463 U.S. at 791)).  Secretary Jester further argues that the "specific practices common in 1791" are not all the Establishment Clause permits (*Id.* (citing *Cnty. of Allegheny*, 492 U.S. at 670 (Kennedy, J., concurring in judgment in part and dissenting in part)).  Secretary Jester urges that the Supreme Court has recognized "depictions of the Ten Commandments" as an "example" of "an established monument, symbol, or practice." (*Id.* at 9 (citing *Am. Legion*, 588 U.S. at 52–54 (majority); *see Van Orden*, 545 U.S. at 688 (plurality) (public "acknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout America")))).  Jester also argues that there is a "125-year-plus practice of Ten Commandment displays."  (*Id.* (citing Dkt. Nos. 260-3, at 41–63, 60 n.260 (other citation omitted)).

Secretary Jester asserts that it is "uncontroversial" that the Ten Commandments "are an important component of the moral foundation of the laws and legal system of the United States of America and of the State of Arkansas" (*Id.* at 11 (citing in support of this argument Dkt. No. 260-2 (the Display Act, Ark. Code Ann. § 22-3-221))).  The Orsi, Cave, and Intervenor plaintiffs contest this statement and Secretary Jester's use of Dr. Green's article *The Fount of Everything Just and Right? The Ten Commandments as a Source of American Law*, 14 J. Law & Religion 525 (1999-2000), to support it.  Specifically, the Orsi plaintiffs take issue with an ellipsed quotation of Dr. Green's article in Secretary Jester's response to their motions for summary judgment (Dkt. No. 292, at 8).  In the quotation, Secretary Jester omits the italicized portion of Dr. Green's quote which reads, "[f]ew people, if any, would dispute that the Ten Commandments *and its parallels from other ancient cultures* inform our notions of right and wrong and, as such, have influenced the development of Western law of which the American legal system is part." (Dkt. No. 285, at 11).  Dr. Green's article, in fact, concludes that the historical record fails to support a direct relationship

between the law and the Ten Commandments (*Id.*).  Compare Dkt. No. 285, at 10–11 (Secretary Jester's brief) with 14 J. Law & Religion 525, 557 (1999-2000) (the quoted material).

What Dr. Green concludes in his article, and what he contends "has always been a noncontroversial fact" is, that "[a]t best, the most that could be said about the relationship of the Ten Commandments to the law is that the former has influenced legal notions of right and wrong." Green, 14 J. Law & Religion at 558.  The Court agrees with the Orsi plaintiffs that it is an overstatement for Secretary Jester to assert that Dr. Green's article supports Secretary Jester's assertion that the Ten Commandments are a historical basis for the legal system of the United States and the State of Arkansas.

### c.    Analysis

Secretary Jester's analysis of the specific practice at issue in this case misses the mark.  In *Town of Greece*, the United States Supreme Court asked whether "history shows that the *specific practice* is permitted," not whether a general practice is permitted.  572 U.S. at 577 (2014) (emphasis added); *see New Doe Child #1*, 901 F.3d at 1021 (the court asks at step one whether history "has spoken to" a specific practice); s*ee also Rowan Cnty. v. Lund*, 586 U.S. 1035, 1038 (2018) (Thomas, J., dissenting from denial of *certiorari*) (stating that *Town of Greece's* historical inquiry requires an examination of the "specific practice" at issue).

The specific practice at issue here is the Arkansas General Assembly's passage of a Display Act, through which the State of Arkansas issued a government mandate for a display of the text of the Ten Commandments "commemorating the Ten Commandments," Ark. Code Ann. § 22-3-221, and mandated the placement of a new, stand-alone Ten Commandments Monument on State Capitol grounds.  The practice is not, as Secretary Jester suggests, the "public acknowledgements of religion" (Dkt. No. 285, at 3–9).  Nor is the question about whether "religion has been closely

associated with our nation's history and government." (*Id.*, at 11).  Instead, the question is whether the "specific practice" of government mandated placement of a new, stand-alone monument on State Capitol grounds specifying the exact text of the Ten Commandments and "commemorating the Ten Commandments," Ark. Code Ann. § 22-3-221, is permitted by our history and whether the practice at issue "fits within" and is "consistent with a broader tradition."  *Town of Greece*, 572 U.S. at 577–78.  Secretary Jester fails to demonstrate that the Display Act and the Ten Commandments Monument withstand this type of scrutiny.

Looking to the specific practice at issue in this case, this Court must evaluate the Arkansas General Assembly's action in passing the Display Act against any history of Congress or a state legislature passing similar legislation.  The Supreme Court explained in *Town of Greece* that, while the "Establishment Clause must be interpreted 'by reference to historical practices and understandings,'" that approach "must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation."  572 U.S. at 576; *see also Marsh*, 463 U.S. at 790 ("Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees . . . ."); *Walz v. Tax Comm'n*, 397 U.S. 664, 678 (1970) ("It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it.  Yet an unbroken practice . . . is not something to be lightly cast aside.").  In other words, government action that is contrary to founding-era values that motivated the Framers should be evaluated skeptically.

For example, in *Marsh*, the Supreme Court used a historical analysis to analyze an Establishment Clause challenge to the Nebraska legislature opening each session with a prayer by a chaplain paid with public funds.  463 U.S. at 784.  The Supreme Court opted for a historical

90

analysis because "historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First congress—their actions reveal their intent." *Id*. at 790. The historical analysis revealed that "in the same week Members of the First Congress voted to appoint and to pay a Chaplain for each House and also voted to approve the draft of the First Amendment for submission to the States, they intended the establishment Clause of the Amendment to forbid what they had just declared acceptable." *Id*. The Supreme Court upheld the Nebraska practice because the Court found historical support for it. *Id*. at 794–95.

As Dr. Green states in his report, "publicly-erected and publicly-owned Ten Commandments monuments lack the historical pedigree of other forms of government religious expression, such as with legislative chaplains, see *Marsh v. Chambers*, 463 U.S. 783 (1983)." (Dkt. No. 254-1, at 167). Secretary Jester has not pointed to a longstanding history of legislation or similar government action mandating the placement of a new, stand-alone monument on State Capitol grounds "commemorating the Ten Commandments" and mandating the text of the Ten Commandments that approaches the "unambiguous and unbroken history of more than 200 years" found sufficient to uphold legislative prayer in *Marsh*. 463 U.S. at 792. As Dr. Green observed, Ten Commandments monuments, like the one at issue here, "are of recent invention and do not possess 'a long history' or a 'distinctive constitutional warrant by virtue of tradition.'" (Dkt. No. 254-1, at 186). The design of the Ten Commandments monument, similar to the one at issue here but arising in other contexts, dates to the mid-1940s. *Van Orden*, 545 U.S. at 713. The actual erection of monuments donated by the Fraternal Order of the Eagles did not begin until the mid-1950s (Dkt. No. 254-1, at 96–106).

Secretary Jester relies on Dr. Hall's report to argue that the Court should uphold the Display Act based on a more abstract and general history of religious references by government actors or religious references on government property (Dkt. Nos. 258, at 22–24; 254-1, at 49–162). Secretary Jester refers to these as "public acknowledgements of religion." (Dkt. No. 285, at 9). Dr. Hall attempts to address the issue of religious displays on government property not with examples of founding-era Ten Commandments legislation but with a list of crosses, presumably displayed on public property, that even he admits "have often been used to commemorate and honor the dead." (Dkt. No. 254-1, at 90–92). Dr. Hall also discusses religious references inside the Washington Monument, placed 100 years after the First Amendment was ratified; biblical quotes on three other government buildings, without identifying when those were established or why they are significant; and contemporary monuments, all from the 20th or 21st century, that include minority religious symbols (*Id*., at 110–111).

Dr. Hall's alleged historical analysis does not support the action taken by the Arkansas General Assembly in passing a Display Act that mandates the placement of a new, stand-alone monument on State Capitol grounds specifying the exact text of the Ten Commandments and "commemorating the Ten Commandments." Ark. Code Ann. § 22-3-221(b). The cross displays are not analogous because they took on a secular meaning when they were used as memorials to war veterans. Further, despite Secretary Jester's argument to the contrary, nothing about the Ten Commandments Monument commemorates or marks a secular historical event. The record before the Court does not show that there is a historical foundation for the specific practice at issue in this case in order for it to be permitted under the Establishment Clause.

### d.    Conclusion

On the record before it, the Court determines that historical tradition or practice does not support the Arkansas General Assembly's passage of the Display Act through which the State of Arkansas issued a government mandate for a display of the text of the Ten Commandments "commemorating the Ten Commandments," Ark. Code Ann. § 22-3-221, and required the placement of a permanent, stand-alone Ten Commandments Monument on State Capitol grounds.

## 2.    Is The Display Act Impermissibly Coercive?

### a.    Standard

In *Town of Greece*, the United States Supreme Court stated that "[i]t is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise.'" 572 U.S. at 586–87 (quoting *Cnty. of Allegheny,* 492 U.S. at 659 (Kennedy, J., concurring in judgment in part and dissenting in part)); *see also Van Orden,* 545 U.S. at 683 (recognizing that our "institutions must not press religious observances upon their citizens"). As Justice Blackmun observed for the Supreme Court in *County of Allegheny:*

> Whatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion, *see, e.g., Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989)), it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente,* 456 U.S. 228, 244 (1982).

492 U.S. at 605.

In *Van Orden*, the Supreme Court observed that a "contemporary state effort to focus attention upon a religious text is certainly likely to prove divisive in a way that [a] longstanding, pre-existing monument has not." 545 U.S. at 703.

### b.    Arguments Of The Parties

At the outset, the Cave plaintiffs argue that the second portion of the analysis focusing on "coercion" should have no application to this the present case because, in their view, "[t]he Eighth Circuit identified this element solely because '[a] majority of the Court' in *Town of Greece* 'considered whether the prayer at issue was unduly coercive.'" (Dkt. No. 265, at 16  (citing *New Doe Child # 1*, 901 F.3d at 1020)).  The Cave plaintiffs say that this part of the *Town of Greece* "opinion arose solely in response to an argument put forward by the plaintiffs" and that "[t]here is no indication that the Court would have addressed this issue as an essential element of its analysis but for the plaintiffs' contentions." (*Id.*).  In support of this proposition, the Cave plaintiffs assert that "the portion of the opinion in *Town of Greece* addressing coercion (Part II-B) commanded the votes of only three Justices (*Id.*, at 16 n.1 (citing 572 U.S. at 568-69 & n.1; 572 U.S. at 610 (Thomas, J., concurring in part and concurring in the judgment))).

Further, Cave plaintiffs assert that "the Establishment Clause does far more than protect individual religious autonomy from government coercion.  The Establishment Clause is also about governmental evenhandedness on all matters religious." (*Id.*, at 16 (citing *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) (the "touchstone" is the principle that the "First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."); *see also Cnty. of Allegheny*, 492 U.S. at 593 ("Whether the key word is 'endorsement,' 'favoritism,' or 'promotion,' the essential principle remains the same"); *Edwards v. Aguillard*, 482 U.S. 578, 593 (1987) ("preference" for particular religious beliefs constitutes an endorsement of religion); *Engel v. Vitale*, 370 U.S. 421, 443 (1962) ("By reason of the First Amendment government is commanded to have no interest in theology or ritual, for on those matters government must be neutral.") (internal citation omitted); *Everson v. Bd. of Educ. of Ewing*, 330

94

U.S. 1, 18 (1947) (the First Amendment "requires the state to be a neutral in its relations with groups of religious believers and non-believers"))). For this reason and based on caselaw cited, Cave plaintiffs argue that, to the extent this Court asks a second question after the historical inquiry, "the Court should probe whether the Ten Commandments Monument 'convey[s] a message that religion or a particular religious belief is favored or preferred." (*Id.*, at 17 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 70 (1985) (O'Connor, J., concurring))).

The Orsi and Cave plaintiffs argue that the Arkansas General Assembly's passage of a Display Act impermissibly promotes the Ten Commandments and conveys an intent to favor Christian religion in violation of the Establishment Clause (Dkt. Nos. 256, at 16–19; 265, 32–50). Intervenor plaintiffs maintain that the Display Act violates the Establishment Clause because the Ten Commandments Monument is new, has prompted religious controversy, and endorses a particular set of religious beliefs (Dkt. No. 271, at 25–29).

The Orsi and Cave plaintiffs point out that the United States Supreme Court has long recognized that the Ten Commandments are "undeniably a sacred text in the Jewish and Christian faiths" and "do not confine themselves to arguably secular matters." (Dkt. Nos. 256, at 17; 265, at 18). *See Stone*, 449 U.S. at 41; *McCreary County*, 545 U.S. at 869 ("[T]he original text viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction.").

The Orsi, Cave, and Intervenor plaintiffs maintain that the record in this case is most like the record in *McCreary County*, which Justice Breyer later described in *Van Orden* as a "short (and stormy) history." (Dkt. Nos. 256, at 29; 265, at 40; 271, at 26). *Van Orden*, 545 U.S. at 702 (Breyer, J., concurring). This case, like *McCreary County*, "demonstrates the substantially

95

religious objectives of those who mounted them, and the effect of this readily apparent objective upon those who view them." *Id*.

The Cave plaintiffs argue that during the enactment of the Display Act and after the placement of the Ten Commandments Monument, there was almost immediate, vocal public backlash due to the Arkansas General Assembly's preference for a Christian religious message (Dkt. Nos. 265, at 39–44; 287 ¶¶ 15, 19–21). Further, the Cave plaintiffs contend that Arkansas State officials had a clear religious purpose for erecting the Ten Commandments Monument (Dkt. No. 265, at 44–49). According to the Cave plaintiffs, Senator Rapert believes the word "God" as prescribed in the text of the Ten Commandments that appears on the Ten Commandments Monument, is the God of the Old Testament who appeared and spoke to Moses according to the Old Testament Book of Exodus, and Senator Rapert also believes that the word "commandment" is synonymous with the word "order." (Dkt. No. 266, ¶¶ 54-55).

The Cave plaintiffs assert that Senator Rapert's statements are evidence of the religious motivation for the Display Act as expressed by the bill's lead sponsor. They contend that Senator Rapert's statements: (1) reveal that the purpose of displaying the text of the Ten Commandments on the State Capitol grounds was to express Christian religious principles and (2) undercut any argument that the Arkansas General Assembly passed the Display Act because the Ten Commandments reflect an "important component of the moral foundation of the laws and legal system of the United States of America and of the State of Arkansas." (Dkt. No. 265, at 46–49). *See Wallace v. Jaffree*, 472 U.S. 38, 60 (1985) (relying on testimony of prime sponsor of legislation to find that purpose of law was to return prayer to public school); *Edwards*, 482 U.S. at 586-88 (looking to the detailed public comment of statute's sponsor to determine the purpose of state law requiring that creationism be taught alongside evolution).

Further, the Cave plaintiffs contend that the circumstances of the financing of the Ten Commandments Monument and the unveiling of the Ten Commandments Monument show support for its Christian religious message (Dkt. No. 265, at 49–50). As support for their argument, the Cave plaintiffs point to Senator Rapert's involvement in raising funds for the Ten Commandments Monument.

The Intervenor plaintiffs argue that the Ten Commandments monument is obviously religious and that there is no *bona fide* secular justification for the Ten Commandments monument, which is a "transparent attack on the American bulwark which safeguards the freedom of thought that 'no official, high or petty, can prescribe what shall be orthodox in . . . religion.'" (Dkt. No. 271, at 29 (quoting *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943))).

Secretary Jester argues that plaintiffs' misguided efforts to impugn the General Assembly's intent fail (Dkt. No. 285, at 12–13). Further, Secretary Jester argues that, by accepting the Ten Commandments Monument, Arkansas did not "endorse the specific meaning that any particular donor sees in the monument" (*Id.*, at 12 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 476–77 (2009)). Secretary Jester calls plaintiffs' efforts to associate the Ten Commandments Monument with the religious identities of "twice-removed" donors and the "personal-capacity statements" of a single legislator baseless (*Id.*, at 12). Secretary Jester accuses plaintiffs of relying on "cherrypicked, decontextualized comments" and not addressing the General Assembly's intent (*Id.*, at 13). Secretary Jester points to *Rosenstiel v. Rodriguez*, 101 F.3d 1544 (8th Cir. 1996), to argue that plaintiffs pointed improperly to Senator Rapert's comments as evidence of the General Assembly's intended effect of the Display Act. Secretary Jester points out that the General Assembly's intent is memorialized in the unambiguous statutory text (*Id.*).

c.      Analysis

The Court's review of the Display Act passed by the General Assembly, together with the

other evidence in the record, conveys a message that the Christian religion is favored, and the

Display Act is coercive in violation of the Establishment Clause.

i.      The Display Act

The Court begins with an analysis of the Display Act.  Ark. Code Ann. § 22-3-221.  The

passage of the Display Act itself indicates that the Display Act favors religion in violation of the

Establishment Clause.  The Display Act mandates that the Arkansas Secretary of State "arrange

for the placement on the State Capitol grounds of a suitable monument commemorating the Ten

Commandments."  Ark. Code Ann. § 22-3-221(b)(1).  At the time of the Display Act's passage,

no other Arkansas legislation  mandated the display of a monument on State Capitol grounds

without first being approved by the Arts and Grounds Commission Subcommittee.

The Court turns to examine the text of the Display Act.  Under Arkansas law, "[t]he basic

rule of statutory construction to which all other interpretive guides must yield is to give effect to

the intent of the legislature."  *Thomas v. State*, 864 S.W.2d 835, 836 (Ark. 1993).  "Where the

language of a statute is plain and unambiguous, [the] court determines legislative intent from the

ordinary meaning of the language used."  *Simpson v. Cavalry SPV I, LLC*, 440 S.W.3d 335, 337

(Ark. 2014).  "When a statute is ambiguous, [the Court] must interpret it according to legislative

intent and our review becomes an examination of the whole act."  *Id*. at 338.

The Arkansas General Assembly's stated purpose for passing the Display Act was not to

commemorate the state's religious heritage or the development of the law or any other secular

idea.  Instead the Arkansas General Assembly's stated purpose in passing legislation to mandate

the placement of a new, stand-alone monument on State Capitol grounds was "commemorating

98

the Ten Commandments." Ark. Code Ann. § 22-3-221(b)(1). Here, the Display Act requires the full text of the Ten Commandments be displayed on the monument. Ark. Code Ann. § 22-3-221(b)(1). As this Court acknowledges, the United States Supreme Court has long recognized that the Ten Commandments are "undeniably a sacred text in the Jewish and Christian faiths" and "do not confine themselves to arguably secular matters." *Stone*, 449 U.S. at 41; *McCreary County*, 545 U.S. at 869. "[T]he first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day." *Stone*, 449 U.S. at 42. As stated by the Supreme Court in *McCreary County*, "[w]hen the government initiates an effort to place this statement alone in public view, a religious object is unmistakable." *McCreary County*, 545 U.S. at 869.

The Court recognizes that the Display Act states the Ten Commandments Monument "shall be placed on the State Capitol grounds where there are other monuments." Ark. Code Ann. § 22-3-221(b)(2)(B). However, in the instant case, the undisputed record evidence is that the Ten Commandments Monument is isolated from the other monuments on the roughly 40 acres that makes up the State Capitol grounds (Dkt. No. 260-30; 260-31, at 44; 266-10). The monument has no visual relationship to any other monument such that the message of other monuments can affect the message of the Ten Commandments (*Id.*). To the extent Secretary Jester attempts to rely on undisputed record evidence about other public displays (*See* Dkt. Nos. 260-12; 261, ¶¶ 17–19, 21; 279, ¶¶ 17–18; 283, ¶¶ 17–18; 290, ¶¶ 17, 19), these displays do not include (as a government mandate) the full text of the Ten Commandments and are not included on or near the Ten Commandments Monument on the Arkansas State Capitol grounds (Dkt. No. 266-10). Moreover, at the time the parties briefed the summary judgment issues in this case, a pamphlet published by former Secretary Thurston called "A Walk on the Hill" and describing most of the monuments on

99

the State Capitol grounds—did *not* mention the Ten Commandments Monument.  This confirmed

that there was no subject matter relationship between the Ten Commandments Monument and any

of the other monuments on the State Capitol grounds (Dkt. No. 266-6, at 34–52).[127]

Further, most of the other monuments on the State Capitol grounds are memorials to

soldiers who died in military conflicts, honor military units or soldiers, or pay tribute to other

classes of people, such as law enforcement officers, firefighters, public officials, pioneer women,

and children (*Id.*).  Two monuments relate specifically to Arkansas history and industry, and two

honor specific historical events (*Id.*).  No monument honors any belief about religion other than

the Ten Commandments Monument.

Pursuant to the Display Act, the Secretary of State is to approve the design and site

selection and to arrange a suitable time for its placement. Ark. Code Ann. § 22-3-221(b)(2)(B).

However, the Display Act specifically exempts the monument "from §§ 23-3-301 *et seq.* and 23-

3-501 *et seq.*" Ark. Code Ann. § 22-3-221(b)(4)(B).  This provision of the Display Act singles

out this mandated monument on State Capitol grounds, affording this monument different and

more favorable treatment under the law than that afforded to other proposed monuments at the

time the Display Act was passed.

The Display Act accounts for the defense of any legal challenge to the Act.  *See* Ark. Code

Ann. § 22-3-221(c).  Further, the Display Act states: "The placement of the monument under this

section shall not be construed to mean that the State of Arkansas favors any particular religion or

denomination over others."  Ark. Code Ann. § 22-3-221(d).  Taken together these provisions

---

[127] At some time after the close of summary judgment briefing in this matter, the Arkansas Secretary of State appears to have updated information provided for self-guided tours.  *See* https://www.sos.arkansas.gov/state-capitol/state-capitol-tour-information/ (last visited March 30, 2026).  For the reasons explained in this Opinion and Order, *supra*, the Court finds this publicly available change currently on Secretary Jester's website insufficient.

could be viewed as a signal of the General Assembly's awareness of the divisiveness of the Display Act and the likelihood of legal challenges to follow.

Based on this, the Court finds a conflict and ambiguity in the plain language of the Display Act, specifically in subsection (b)(1) which mandates the placement of a new, stand-alone monument on State Capitol grounds "commemorating the Ten Commandments" and in subsection (d) which purports to disclaim the State of Arkansas favoring any particular religion or denomination over others. *See Simpson*, 440 S.W.3d at 338 ("A statute is considered ambiguous if it is open to more than one construction.").

To resolve this ambiguity, this Court interprets the statute according to legislative intent by looking at the Act in its entirety. *Ark. Tobacco Control Bd. v. Santa Fe Nat. Tobacco Co.*, 199 S.W.3d 656, 659 (Ark. 2004). "When a statute is ambiguous, [the Court] must interpret it according to legislative intent and our review becomes an examination of the whole act." *Simpson*, 440 S.W.3d at 338. We "review[ ] the act in its entirety" and "reconcile provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part." *Id*. Further, the Court's task includes consideration of "the legislative history, the language, and the subject matter involved." *Id*.

### ii.    Legislative History:
### Legislative Findings

Given this, the Court turns to the legislative history of the Act based on the undisputed record evidence before the Court. Senator Rapert was the primary sponsor of the bill that became the Display Act (Dkt. No. 286, ¶ 43). The original bill introduced by Senator Rapert in the Arkansas General Assembly contained the following legislative findings:

LEGISLATIVE FINDINGS. The General Assembly finds that:

(1)     The Ten Commandments, found in the Bible at Exodus 20:1-17 and Deuteronomy 5:6-21, are an important component of the moral foundation of the laws and legal system of the United States of America and of the State of Arkansas;

(2)     The courts of the United States of America and of various states frequently cite the Ten Commandments in published decisions;

(3)     The Ten Commandments represent a philosophy of government held by many of the founders of this nation and by many Arkansans and other Americans today, that God has ordained civil government and has delegated limited authority to civil government, that God has limited the authority of civil government, and that God has endowed people with certain unalienable rights, including life, liberty, and the pursuit of happiness;

(4)     In order that they may understand and appreciate the basic principles of the American system of government, the people of the United States of America and of the State of Arkansas need to identify the Ten Commandments, one of many sources, as influencing the development of what has become modern law; and

(5)     The placing of a monument to the Ten Commandments on the grounds of the Arkansas State Capitol would help the people of the United States and of the State of Arkansas to know the Ten Commandments as the moral foundation of the law.

(Dkt. No. 286, ¶ 44).  These legislative findings are not part of the Display Act that was codified into law (*Id*., ¶ 45).[128]  However, Secretary Jester maintains that these legislative findings should be considered (Dkt. No. 285, at 10 n.2).

---

[128] Secretary Jester further addresses this point in his briefing (Dkt. No. 285, at 10 n.2). Secretary Jester cites the Revision Commission's authority pursuant to Arkansas Code Annotated § 1-2-303.  Under Arkansas law, the text as codified controls unless the Revision Commission exceeded its authority, in which case  the text as enacted controls.  *Bio Gen LLC v. Sanders*, 142 F.4th 591, 601 (8th Cir. 2025) (citing *Porter v. Ark. Dep't of Health & Hum. Servs.*, 286 S.W.3d 686, 691–92 (Ark. 2008)).  To the extent any ruling on this issue is required, because "there is no state supreme court case directly on point, our role is to predict how the state supreme court would rule if faced with the same issue before us."  *Bio Gen*, 142 F.4th at 601 (quoting *Church v. Missouri*, 913 F.3d 736, 745 (8th Cir. 2019)).  This Court does not view the Revision Commission's actions here as like other times where the Arkansas Supreme Court held that revisions changed the substance or meaning.  *See Ortho-McNeil-Janssen Pharms., Inc. v. State*, 432 S.W.3d 563, 573–74 (Ark. 2014) (rejecting the Revision Commission's splitting of a subsection "into two separate stand-alone provisions-subsections"); *Porter*, 286 S.W.3d at 691–92 (rejecting the Revision Commission's removal of the word "not"); *Harrell v. State*, 2012 WL 5462868 (Ark. 2012) (switching the order of interjectory clauses).

After the bill was passed by the Arkansas Senate, it went to the Arkansas House of Representatives for consideration; then-Representative Hammer was the primary sponsor for the legislation in the House of Representatives (*Id.*, ¶ 46). In addition to being a State Representative, Mr. Hammer has been a hospice chaplain and a church pastor (*Id.*, ¶ 47). After the bill was passed by both chambers of the Arkansas General Assembly, former Governor Hutchison signed it into law in April 2015 (*Id.*, ¶ 48). Other than the absence of the legislative findings, the final bill signed into law is identical to the bill introduced by Senator Rapert (*Id.*, ¶ 49).

With respect to legislative findings, the Supreme Court in other contexts has directed that courts should review legislative fact finding under a "deferential standard" but "must not 'place dispositive weight'" on those findings. *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 608–09 (2016), overruled in part on other grounds by *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). The Supreme Court has stated that the "*Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake.*" *Id.* (emphasis in original) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 165 (2007)). Further, where record evidence contradicts some legislative findings, uncritical deference to the legislative factual findings is inappropriate. *Id.*

As explained in this Opinion and Order, the record evidence contradicts the first and third legislative findings quoted above (Dkt. No. 260-2, at 1). Secretary Jester purports to rely on Dr. Green's article to support the assertion that the Ten Commandments are a historical basis for the legal system of the United States and the State of Arkansas; the Court concludes that is an overstatement of Dr. Green's article and is unsupported by the article. *Compare* Dkt. No. 285, at 10–11 (Secretary Jester's brief) *with* 14 J. Law & Religion 525, 528 (1999-2000) (the quoted material). Given this, the Court gives little, if any, deference to the first and third legislative

findings.  Moreover, the legislative findings' references to the Bible and to the God of the Bible as support for the passage of the Display Act support the Orsi, Cave, and Intervenor plaintiffs' assertion that the Display Act conveys that religion is favored in violation of the Establishment Clause.

Although the fourth legislative finding purports to lend support for subsection (d) of the Display Act (Dkt. No. 260-2, at 2), neither the letter nor the spirit of that fourth legislative finding or subsection (d) of the Display Act appear on the Ten Commandments Monument mandated by the Arkansas General Assembly and viewed by the public (Dkt. No. 266-10).  Nothing on the Ten Commandments Monument explains that a purpose of the monument is allegedly to provide basic principles of the American system of government (Dkt. Nos. 266, ¶ 53; 266-10).  Ark. Code Ann. § 22-3-221.

Based on this analysis alone, the Court determines that the Display Act is coercive.

### iii.    Legislative History: Language And Subject Matter Involved

Additionally, when examining the language and subject matter involved to assess the ambiguity in the Display Act, the Court determines that the sources of the Foundation's funding for the Ten Commandments Monument and the statements of the Display Act's primary sponsor, Senator Rapert, while not determinative, are relevant to the Court's consideration when assessing the Display Act.

Based on undisputed record evidence, in February 2015—one month before he introduced the Display Act in the Arkansas General Assembly—Senator Rapert posted on his Twitter account, "To deny America was founded upon Judeo-Christian values is willful ignorance. #arleg #God #AppealtoHeaven." (Dkt. No. 286, ¶ 139).  The same post quoted from an 1864 book entitled, "The Christian Life and Character" that "[t]his is a Christian nation. . . . It is preeminently the land

of the Bible, of the Christian Church, and of the Christian Sabbath." (*Id*.).  It also is undisputed that, in March 2015—at roughly the same time he introduced the Display Act—Senator Rapert posted on his Twitter account, "[t]he late Sen Robert Byrd (D) wasn't afraid to honor the Judeo-Christian heritage of our nation. #AppealtoHeaven." (*Id*., ¶ 140).

When the Arkansas General Assembly considered the bill that became the Display Act some legislators voted against the measure (Dkt. No. 286, ¶ 100).  After the Display Act was passed by both chambers of the Arkansas General Assembly, former Governor Asa Hutchinson signed it into law in April 2015 (*Id.*, ¶ 48).  The headline of an *Arkansas Democrat-Gazette* article that ran when the Display Act was passed was "Bill Passes to display holy rules at Capitol." (Dkt. Nos. 254-1, at 22–24; 287, ¶ 14).

Against this backdrop, the Arkansas General Assembly chose to pass the Display Act, understanding Senator Rapert was a sitting member of the General Assembly when the Display Act was proposed and enacted.

Undisputed record evidence establishes that the Foundation was formed after the statute prescribing the monument was passed in 2015 (Dkt. No. 255, ¶ 27).  Senator Rapert also is an officer and director of the Foundation, an Arkansas non-profit corporation (Dkt. No. 286, ¶ 124). According to the records maintained by the Arkansas Secretary of State, the address for the Foundation is the same as Senator Rapert's business mailing address (*Id*., ¶ 125).  The Foundation website, on the pages designated "about" and "donate" show pictures of Senator Rapert standing with the first Ten Commandments Monument installed on the grounds of the Arkansas State Capitol (*Id*., ¶ 126).  The Foundation website, on the page designated "donate," shows the same address as Senator Rapert's business mailing address (*Id*., ¶ 127).  The Foundation website, on the

page designated contact," lists Senator Rapert as the Founder and President and shows a phone number and the email address senator.jason.rapert@gmail.com (*Id.*, ¶ 128).

On July 8, 2015, three months after former Governor Hutchinson signed the Display Act into law, Senator Rapert posted on his Twitter page ("Sen. Jason Rapert @jasonrapert"), "[i]f you would like to donate to the Ark. Ten Commandments Monument project, please email senator.jason.rapert@gmail.com." (*Id.*, ¶ 87). On February 17, 2016, Senator Rapert created a GoFundMe page on the internet on behalf of the Foundation to raise money for the Ten Commandments Monument (*Id.*, ¶ 88). The Foundation was the primary private entity that assumed financial responsibility for raising the money for the Ten Commandments Monument (*Id.*, ¶ 89). On February 17, 2016, Senator Rapert posted on his Twitter page ("Sen. Jason Rapert @jasonrapert"), "I'm raising money for Ten Commandments Monument," with a link to the GoFundMe page he created (*Id.*, ¶ 90).

Unlike the Fraternal Order of the Eagles, which had a long history of charitable activities in the community, the Foundation was formed by Senator Rapert for the purpose of obtaining financing for the Ten Commandments Monument project. The Foundation had no history of charitable activities prior to the funding of the Ten Commandments Monument. Whenever the Fraternal Order of the Eagles placed a monument, the monument bore an acknowledgement of the Order's contributions. The Foundation has not made similar contributions, but it is acknowledged on the Ten Commandments Monument. The major contributor for the first Ten Commandments Monument was the Agape Church, and the sole contributor for the second Ten Commandments Monument was PureFlix, a self-described "Christian movie studio" (Dkt. No. 266, ¶ 92; 94). The Court finds the funding for the Ten Commandments Monument, coming primarily from two Christian religious organizations under the guise of the Foundation, is significant when the Court

considers the circumstances giving rise to this legal challenge and the past legal challenges to monuments examined by the Supreme Court.

The Court observes that Senator Rapert's role as primary sponsor of the bill—and as organizer of the Foundation, which was formed to raise funds to build the Ten Commandments Monument—is also important.  The Foundation completed construction of the Ten Commandments Monument before it received final approval from the Arts and Grounds Commission Subcommittee to place the monument on State Capitol grounds.

Senator Rapert asserts that the statements he made regarding the Ten Commandments Monument in his "individual capacity" should not be attributed to the General Assembly, but Senator Rapert made statements posted on his Facebook page for Holy Ghost Ministries often identifying himself as "Sen. Jason Rapert" not "Jason Rapert" (*Id*., ¶¶ 143-144).  Jason Rapert was identified as "Senator Rapert" in an advertisement that was published in several national newspapers on September 25, 2016, entitled "Declaration of Dependence Upon God and His Holy Bible" (Dkt. No. 286, ¶ 146).  On January 8, 2017, "Senator Rapert" wrote an editorial for the *Arkansas Democrat-Gazette* stating our nation would be better off if people honored the Ten Commandments "given by God Himself" (Dkt. Nos. 254-1, at 17–21; 287, ¶ 29).  On June 17, 2017, ten days before the installation of the first Ten Commandments Monument, "Senator Rapert" tweeted, "Thank god we have a clear record of our Judeo-Christian history.  May the @ACLU @FFRF NEVER wipe it away. #ThanksgivingDay #Lincoln #arpx." (Dkt. No. 286, ¶ 142).  The record evidence does not support Secretary Jester's suggestion that these statements were made by Senator Rapert in his "individual capacity"; rather, the record evidence shows that these statements were made by Senator Rapert as an Arkansas State Senator and lead sponsor of the Display Act.

In *Rosenstiel v. Rodriguez*, the Eighth Circuit determined that "an isolated statement by an individual legislator is not a sufficient basis from which to infer the intent of that entire legislative body." 101 F.3d at 1552. In *Rosenstiel,* however, the Eighth Circuit did not conclude that a legislator's statements are irrelevant when determining legislative intent. In *Rosenstiel*, unlike here, the legislator's comment was made during a committee hearing, and while he was the "chief proponent" of the bill in question, he was not the bill's principal sponsor. Further, unlike here, the *Rosenstiel* litigants made no showing that the legislator's proffered statement was intended to apply to the challenged provision. *Id*.

Here, Senator Rapert was the lead sponsor of the Display Act, and the undisputed record evidence includes statements Senator Rapert made regarding the Display Act. The Court is not considering an isolated statement from an individual legislator but instead considers the record as a whole. Although the Court does not consider the statements alone to be sufficient to infer the intent of the entire legislative body, it does consider Senator Rapert's comments along with other undisputed record evidence to be relevant to the intent issue.

On February 29, 2016, Senator Rapert announced that the Ten Commandments Monument was funded, and the GoFundMe.com page reflected that a total of $18,280.00 had been donated (Dkt. No. 286, ¶ 91). Under the Display Act, the Secretary of State was required to permit and arrange for the placement of a Ten Commandments Monument on the State Capitol grounds (Dkt. No. 286, ¶ 56). Pursuant to the Display Act, on March 10, 2016, Mr. Boyd, Chief Deputy Secretary of State, contacted Senator Rapert and transmitted the documents "necessary for submitting your request to the []Commission." (*Id*., ¶ 57). The Foundation submitted the preliminary application request for the Ten Commandments Monument to the Arkansas Secretary of State in early August

108

2016 (Dkt. No. 286, ¶ 58).  On August 13, 2016, TST also submitted an application to place the Baphomet monument on Arkansas's Capitol grounds (Dkt. No. 290, ¶ 72).

Undisputed record evidence shows that objections to the placement of the Ten Commandments Monument—as well as statements in support of the monument—were voiced at public hearings (Dkt. No. 287, ¶ 15).  At the hearings, one packet of over 300 letters supporting the monument (all identical except for the signature) was presented to former Secretary Thurston (*Id.*, ¶ 16).  The form letter signed by the three hundred supporters all contained language evincing an understanding of the religious nature of the monument (*Id.*, ¶ 17).  There was some objection to the symbolism on the monument, such as the all-seeing eye (*Id.*, ¶ 18).

At the public hearings held by the Arts and Grounds Commission Subcommittee, people spoke both for and against the monument (Dkt. No. 286, ¶ 102).  At one meeting held in December 2016, of the 31 people who spoke about the Ten Commandments Monument, 17 people spoke in favor of the monument and 14 people spoke against it (*Id.*).  During the time that the Arts and Grounds Commission Subcommittee was considering the Ten Commandments Monument, certain groups threatened litigation if the monument was erected (*Id.*, ¶ 103).

There was publicity in the media both for and against the monument between 2016 and 2017 (Dkt. No. 287, ¶ 23).  During the State's deliberative process, citizens wrote letters to the editors of various newspapers speaking out against having a Ten Commandments Monument at the State Capitol, and certain newspapers wrote editorials against having a Ten Commandments Monument placed on the State Capitol grounds (Dkt. No. 286, ¶ 104).

Objections to—as well as statements in support of—the placement of the monument were also sent to the Secretary of State (Dkt. No. 287, ¶ 15).  While the Ten Commandments Monument was being considered by the Arts and Grounds Commission Subcommittee, the Secretary of State

109

received a fair amount of mail about the monument, including mail from people who were opposed to the monument (Dkt. No. 286, ¶ 101).

In fact, undisputed record evidence demonstrates that Mr. Boyd established a hotline for members of the public to call to give comments on the Baphomet monument, the Saline Atheists and Skeptics Society monument, the Gold Star Families monument, and the Ten Commandments Monument (*Id.*, ¶ 110). The hotline was established before the first Ten Commandments Monument was erected and stayed open through June 2017 (*Id.*). There were so many telephone calls about the Ten Commandments Monument that Mr. Boyd was concerned that the Secretary of State's office could lose control of people's comments (Dkt. Nos. 287, ¶ 20; 288, ¶ 10). According to records maintained by the Secretary of State's office, 157 people called the hotline to comment in favor of the Ten Commandments Monument, and 68 spoke against the monument (Dkt. No. 286, ¶ 111).

Mr. Boyd listened to the comments and created a spreadsheet about the comments (Dkt. No. 287, ¶ 20). Mr. Boyd documented roughly 823 calls. Some callers expressed multiple opinions, all of which were documented (*Id.*, ¶ 21). Of all the callers, one referenced the Code of Hammurabi, but otherwise nobody stated a need for a monument to the law (*Id.*, ¶ 22).

Senator Rapert and his family received personal threats arising from his sponsorship of the Ten Commandments Monument, some of which he took to law enforcement (Dkt. No. 286, ¶ 106). Mr. Boyd received emails from individuals about the Ten Commandments Monument that concerned him enough that he contacted the Capitol State Police (*Id.*, ¶ 107).

Despite this public opposition to the Ten Commandments Monument, Mr. Boyd is not aware if anyone in the Governor's Office or the Office of the Secretary of State questioned whether the Ten Commandments Monument should be placed at the State Capitol (*Id.*, ¶ 108). Mr. Boyd

does not recall any member of the Arts and Grounds Commission Subcommittee in a meeting raising a question as to whether there should be a Ten Commandments Monument on the State Capitol grounds (*Id.*, ¶ 109).

On January 26, 2017, with respect to TST's application to place the Baphomet monument, Senator Rapert posted on Facebook that, "if they find a legislator that actually would file a bill to put up the statue of a goat headed person they call Baphomet, that might be the last time you ever see that legislator in this session again, because they probably would never be reelected," and "even if they did, you are not going to get the Arkansas legislature to approve any such statue or any such monument to be put up on the Capitol grounds." (Dkt. No. 269-1, at 245).

Undisputed record evidence demonstrates that, around February 2017, the Arts and Grounds Commission Subcommittee reviewed the application for placement of the Baphomet monument and found it "sufficient" for advancement to the next phase of the process, structurally proper, of appropriate design, and that the materials fit within the Master Plan for the Arkansas Capitol grounds (Dkt. No. 269, ¶ 7). After TST received the Arts and Grounds Commission Subcommittee's blessing, the next step was for the Baphomet monument to undergo a public comment period (*Id.*, ¶ 8).

Before the public comment period occurred, Senator Rapert posted a video-recorded statement on his government-official Facebook page (Dkt. No. 288, ¶ 8). In that statement, Senator Rapert explains that it is politically impossible for TST to obtain favorable action in the General Assembly, and he assures his viewers, "[I]t will be a very cold, cold day in the pits of Hell before you ever see a statue from The Satanic Temple, or some other group like that, at the Arkansas Capitol." (*Id.; see also* Dkt. No. 269-1, at 245).

111

Two days later, on February 22, 2017, State Senator Rapert and State Representative Hammer ran the bill which would become Act 274 (Dkt. No. 288, ¶ 9). Act 274 modified the procedure to require an Act of the General Assembly as a condition precedent for the Arts and Grounds Commission Subcommittee to vet monument applications and make recommendations concerning them to the Secretary of State (*Id.*). Act 274 also included an "emergency clause," which put it into effect immediately upon enactment (*Id.*). It was enacted on February 22, 2017 (*Id.*). As a result, Act 274 precluded the public comment period for the Baphomet monument (*Id.*).

On June 27, 2017, the first Ten Commandments Monument was installed (Dkt. Nos. 286, ¶ 70; 288, ¶ 4). After the installation, Senator Rapert was filmed in front of the Ten Commandments Monument with Scott Stewart, who was the Pastor of Agape Church, the Foundation's largest donor for the first Ten Commandments Monument, in a video that later was posted on YouTube (Dkt. No. 286, ¶ 71) (Dkt. No. 288, ¶ 5). Less than 24 hours after the first Ten Commandments Monument was installed, an individual used his vehicle to destroy it (Dkt. No. 286, ¶¶ 73, 105).

On July 6, 2017, an event was held at the Rotunda of the Arkansas State Capitol where the executive producers of the film series "God's Not Dead" and PureFlix Entertainment presented the Foundation a check for $25,000.00 for the reconstruction of the Ten Commandments Monument (Dkt. No. 286, ¶ 93). PureFlix described itself as "a Christian movie studio" whose vision is "to influence the global culture for Christ through media" and whose mission is to "to strive to make a difference for His name." (*Id.*, ¶ 94).

In advance of the July 6, 2017, event, Senator Rapert requested that the Secretary of State's office provide a podium, a PA system, and chairs. The Secretary of State's Event Coordinator arranged for a podium to be provided (*Id.*, ¶ 96). The podium provided by the Secretary of State's

office for this event shows the Seal of the State of Arkansas (*Id.*, ¶ 97). The event was held in front of a portrait of former Governor Mike Huckabee (*Id.*, ¶ 98). In addition to representatives from PureFlix, State Senators Rapert and Gary Stubblefield and Representatives Hammer, Jack Fortner, and Bob Ballinger all stood at the front of the event to accept the check from PureFlix; other members of the Arkansas General Assembly also were in attendance (*Id.*, ¶ 99). Record evidence indicates that additional news articles and editorials were published regarding these events (Dkt. No. 254-1, at 12–16).

On April 26, 2018, a ceremony was held to dedicate the second Ten Commandments Monument (Dkt. Nos. 261, ¶ 31; 286, ¶ 75; 287, ¶ 32). Both supporters and protestors appeared (Dkt. No. 255, ¶ 33). At least one of the Orsi plaintiffs, one of the Orsi plaintiffs' counsel, and one of the intervenors were present at the protest (*Id.*). The Secretary of State's office provided a podium and microphone for the Ceremony (Dkt. No. 286, ¶ 76). Senator Rapert contacted the Secretary of State's office and asked that former Secretary Martin appear at the Ceremony (*Id.*, ¶ 77). As Deputy Secretary of State, Ms. Moody was present at the Ceremony as the Secretary of State's representative (*Id.*, ¶ 78). In one photograph of the Ceremony, Ms. Moody stood at the front near the podium and facing the audience who attended; in another photograph, Ms. Moody stood on the "far left" side of the podium facing Senator Rapert (*Id.*, ¶ 79). As a representative of the Secretary of State's office, Ms. Moody shook Senator Rapert's hand at the podium (*Id.*, ¶ 84). During part of the ceremony, Ms. Moody stood next to members of the Agape Church pastoral team, including Pastor Stewart, whom Ms. Moody did not know at the time (*Id.*, ¶ 80). Representatives Hammer and Jim Dotson also stood at the front near the podium at the Ceremony (*Id.*, ¶ 81).

113

Several individuals associated with the Arkansas Family Council also stood at the front near the podium next to the Ten Commandments Monument (*Id.*, ¶ 82). The Arkansas Family Council's stated mission is to "promote, protect, and strengthen traditional family values found and reflected in the Bible by impacting public opinion and public policy in Arkansas." (*Id.*, ¶ 83). See https://familycouncil.org/about-us/ (last accessed March 30, 2026).

Record evidence indicates that additional news articles and editorials were published about these events (Dkt. No. 254-1, at 8–11, 40–41). The initial complaint in this action was filed on May 23, 2018, less than one month after the April 2018 Ceremony discussed above (Dkt. Nos. 1, ¶¶ 74–93; 286, ¶ 112).

This record evidence is difficult to reconcile with what the Supreme Court said in *Marsh*, when upholding the legislative prayer: "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer." 463 U.S. at 794–95. Further, the Supreme Court has held that the Establishment Clause "guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a [state] religion or religious faith, or tends to do so." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). On the record before the Court there is undisputed record evidence of: (1) the Arkansas General Assembly's passage of the Display Act and the passage of Act 274 with an emergency clause; (2) the placement of the first Ten Commandments Monument and then of the second Ten Commandments Monument after approval by the Arts and Grounds Commission Subcommittee; (3) the gathering of funding for the first and second Ten Commandments monuments by the Foundation, chaired by Senator Rapert, from Agape Church

114

and PureFlix; and (4) the Secretary of State and State Officials' involvement in the ceremonies for the funding of the second Ten Commandments Monument and when the monuments were placed where donors appeared.  The totality of these undisputed facts leads the Court to conclude that the Arkansas General Assembly and Secretary Jester strayed from permissible bounds and that the Display Act and the Ten Commandments Monument are coercive.

### d.      Conclusion

Having considered the Display Act and its legislative findings, the resulting Ten Commandments Monument, and all of the undisputed record evidence in the light most favorable to Secretary Jester, the Court determines that the Display Act is coercive.  At this stage of the proceedings, the Orsi, Cave and Intervenor plaintiffs have come forward with undisputed record evidence establishing that the Display Act impermissibly promotes the Ten Commandments and conveys an intent to favor Christian religion in violation of the Establishment Clause.

### H.      Conclusion:  Establishment Clause

Based on the undisputed record evidence before it and for the reasons explained in this Opinion and Order, the Court concludes that the Orsi, Cave, and Intervenor plaintiffs have sufficiently established that the Display Act and the Ten Commandments Monument violate the Establishment Clause.  The placing of the Ten Commandments Monument as required by the Display Act failed to avoid excessive government entanglement with religion, and the Display Act and the Ten Commandments Monument violate the Establishment Clause under the test set forth in *Lemon*.  *See Lemon,* 403 U.S. at 612–13.

In addition, based on the undisputed record evidence before the Court, including but not limited to the text and design of the Ten Commandments Monument; its placement on the State Capitol grounds; the circumstances of its installation, financing, and unveiling; and the timing of

115

this litigation, the Court concludes that this case is distinguishable from *Van Orden* and from *Plattsmouth*.

Finally, the placement of a Ten Commandments Monument on State Capitol grounds does not fit within and is not consistent with a broader tradition in place at the time of the founding. Moreover, even if there were a broader tradition at play, the Display Act and the Ten Commandments Monument that the Act mandates would be inconsistent with that tradition because the Display Act and the Ten Commandments Monument are discriminatory and coercive, as demonstrated through undisputed record evidence.

For all of these reasons, the Court grants the Orsi, Cave, and Intervenor plaintiffs' motions for summary judgment on their Establishment Clause claims (Dkt. Nos. 254; 264; 268), and the Court denies Secretary Jester's motion for summary judgment (Dkt. No. 257).

## VII.    Government Speech Doctrine

At various points in his briefing, Secretary Jester argues that Arkansas does not need to "sponsor a message with which it disagrees" (Dkt. No. 258, at 24) and cites to cases that invoke the government speech doctrine as discussed in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (Dkt. No. 285, at 13–14). In *Summum*, the Supreme Court explained that "[t]here may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech, but this case does not present such a situation. Permanent monuments displayed on public property typically represent government speech." *Id.* at 470. "Government decisionmakers select the monuments that portray what they view as appropriate for the place in question, taking into account such content-based factors as esthetics, history, and local culture. The monuments that are accepted, therefore, are meant to convey and

have the effect of conveying a government message, and they thus constitute government speech." *Id.* at 472.

Typically, viewpoint discrimination is permissible with government speech. Under the government speech doctrine, the government may constitutionally discriminate among political viewpoints when expressing its own policies, directives, and preferred views. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.,* 576 U.S. 200, 208 (2015) ("[W]hen the government speaks it is entitled to promote a program, to espouse a policy, or to take a position."). The government typically is afforded this immunity from First Amendment criticism because "'it is not easy to imagine how government could function if it lacked th[e] freedom' to select the messages it wishes to convey." *Id*. (quoting *Summum,* 555 U.S. at 468).

However, "[t]his does not mean that there are no restraints on government speech. For example, government speech must comport with the Establishment Clause. The involvement of public officials in advocacy may be limited by law, regulation, or practice." *Summum,* 555 U.S. at 468. *Summum* involved a Ten Commandments monument that was one of "15 permanent displays," "donated by the Eagles as part of its national effort to combat juvenile delinquency," and "erected in 1971" making it 40 years old at the time of the challenge. *Id.* at 483 (Scalia, J., and Thomas, J., concurring). The *Summum* Court applied the government speech doctrine on those facts.

The facts of *Summum* are not the facts of this case. This case does not involve a Ten Commandments Monument contextualized by numerous permanent displays, does not involve a monument donated by the Fraternal Order of the Eagles as part of its national effort to combat juvenile delinquency, and does not involve a monument that has stood for 40 years prior to the challenge to it. Instead, in this case the Court, as explained above, has concluded that the Display

117

Act and the Ten Commandments Monument it mandates be placed violate the Establishment Clause. For these reasons, the Court concludes that *Summum* provides no safe harbor for Secretary Jester.

As a result, this Court concludes that *Summum* also provides no safe harbor for Secretary Jester in response to Intervenor plaintiffs' equal protection claim due to the unique facts and circumstances presented by this case—specifically the passage of the Display Act and then the passage of Act 274 with an emergency clause. The parties dispute the intent and effect of the Display Act and Act 274.

If Intervenor plaintiffs are to be believed, then the intent and effect of Act 274 were to change the process for approval of monuments on State Capitol grounds—specifically, to *thwart* that process when the Baphomet monument was close to obtaining its approval. Intervenor plaintiffs assert that the State of Arkansas passed: (1) the Display Act to favor Christianity and (2) Act 274, with its emergency clause, to change the procedure and make it more difficult for a minority religion to compete for placement of a monument. Intervenor plaintiffs contend that such an equal protection "opportunity" injury should be actionable, not protected by *Summum* and the government speech doctrine. As a result of the Court's determination that *Summum* and the government speech doctrine do not apply here, the Court will examine Intervenor plaintiffs' Equal Protection Clause claim.

## VIII. Equal Protection

### A. Overview Of The Motions For Summary Judgment On The Equal Protection Clause Claim

In their complaint, Intervenor plaintiffs challenge the constitutionality of the Display Act and Act 274 under the Equal Protection Clause (Dkt. No. 271, at 3). As discussed, the Display Act required the Secretary of State to erect and maintain the Ten Commandments Monument on

118

State Capitol grounds. Act 274, which the General Assembly passed in 2017 to amend Arkansas Code Annotated § 22-3-503(c), modified the order of procedure to require those seeking the placement of monuments on the State Capitol grounds to first obtain approval of the General Assembly (*Id.*). Intervenor plaintiffs contend that, by operation of both statutes, the Ten Commandments Monument has stood as the "only monument of religious significance [on the Arkansas State Capital grounds] since April 2018." (*Id.*).

In their second amended complaint, in support of their Equal Protection claim, the Intervenor plaintiffs assert:

> 36.    This preferential treatment for the Ten Commandments Monument, and not the Baphomet Monument, "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to [] adherents that they are insiders, favored members of the political community." *Lynch v. Donnell*, 465 U.S. 688, 688 (1984) (O'Connor, J., concurring).

> 37.    The TST Plaintiffs are powerless to protect themselves by the political process because they are a historically oppressed minority outsider group. Judicial intervention is necessary to vindicate their constitutional rights.

> 38.    In placing the Ten Commandments Monument but refusing to place the Baphomet Monument, the State has engaged in unlawful disparate treatment on the basis of religion. This is a violation of the Equal Protection Clause of the Fourteenth Amendment. . . .

(Dkt. No. 89, ¶¶ 36-38).

Before the Court is Secretary Jester's motion for summary judgment on Intervenor plaintiffs' Equal Protection claim (Dkt. No. 254). Intervenor plaintiffs have responded to Secretary Jester's motion for summary judgment on their Equal Protection claim (Dkt. No. 289). Secretary Jester has replied in support of his motion for summary judgment (Dkt. No. 295). Also before the Court is Intervenor plaintiffs' motion for summary judgment on their Equal Protection claim (Dkt. No. 268). Secretary Jester has responded to Intervenor plaintiffs' motion for summary

119

judgment (Dkt. No. 285). Intervenor plaintiffs have replied in support of their motion for summary judgment (Dkt. No. 294).

**1.      Secretary Jester's Motion For Summary Judgment**

Secretary Jester contends that, because Act 274 did not prevent Intervenor plaintiffs from placing their Baphomet monument but just changed the order that monument applicants had to follow to get approval, Act 274 did not deny Intervenor plaintiffs equal protection (Dkt. No. 258, at 25). Additionally, Secretary Jester maintains that the Ten Commandments Monument did not receive special treatment (*Id*., at 26). Secretary Jester maintains that both the Display Act and Act 274 would easily pass muster under strict scrutiny or rational basis review, but he contends that strict scrutiny does not apply because Intervenor plaintiffs' failure to gain legislative approval for the Baphomet monument was not religious discrimination and because TST is not a religion (*Id*., at 27). Finally, Secretary Jester maintains that the Display Act is rationally related to law and moral conduct and that public display of the Ten Commandments holds a significant place in the nation's history and tradition (*Id.*, at 29). As to Act 274, Secretary Jester asserts that the State of Arkansas has a unique interest in demonstrating that an applicant for a monument has substantial public support before spending time and resources in vetting a monument application (*Id*.).

Intervenor plaintiffs oppose Secretary Jester's motion for summary judgment and argue that TST is a bona fide religion (Dkt. No. 289, at 10–16). Intervenor plaintiffs also contend that Secretary Jester's point that "Arkansas 'disagrees' with Intervenor plaintiffs' religious viewpoint" makes Secretary Jester's case worse, not better (*Id*., at 16). Finally, Intervenor plaintiffs maintain that both the Display Act and Act 274 departed from normal procedure, which demonstrates that the Arkansas General Assembly refused TST the protections of Arkansas's favored religious sect, Christianity (*Id*., at 17–20).

In his reply to Intervenor plaintiffs' response, Secretary Jester argues that TST had an equal opportunity to seek legislation for the Baphomet monument before pursuing review by the Arts and Grounds Commission Subcommittee, the way the Foundation did for the Ten Commandments Monument, but Intervenor plaintiffs did not do so (Dkt. No. 295, at 5). Secretary Jester maintains that TST "admits" that it "never made any genuine effort to obtain legislative approval." (*Id*.). Secretary Jester contends that this is not a case where TST satisfied the same requirements as the Foundation but was denied the ability to place its monument, and Secretary Jester therefore asserts that Intervenor plaintiffs are not "similarly situated" to the Foundation (*Id*., at 6 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

### 2.	Intervenor Plaintiffs' Motion For Summary Judgment

TST's Baphomet monument is the only other monument of religious significance to obtain approval of the Arts and Grounds Commission Subcommittee. Intervenor plaintiffs assert that, by operation of Act 274, TST was deprived of the continuation of the process. The public comment period scheduled for February 10, 2017, never occurred after the Arkansas General Assembly passed Act 274 with an emergency clause so that Act 274 became effective on February 22, 2017 (Dkt. Nos. 260-37; 269-1, at 51–52; 55). TST was instead required, under Act 274, to obtain legislative approval of the Baphomet monument. Intervenor plaintiffs maintain that TST inquired of every member of the General Assembly, but TST could not find a member to sponsor a bill to place the Baphomet monument (Dkt. No. 271, at 4).

Senator Rapert, the sponsor of the Display Act that required the placement of the Ten Commandments Monument, explained on his government-official Facebook page that no Arkansas legislator would sponsor a bill to place the Baphomet monument because it would result in that legislator not being reelected and because it was politically impossible for such a bill to

pass (*Id*.). Intervenor plaintiffs assert that they are entitled to be free from religious discrimination and to equal protection of the law regardless of their minority viewpoint, and Intervenor plaintiffs assert that the State of Arkansas deprived TST of its right to compete with Christianity on equal footing in the public sphere (*Id*.).

According to Intervenor plaintiffs, strict scrutiny is warranted because: (1) TST has been historically relegated to a position of political powerlessness and, therefore, is a member of a suspect class; (2) TST is a religion; and (3) this case involves a classification that impinges upon a fundamental right to express religious beliefs as expressed in the Free Exercise Clause (*Id*., at 8–15 (citing *Plyler*, 457 U.S. 202, 217 (1982))). Intervenor plaintiffs claim that their ability to compete equally for the placement of a monument was intentionally preempted (*Id*., at 16–23). Finally, Intervenor plaintiffs argue that the former Secretary of State's refusal to place the Baphomet monument neither survives strict scrutiny nor is rationally related to a compelling state interest (*Id*., at 23–25).

In his response to Intervenor plaintiffs' motion for summary judgment, Secretary Jester argues that nothing more than rational basis review is appropriate because TST is not a religion and because neither the Display Act nor Act 274 classifies on the basis of religion (Dkt. No. 285, at 14). Secretary Jester continues to argue, however, that his actions survive any scrutiny because Arkansas has a strong interest in maintaining the unique State Capitol grounds and in economizing the Arts and Grounds Commission Subcommittee's work (*Id*.). Secretary Jester also contends that Intervenor plaintiffs misrepresent Act 274's effect (*Id*., at 15). He argues that Intervenor plaintiffs falsely claim that Act 274 resulted in the permanent exclusion of the Baphomet monument (*Id*.). Secretary Jester points out that Act 274 only specified the order in which the preexisting requirements had to be met (*Id*.). Secretary Jester maintains that TST already has an opportunity

to avail itself of the same process that resulted in the Ten Commandments Monument's placement by obtaining passage of a legislative act before Commission review (*Id.*, at 16).  According to Secretary Jester, TST wants "a special exemption—the ability to circumvent the legislative-approval requirement altogether." (*Id.*).

In their reply, Intervenor plaintiffs argue that TST is a suspect class, a religion, and a minority religion that has historically been politically powerless (Dkt. No. 294, at 3–10). Intervenor plaintiffs maintain that they have a "fundamental right" to compete with Christianity and that equal competition was intentionally preempted (*Id.*, at 10).  Again, Intervenor plaintiffs insist that the refusal to place the Baphomet monument does not survive any tier of scrutiny (*Id.*, at 13–14).

### B.      Legal Standard For Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Zink v. Lombardi*, 783 F.3d 1089, 1110 (8th Cir. 2015) (quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, (1985)).  "A fundamental principle of equal protection is that the Constitution only prohibits intentional or purposeful discrimination by the state." *Klinger v. Dep't of Corrs.*, 31 F.3d 727, 733 (8th Cir. 1994) (citing *Pers. Adm'r of Ma. V. Feeney*, 442 U.S. 256, 274 (1979)).  Typically, the Court would first analyze whether the plaintiffs have demonstrated that they were treated differently than others who were similarly situated to them.  *Id*. at 731.

A legislative classification or distinction that "neither burdens a fundamental right nor targets a suspect class," will be upheld "so long as it bears a rational relation to some legitimate end." *Zink*, 783 F.3d at 1110 (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)).  However, if

123

"the [legislative] classification" burdens "a fundamental right" or "operates to the peculiar disadvantage of a suspect class," "equal protection analysis requires strict scrutiny." *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (per curiam). When "subjected to strict scrutiny," the legislative classification or distinction will be sustained "only if [it is] suitably tailored to serve a compelling state interest." *City of Cleburne*, 473 U.S. at 440 (citing *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964); *Graham v. Richardson*, 403 U.S. 365 (1971)).

### C.    Analysis

On the undisputed record evidence before it, the Court concludes that, under either strict scrutiny or rational basis review, the Display Act and Act 274 denied Intervenor plaintiffs equal protection.

### 1.    Strict Scrutiny

Strict scrutiny applies when a law burdens a fundamental right, targets a suspect class, or has a disparate impact on a protected class and was motivated by a discriminatory intent. *See New Doe Child #1*, 901 F.3d at 1027 (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *Knapp v. Hanson*, 183 F.3d 786, 789 (8th Cir. 1999)).

Strict scrutiny is required in cases where there is a suspect class or where the restriction at issue impinges upon the exercise of a fundamental right. *Plyler*, 457 U.S. at 216–17. The Eighth Circuit Court of Appeals has recognized religion as a suspect classification. *Weems v. Little Rock Police Dep't,* 453 F.3d 1010, 1016 (8th Cir. 2006); *see also Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815–16 (8th Cir. 2008) ("Religion is a suspect classification.").[129]

---

[129]    This Court is bound by controlling Eighth Circuit precedent, in the absence of a controlling United States Supreme Court case overruling that precedent or an *en banc* decision of the Eighth Circuit overruling that precedent.    This Court acknowledges that the Supreme Court has applied heightened review when addressing laws that classify on the basis of race, alienage, or national origin. *United States v. Skrmetti*, 605 U.S. 495, 509–10 (2025) (citing *City of Cleburne*,

Intervenor plaintiffs assert that strict scrutiny applies to this case because Intervenor plaintiffs are members of, and that TST is, a historically disadvantaged minority and, thus, a suspect class (Dkt. No. 271, at 8). A "suspect class" is one that has historically been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Plyler*, 457 U.S.at 216 n.14. In his dissent in *Zorach v. Clauson*, 343 U.S. 305, 319 (1952), Justice Black acknowledged that pre-First Amendment "zealous sectarians entrusted with governmental power to further their causes would sometimes torture, maim and kill those they branded 'heretics,' 'atheists' or 'agnostics.'" Intervenor plaintiffs also contend that they are members of, and that TST is, a minority religion (Dkt. No. 271, at 9–11). Further, Intervenor plaintiffs assert that TST is a minority religion that has been historically relegated to political powerlessness (*Id.*, at 12–13). For these reasons, Intervenor plaintiffs assert that the Display Act and Act 274 operate to the disadvantage of a suspect class, thereby qualifying for strict scrutiny. Secretary Jester argues that TST is not a religion.

### a.    TST's Status As A Religion

TST contends that it is a religion and, thus, a suspect class for Equal Protection purposes. Notably, Secretary Jester does not address whether TST is a suspect class but disputes only that TST is a religion. Intervenor plaintiffs respond that Secretary Jester does not come forward with any evidence in the record to support his assertion that TST is not a religion; Intervenor plaintiffs argue that Secretary Jester instead relies on speculation and, at times, hearsay, which the Court is precluded from considering by Federal Rules of Evidence 602 and 802 (Dkt. No. 289, at 10).

---

473 U.S. at 440). Further, the Supreme Court has determined that sex-based classifications also warrant heightened scrutiny. *Id.* (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

First Amendment protection only attaches to beliefs rooted in religion, as opposed to purely secular beliefs or personal preferences. *See Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 713 (1981); *Love v. Reed*, 216 F.3d 682, 687 (8th Cir. 2000); *Ochs v. Thalacker,* 90 F.3d 293, 296 (8th Cir. 1996). "The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task. . . . However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas,* 450 U.S. at 714. Moreover, "[c]ourts should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id*. at 715; *see also Love*, 216 F.3d at 688 ("It is not the place of the courts to deny a man the right to his religion simply because he is still struggling to assimilate the full scope of its doctrine.").

"Courts have interpreted the term religion broadly to include a wide variety of theistic and nontheistic beliefs." Black's Law Dictionary, Religion (12th ed. 2024). In *Malnak v. Yogi*, the Third Circuit Court of Appeals explained that "religion" is defined, in part, as the "[s]um and essence of one's basic attitudes to the fundamental problems of human existence" and that "Theism" is not essential to religion and has not been since the early 20th Century. 592 F.2d 197, 207 (3d Cir. 1979) (Abrams, J., concurring). In *Africa v. Commonwealth of Pennsylvania*, the Third Circuit also identified three "useful indica" for determining whether a belief qualifies as religious: (1) the addressing of "fundamental and ultimate questions having to do with deep and imponderable matters," (2) a "comprehensive" belief system, and (3) "the presence of certain formal and external signs." 662 F.2d 1025,1032 (3d Cir. 1981). The Eighth Circuit has cited

126

*Africa* three times, has given the factors consideration but treated them as non-dispositive, and has not relied upon *Africa* or its factors to reject a party's claim to a protectable religious belief. *See Stanko v. Patton*, 228 F. App'x 623, 625 (8th Cir. 2007) (per curiam) (reversing the district court's determination that a prisoner's First Amendment claim was frivolous because no record evidence answered the question of whether a protectable religious belief existed); *Love*, 216 F.3d at 691 (upholding First Amendment claim); *Wiggins v. Sargent*, 753 F.2d 663, 666 (8th Cir. 1985) (reversing district court's determination that plaintiff's beliefs were "purely secular").[130]

Applying a similar analysis to the record evidence before it, a federal court in the District of Arizona recognized TST as a religion in *Satanic Temple v. City of Scottsdale*, Case No. CV18-00621-PHX-DGC, 2020 WL 587882, at *6-7 (D. Ariz. Feb. 6, 2020), *aff'd sub nom.*, *Satanic Temple, Inc. v. City of Scottsdale*, 856 Fed. App'x 724 (9th Cir. 2021).

For purposes of resolving the pending motions, this Court considers TST a religion based on the record evidence before it.

Undisputed record evidence before the Court establishes that, in response to the Oklahoma Ten Commandments monument controversy, TST created the Baphomet monument for inclusion

---

[130] Federal and state courts around the country have held that many nontraditional and unusual beliefs qualify as protected religious beliefs under other cases. *See, e.g.*, *United States v. Seeger*, 380 U.S. 163, 185 (1965) (to qualify as religious, beliefs must be "sincerely held" and, "in the claimant's scheme of things, religious in nature"); *Torcaso v. Watkins*, 367 U.S. 488, 495 n.11 (1961) ("Among religions in this country which do not teach what would generally be considered a belief in the existence of God are. . . Ethical Culture, Secular Humanism[,] and others."); *Kaufman v. Pugh*, 733 F.3d 692, 697 (7th Cir. 2013) (Atheism); *United States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992) ("Religious beliefs, then, are those that stem from a person's moral, ethical, or religious beliefs about what is right and wrong and are held with the strength of traditional religious convictions." (quotation marks and citation omitted)); *Am. Humanist Ass'n v. United States*, 63 F. Supp. 3d 1274, 1283 (D. Or. 2014) (finding that Secular Humanism is a religion for Establishment Clause purposes); *Seemodarae v. Mercy Health Servs.*, 456 F. Supp. 2d 1021, 1023 n.1 (N.D. Iowa 2006) (Wicca); *Flanagan v. State*, 846 P.2d 1053, 1057 (Nev. 1993) (Satanism).

on Oklahoma Capitol grounds (Dkt. No. 269, ¶ 2). Secretary Jester and the Intervenor plaintiffs agree that Baphomet is an occultic figure of religious import to TST (*Id.*). The figurehead is a reconciliation of opposites: simultaneously male and female, human and beast, angel and demon (*Id.*). The concept of Baphomet comes from the now-infamous inquisition against the Knights Templar, who were all tortured to death on trumped-up charges of heresy (*Id.*). To TST's membership, Baphomet represents both harmonic balance and serves as a memorial to the victims of demonization (*Id.*). TST's Baphomet monument refutes the self-asserted supremacy of the God of Abraham and retorts that governmental preference for Christianity has inevitably ended in outgroup demonization, promptly followed by outgroup persecution (*Id.*).

Since at least August 2015, TST has not claimed that Satan or any supernatural being exists (Dkt. No. 290, ¶ 54). Rather, TST claims belief in a "metaphorical Satanic construct" and "actively fights for . . . secular values." (*Id.*, ¶ 54 (citing Dkt. Nos. 260-42, at 38; 260-50, at 164, 197-98)). Mr. Misicko and Ms. Robbins think of religion as a metaphorical narrative construct (Dkt. No. 290, ¶ 55). TST expects that members will disagree on a large number of important issues ranging "from politics to metaphysics." (*Id.*, ¶ 60).

In a letter addressed to the Arkansas Secretary of State and dated August 31, 2015, TST stated, in part, that the Baphomet monument has a "wholly secular purpose" (*Id.*, ¶ 71; Dkt. No. 260-40, at 2). On August 13, 2016, TST submitted an application to place the Baphomet monument on Arkansas's Capitol grounds. The application stated, in part, that the Baphomet monument represents "pluralism" founded on "secular law" (Dkt. No. 290, ¶ 72).

It is undisputed that the for-profit commercial enterprise United Federation of Churches, LLC, the fundraising nonprofit Reason Alliance, Ltd.; The Satanic Temple, Inc., a non-profit; and another for-profit commercial enterprise, Cinephobia, LLC, are "all part of the larger—The Satanic

128

Temple Organization." (*Id.*, ¶ 52).  There is also undisputed record evidence that the Internal Revenue Service has recognized TST as a Section 501(c)(3) exempt organization (Dkt. No. 269-1, at 84–85).

Ms. Robbins and Mr. Hargett joined TST by entering an email address to receive an email newsletter (Dkt. No. 290, ¶ 64).  Neither Ms. Robbins nor Mr. Hargett recalled having to affirm TST's tenets to become a member (*Id.*).  During the time period relevant to this lawsuit, TST had no required rituals (*Id.*, ¶ 65).

There is other record evidence before the Court with respect to TST's history, beliefs, practices, and activities.  Although Secretary Jester disputes this evidence, the Court is aware of no admissible evidence in the record before it to refute TST's evidence.  There is record evidence that TST provides its members with regular religious services; a ministry program; religious symbols, one of which is the Baphomet monument; and, perhaps most importantly, a comprehensive moral framework to address the fundamental questions of life (Dkt. No. 269-1, at 233–236).  Further, as Mr. Misicko states in his affidavit supporting Intervenor plaintiffs' motion for summary judgment, TST's religious ideology "explores questions of universal and personal significance" in which its adherents contextualize their lives "as active participants in an eternal struggle between conflicting forces of enlightenment and tyranny." (*Id.*, at 233, ¶ 2).  Mr. Misicko points out that satanic doctrine espouses "self-determination, individual dignity, pluralism, democracy, [and] free expression" through the Seven Fundamental Tenets (*Id.*).  According to Mr. Misicko, TST observes holidays and ritual ceremony and also has an organized ministry and regular services that include weekly services, annual conferences, addiction and recovery support, after-school educational clubs, and Satanic weddings (Dkt. Nos. 260-41, at 16; 269-1, at 233–235,

129

¶¶ 2, 4–5). TST has organized congregations and religious iconography (Dkt. No. 269-1, at 233-237, ¶ 6). *See also City of Scottsdale*, 2020 WL 587882, at *7.

Additionally, there is support for Intervenor plaintiffs' position that historically heretics, atheists, and agnostics were common targets for religious persecution. *Zorach*, 343 U.S. at 319 (Black, J., dissenting). It is undisputed that, on August 16, 2018, TST held a rally for religious freedom at the Arkansas Capitol (Dkt. No. 269, ¶ 13). In advance of the rally, several members of the public complained to the Arkansas State Police about TST's right to speak on these public grounds (*Id.*, ¶ 13).

For purposes of resolving the pending motions, having considered the controlling and persuasive legal authorities, this Court considers TST a religion based on the record evidence before it with all reasonable inferences from that evidence construed in favor of Secretary Jester. Accordingly, the Court determines that Intervenor plaintiffs are a suspect class for Equal Protection purposes under controlling Eighth Circuit law.

### b.    The Display Act And Act 274

Based on the undisputed record evidence in this case, the Court determines that the Arkansas General Assembly endorsed the Ten Commandments through the Display Act and communicated official criticism of TST and its placement of the Baphomet monument through the Display Act and Act 274.

The Arkansas General Assembly's stated purpose in passing the Display Act to mandate the placement of a new, stand-alone monument on State Capitol grounds was "commemorating the Ten Commandments." Ark. Code Ann. § 22-3-221(b)(1). As this Court acknowledges, the United States Supreme Court has long recognized that the Ten Commandments are "undeniably a sacred text in the Jewish and Christian faiths" and "do not confine themselves to arguably secular

matters." *Stone*, 449 U.S. at 41; *McCreary County*, 545 U.S. at 869.  As the United States Supreme Court has observed, "[w]hen the government initiates an effort to place this statement alone in public view, a religious object is unmistakable." *Id*. , 545 U.S. at 869.

Pursuant to the Display Act, the Secretary of State is to approve the design and site selection and to arrange a suitable time for its placement.  Ark. Code Ann. § 22-3-221(b)(2)(B).  However, the Display Act specifically exempts the monument "from §§ 23-3-301 *et seq*. and 23-3-501 *et seq*."  Ark. Code Ann. § 22-3-221(b)(4)(B).  This provision of the Display Act singles out this mandated monument on State Capitol grounds, affording this monument different and more favorable treatment under the law than that afforded to other proposed monuments at the time the Display Act was passed.  Additionally, at the time of the passage of the Display Act and until the passage of Act 274, it was not the norm for an outside entity to initiate the monument process with a legislative act (Dkt. Nos. 269-1, at 112; 260-24, at 53).  At the time of its passage, the Ten Commandments Monument was the only monument prompted by legislative action.

Secretary Jester maintains that the passage of Act 274 only changed the order of requirements that already existed for placement of a monument on State Capitol grounds.  The Court disagrees based on the undisputed record evidence before it.

At the time of passage of Act 274, Arkansas Code Annotated § 22-3-503(a) and (b) provided:

> (a)    The Capitol Arts and Grounds Commission shall have the following powers and duties:
>
> (1)    To recommend the acquisition of land for such expansion of the State Capitol grounds as may be required to meet the needs of state agencies;
>
> (2)    To review and recommend to the Secretary of State on the location of monuments, memorials, fountains, and similar improvements on the State Capitol grounds or for the relocation of existing monuments, memorials, and fountains on the State Capitol grounds; and

(3)     To review any permanent statue, statuary, fountain, monument, or memorial tablet to be erected in the public areas of the State Capitol Building or on its grounds for compliance with the adopted plan.

(b) The commission shall have the right to accept donations in money, pictures, paintings, statuary fountains, and memorial tablets on behalf of the state for the State Capitol Building. In cases of money donations, the commission shall have the right to expend the money in decorations, either in the building or on the grounds thereof. To that end, the commission may make all necessary contracts for the expenditure of the funds. . . .

(Dkt. No. 260-25, at 7–8).

Act 274 amended Arkansas Code Annotated § 22-3-503(c) of the statute (*see* Dkt. No. 260-37).  Prior to the enactment of Act 274, that provision stated:  "Any monument on the State Capitol grounds approved by the commission must be authorized by an act of the General Assembly." (*Id.*).   After the enactment of Act 274, that provision stated:   "(1) A monument shall not be constructed on or removed from the State Capitol grounds unless authorized by an act of the General Assembly.  (2) The commission shall not consider the construction of a monument on the State Capitol grounds or the removal of a monument from the State Capitol grounds without legislative authorization under subdivision (c)(1) of this section." (*Id.*).  Act 274 also included an emergency clause so that it became effective immediately upon approval of the Governor on February 22, 2017 (*Id.*).[131]

---

[131]  In July 2019, Arkansas Code Annotated § 22-3-503 was amended to give the Capital Arts and Grounds Committee the  powers and duties to "review proposed actions of the Secretary of State under § 1-4-134 regarding the design, material, production, and method of display of the statue representing Daisy Lee Gatson Bates under § 1-4-134(d)(1) or the statue representing John R. 'Johnny' Cash under § 1-4-134(d)(2), or both."  Ark. Code Ann. § 2-3-503 (amended July 24, 2019).  In July 2021, Arkansas Code Annotated § 22-3-503 was amended to give the Capital Arts and Grounds Committee the authority to "promulgate rules for the orderly discharge of the duties of the commission."  Ark. Code Ann. § 22-3-503 (amended July 27, 2021).

The Intervenor plaintiffs present record evidence of the General Assembly's hostility towards TST that gave rise to Act 274. Secretary Jester presents record evidence of the Arts and Grounds Commission Subcommittee process through which both the Ten Commandments Monument and the Baphomet monument were vetted for a site on the Capitol grounds. The Court examines that evidence.

Mr. Boyd served as Chief Deputy Secretary of State from 2015 through the end of Secretary of State Martin's term of office and had responsibility for the State Capitol building and the State Capitol grounds (Dkt. No. 286, ¶¶ 23–24). In his deposition, Mr. Boyd described the process of monument approval prior to the passage of Act 274 as follows; "Well, what would happen is once the process is complete and we're due to take it, prior to or at the start of the next regular session, unless if there were a special session, we might see if we could get it done there, but at the start of the next regular session we would write a bill and find us a sponsor and ask that sponsor . . . 'Would you like to sponsor this bill?'" (Dkt. No. 260-24, at 64). Mr. Boyd testified that, if the Arts and Grounds Commission Subcommittee voted for approval of a monument, it was the obligation of the Secretary of State at that point to at least submit the monument to the Arkansas General Assembly for consideration and approval "via a legislative bill" (*Id*.).

When supporters of both the Ten Commandments and Baphomet monuments went before the Arts and Grounds Commission Subcommittee on October 12, 2016, to seek approval of their monuments, Mr. Boyd framed the discussion by referring to "Senate Bill 939 which became Act 1231. It is the bill authorizing the Ten Commandments monument." (Dkt. No. 260-31, at 4). Travis Story, who appeared on behalf of the Foundation, told those present that Act 1231 "directs for this process to take place." (*Id*., at 10). With that in mind, the Arts and Grounds Commission Subcommittee gave the Foundation a site for the Ten Commandments Monument and scheduled

another meeting for November 16, 2016, to finalize the site plan for that monument, which had already been constructed (*Id.*, at 36).

Mr. Greaves appeared before the Arts and Grounds Commission Subcommittee at the same October 12, 2016, meeting to advocate for the placement of the Baphomet monument (*Id*., at 37). After some discussion about the purpose of the monument, the Arts and Grounds Commission Subcommittee gave Mr. Greaves a few sites to consider (*Id*., at 44; 48–51).  Mr. Greaves asked to place the Baphomet monument near the Ten Commandments monument but was told by Mr. Boyd "[w]e don't place monuments side by side." (*Id*.).  Mr. Greaves was given a site and then was asked by the Arts and Grounds Commission Subcommittee to consider an "alternate site" on a one-way street (*Id*., at 62).  At the conclusion of the meeting, Mr. Greaves agreed to consider the "alternate site" for the Baphomet monument, and Mr. Greaves was asked to return to the Arts and Grounds Commission Subcommittee on January 25, 2017, to discuss his drawings and engineering work (*Id*., at 63–66, 69-70).

On December 14, 2016, the Arts and Grounds Commission Subcommittee held a public comment hearing on the Ten Commandments Monument.  At the beginning of the hearing, 17 people had signed up to speak for the proposal, and 14 people were to speak against it (Dkt. No. 260-39, at 4). Senator Rapert spoke in favor of the Ten Commandments Monument at the meeting and stated:

> I stand here today on behalf of the Legislature.  99 out of 135 state legislators representing over three million constituents in the State of Arkansas passed this bill in 2015.  We appreciate the good work that the Secretary of State and Capitol Grounds Commission is doing on this behalf.
>
> Of everything that's been said, the great thing is in your position you don't have to decide whether you do put up this monument or not.  It's about where you put it up and if it's esthetically pleasing for the State of Arkansas.

134

What I would like to say is that much of what I have heard today is really just an attempt to inject fear and to in some ways intimidate the commission about what its duties are. The debate has already been had. The bill has already been passed. The Governor has already signed the bill, and it is the law in the State of Arkansas.

(*Id.*, at 77–78).

Mr. Boyd's understanding of the Display Act was similar to Senator Rapert's understanding. At his deposition, Mr. Boyd testified as follows:

Not only [does the Foundation] come to the Arts and Grounds Commission, but [it] come[s] with a mandate; [it] come[s] with a bill that says we construct, we place the monument. We still determine where, we still make—or [the Commission] still determine[s] where, [the Commission] still ensure[s] that it fits in with the Capitol—

(Dkt. No. 260-24, at 66).

When Mr. Greaves returned to the Arts and Grounds Commission Subcommittee on January 25, 2017, prior to the enactment of Act 274, the Arts and Grounds Commission Subcommittee reviewed the Baphomet monument and found it "sufficient" for advancement to the next phase of the process, structurally proper, of appropriate design, and that the materials fit within the Master Plan for the Arkansas Capitol grounds (Dkt. Nos. 269, ¶ 7; 260-36). Mr. Boyd told Mr. Greaves, "[N]ow, we need to move to the public hearing phase," but then Mr. Boyd apologized that, due to busy schedules of subcommittee members, the public hearing could not be scheduled that day (Dkt. No. 260-36, at 11–12). Mr. Boyd also told Mr. Greaves that, due to the requirement of "legislative approval" and due to the legislature's fiscal session, it might be two years before the process could continue (*Id.*). Mr. Boyd recommended to Mr. Greaves that he "give consideration to finding you a sponsor and trying to get that approval." (*Id.*, at 12).

On January 26, 2017, which was two days before he ran the bill that became Act 274, Senator Rapert posted a video-recorded statement on his government-official Facebook page (Dkt. Nos. 269, ¶ 8; 269-1, at 245). In that video, Senator Rapert explained why none of the Arkansas

135

legislators would support a bill to erect the Baphomet monument, which, following the passage of Act 274, became the required first step in the process of obtaining placement of a monument on State Capitol grounds.  Senator Rapert stated:

> And if they find a legislator that actually would file a bill to put up the statue of a goat headed person they call Baphomet, that might be the last time you ever see that legislator in this session again, because they probably would never be re-elected . . . even if they did, you are not going to get the Arkansas legislature to approve any such statute or any such monument to be put up on the Capitol grounds . . . There is no possible way that a bill is going to be passed in the legislature to authorize the Satanic Temple or any other crazy outfit from out of our state to come in and force us to put up a monument to anything.

(Dkt. No. 269-1, at 245).  At the end of the video,  Senator Rapert appeared to give an assurance that the Baphomet monument will never receive treatment equal to those seeking to pass the Display Act to place the Ten Commandments Monument. Senator Rapert stated, "[i]t will be a very cold, cold day in the pits of Hell before you ever see a statue from The Satanic Temple, or some other group like that, at the Arkansas Capitol. It is not going to happen. So, rest easy." (*Id.*; *see also* Dkt. No. 269, ¶ 8).

At his deposition, Senator Rapert expounded further that he finds the organizational belief structure of TST to be "vile," "unnecessary," and "an affront to every American citizen." (Dkt. No. 269-1, at 141). Senator Rapert testified that he does not "foresee in the near future in the State of Arkansas the Satanic Temple passing a bill to do anything just because most people probably feel the way I do." (*Id.*, at 143).

Two days later, Senator Rapert ran the bill that became Act 274 to amend the mandatory authorization language of the prior Act , the bill included an emergency clause, and Act 274 was passed and became effective on February 22, 2017 (Dkt. Nos. 260-37; 269-1, at 51–52; 55). According to the undisputed record, Senator Rapert and others were able to persuade the Arkansas General Assembly to pass Act 274 with an emergency clause about one month after the Arts and

136

Grounds Commission Subcommittee approved the Baphomet monument. The Court observes that, prior to the enactment of Act 274, the statute provided that "[a]ny monument on the State Capitol grounds approved by the [Capitol] commission *must* be authorized by an act of the General Assembly." (Dkt. No. 260-37).

Mr. Boyd explained the passage of Act 274 at a May 11, 2017, meeting of the Arts and Grounds Commission Subcommittee in the following way:

> Our Representative, Kim Hammer, filed a bill during the session. It was House Bill 1273. And what House Bill 1273 did, once it became Act 274, it included an emergency clause, so it was effective immediately. It stopped consideration by this body of any proposal that is not already sponsored by legislative act. Okay. Obviously, the proposal by the American Heritage and History Foundation already had an act. That was Act 1231 of 2015. So that stopped the process completely. It did not take everybody back. The Satanic Temple people had done a lot of work on getting their presentation to us, and spent a lot of money.

(Dkt. No. 260-33, at 17).

Following passage of Act 274 and Senator Rapert's declaration on Facebook, none of the Arkansas legislators would sponsor a bill supporting a Baphomet monument. Undisputed record evidence indicates that Intervenor plaintiffs sent emails to members of the Arkansas General Assembly on two occasions requesting sponsorship (Dkt. No. 290, ¶¶ 75–77). Legislators responded to TST with emails like: "Hell no! And you can quote me on that!" (Dkt. No. 269-1, at 61); "[w]e have to be selective about which monuments we believe the people of Arkansas want on the grounds of their Capitol" (*Id*., at 68); "I could not get it passed. I would just spend what little political capital I have as a member of the very minority Party in the legislature" (*Id*., at 66); and "I do not support satan" (*Id*., at 74).

After the passage of Act 274, the Arkansas General Assembly passed legislation in 2017 approving the Gold Star Family Monument, but the Gold Star Family Monument did not involve religion or compete with Christianity (Dkt. No. 260-24, at 81). *See* Ark. Code Ann. § 22-3-222.

Further, according to the testimony of Mr. Boyd, the Gold Star Family monument had a known sponsor in the Arkansas General Assembly who was a veteran and who was particularly interested in sponsoring that bill (*Id*., at 64).

Having established these facts from the record evidence, the Court turns to examine Intervenor plaintiffs' Equal Protection claim.

### c.   Neutral Treatment Of Religions

Intervenor plaintiffs argue that as a religion TST has a "fundamental right" to compete with Christianity in the public sphere for placement of a monument on State Capitol grounds (Dkt. No. 271, at 15–16).   Intervenor plaintiffs also assert that the Display Act and Act 274 operate to the disadvantage of a suspect class thereby qualifying for strict scrutiny (Dkt. Nos. 271, at 16; 289, at 17–20).

The Supreme Court has called neutral treatment of religions "[t]he clearest command of the Establishment Clause." *See Larson v. Valente,* 456 U.S. 228, 244 (1982); *see also Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet,* 512 U.S. 687, 707 (1994) ("It is clear that neutrality as among religions must be honored.").   Such discrimination is forbidden by the Free Exercise Clause as well.   *Larson,* 456 U.S. at 245 ("This constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause."); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532–33 (1993); *Larson,* 456 U.S. at 246 (citing *Schempp,* 374 U.S. at 305 (Goldberg J., concurring)).   The Free Exercise Clause "protect[s] religious observers against unequal treatment" and subjects to the strictest scrutiny laws that target the religious for "special disabilities" based on their "religious status." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (quoting *Church of Lukumi Babalu Aye,* 508 U.S. at 533, 542 (internal quotation marks omitted)).

"Applying that basic principle, this Court has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'" *Trinity Lutheran*, 582 U.S. at 458 (quoting *McDaniel v. Paty,* 435 U.S. 618, 628 (1978) (plurality opinion) (quoting *Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972))).

The Supreme Court has suggested that the Equal Protection Clause's requirement is parallel. *See Locke v. Davey,* 540 U.S. 712, 720 n.3 (2004) (citing *Johnson v. Robison,* 415 U.S. 361, 375 n.14 (1974); *McDaniel v. Paty,* 435 U.S. 618 (1978)). In other words, "no State can 'pass laws which aid one religion' or that 'prefer one religion over another.'" *Larson,* 456 U.S. at 246 (quoting *Everson v. Bd. of Educ.,* 330 U.S. 1, 15 (1947)).

Based on the undisputed record evidence before it, the Court determines that passage of the Display Act to commemorate the Ten Commandments favored Christianity and that Act 274 adversely affected TST. Moreover, Intervenor plaintiffs present record evidence of the General Assembly's hostility towards TST that gave rise to Act 274. By passing Act 274 with an emergency clause, TST was deprived of a process by which according to Mr. Boyd's testimony the Arkansas Secretary of State would have presented the Baphomet monument proposal to the General Assembly (*see* Dkt. No. 260-36 (Arts and Grounds Commission Subcommittee transcript January 25, 2017, approving Baphomet Monument site plan). Instead, according to the undisputed record evidence in this case, the passage of Act 274 forced TST to draft a bill and obtain a legislative sponsor, which proved to be major roadblock for a minority religion (Dkt. No. 269-1, at 112). Passage of Act 274 made it politically improbable that TST would ever get its monument placed based on adverse statements made about TST's religious ideology by members of the Arkansas legislature (Dkt. No. 269-1, at 60–74, 112, 127, 143, 187–89).

### d.   Discriminatory Intent

Along with a disparate impact on a protected class, an Equal Protection challenge also requires proof of discriminatory intent or purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). To determine whether invidious discriminatory purpose was a motivating factor demands a fact-sensitive inquiry into such circumstantial and direct evidence of intent as may be available. *Id.*, at 266. Courts look to the historical background of the decision, whether the normal procedure was followed, and contemporary statements by members of the decision-making body. *Id.*, at 266-68. Discriminatory purpose can be proved with various kinds of direct and circumstantial evidence but is most often proved with evidence that similarly situated individuals and entities were treated differently. *See Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007).[132]

The undisputed record evidence before the Court supports a finding of discriminatory intent by the Arkansas General Assembly to prevent the placement of the Baphomet monument. For the reasons explained in this Opinion and Order, the undisputed record as a whole supports this finding. Because the record before the Court establishes that discriminatory intent was a "motivating" factor behind the enactment of the Display Act and Act 274, the burden shifts to

---

[132] To the extent Secretary Jester argues that Intervenor plaintiffs are not similarly situated for purposes of an Equal Protection analysis, the Court disagrees. For reasons set forth in the Opinion and Order, the Court determines that TST is a religion and therefore qualifies for First Amendment protection in an Equal Protection analysis.

Moreover, Secretary Jester contends that the process for placement of the Baphomet monument and the Ten Commandments Monument was the same, thereby seeming to concede the similarly situated inquiry. Secretary Jester asserts that TST "already has an opportunity to the same process that resulted in placement of the Ten Commandments monument: The Ten Commandments Monument Display Act was passed before the Commission's review of that monument's application—consistent with the order specified in [ Act 274]. TST is absolutely free to do the same thing. . . ." (Dkt. No. 285, at 16 (footnote omitted)).

140

Secretary Jester to demonstrate that these statutes would have been enacted without discriminatory intent. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

Secretary Jester argues that the Display Act did not give the Ten Commandments Monument special treatment (Dkt. No. 258, at 26). For the reasons explained in this Opinion and Order, undisputed record evidence does not support that argument.

Secretary Jester also contends that the passage of Act 274 was to improve efficiency (Dkt. No. 285, at 15). Nothing in the language of Act 274, however, indicates that it was enacted to improve efficiency (Dkt. Nos. 260-37; 269-1, at 51–52). Further, nothing in the record before the Court suggests that the Arkansas General Assembly would have enacted Act 274 but for the fact that, in January 2017, a subcommittee of the State Capitol Arts and Grounds Commission gave TST approval to move on to the next phase of the monument approval process and, prior to the enactment of Act 274, the statute provided that "[a]ny monument on the State Capitol grounds approved by the [Capitol] commission *must* be authorized by an act of the General Assembly." (Dkt. Nos. 260-37; 260-33, at 17 (passage of Act 274 "stopped process completely"); 269-1, at 55–56). Moreover, just days before Act 274's passage, Senator Rapert made comments to the effect that it would be a cold day in hell before a Baphomet monument appeared on State Capitol grounds. Those comments create a strong inference that the Arts and Grounds Commission Subcommittee's advancement of the Baphomet monument was connected to the passage of Act 274. Secretary Jester has not pointed to other evidence in the record to support his assertion. Thus, there is no evidence to support Secretary Jester's alleged non-discriminatory reason for the Arkansas General Assembly to pass Act 274. The passage of Act 274 had an adverse effect on TST, a minority religion, by stopping its process completely after it obtained approval for the advancement of the Baphomet monument from the Arts and Grounds Commission Subcommittee

141

(Dkt. No. 260-33, at 17).  For all of these reasons, the Court will infer discriminatory intent and apply strict scrutiny.

### e.    Application Of Strict Scrutiny

Based on the undisputed record evidence before it, and applying strict scrutiny, the Court finds that the Display Act and Act 274 had the discriminatory purpose both to show a governmental preference for Christianity and to send an ancillary message to TST members "that they are outsiders, not full members" of the community.  *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309–10 (2000).  There is record evidence that Mr. Hargett, a member of TST, testified that, "[w]hen I see the Ten Commandments monument on our State Capitol grounds, I feel like my State government deems me lesser-than because I reject the religious laws it purports to command." (Dkt. No. 269-1 at 241).

Secretary Jester offers two reasons for the passage of Act 274.  First, Secretary Jester contends that the State had an interest in passing Act 274 for administrative efficiency, but the Court determines this interest is not "compelling" in this context.  As set forth above, passage of Act 274 adversely impacted TST, which the Court determines to be a religion and suspect class. Further, the record evidence before the Court shows that the Arkansas General Assembly's real interest may have been the "bare congressional desire to harm a politically unpopular group" and that "cannot constitute a legitimate governmental interest."  *U.S. Dep't. of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).  As set forth above, in this case the contemporaneous statements of Arkansas legislators and other evidence in the record make clear that the purpose of passing Act 274 was to deprive TST of an opportunity to compete with Christianity in the public sphere.  Secretary Jester has not demonstrated that these statutes are narrowly tailored to serve any compelling interest.

Secretary Jester contends in response that TST made no good faith effort to get legislative support for the Baphomet monument except for sending what he characterizes as threatening emails to members of the Arkansas General Assembly. The undisputed record evidence belies Secretary Jester's claims (Dkt. No. 290, ¶¶ 75–77), as does additional record evidence (Dkt. No. 269-1, at 61–74, 112, 127, 143, 156, 187–89). Moreover, as set forth above, TST is a minority religion which places Intervenor plaintiffs in such "a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Plyler*, 457 U.S. at 216 n.4. The Display Act insulated the Ten Commandments monument from competition, and, in conjunction with Act 274, it also impinged upon TST's fundamental right to compete on equal footing.

On the undisputed record evidence before it, the Court determines that the Display Act and Act 274 do not survive strict scrutiny.

### 2.    Rational Basis

Even if rational basis review applies, the Court determines that the Display Act and Act 274 do not survive rational basis review based on the undisputed record evidence before the Court. It is undisputed that, after the Arkansas General Assembly passed the Display Act and Act 274, TST was unable to move on to a public hearing after the Baphomet monument was approved by the Arts and Grounds Commission Subcommittee. Thus, the Ten Commandments Monument remains the only religious monument on the Arkansas State Capitol grounds. Under the rational basis test, a legislative classification or distinction will be upheld "so long as it bears a rational relation to some legitimate end." *Zink*, 783 F.3d at 1110 (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)).

Secretary Jester argues that the Display Act passes the rational basis test because the Ten Commandments "symbolize law and moral conduct, and such public displays hold a significant place in our nation's history and traditions." (Dkt. No. 258, at 29). As set forth in this Opinion and Order, based on the undisputed record evidence before the Court, Secretary Jester has not established that the Ten Commandments Monument symbolizes law and moral conduct in this context. Moreover, based on the undisputed record evidence before it, the Court has determined that the Display Act and Act 274 were not passed by the Arkansas General Assembly based on the Ten Commandments having a significant place in our nation's history and traditions. *See supra*.

Secretary Jester's other argument is that Act 274 survives rational basis review because the State Capitol grounds are limited, and "the State has a unique interest in requiring an applicant to demonstrate that it has substantial public support in the form of approval from the General Assembly before expending time and resources to vet an application." (Dkt. No. 258, at 29). The undisputed record evidence surrounding the passage of Act 274 does not support Secretary Jester's claim that Act 274 was passed by the Arkansas General Assembly to further efficiency. Nothing in the record suggests that the Arkansas General Assembly would have enacted Act 274 but for the fact that TST obtained preliminary approval of the Baphomet monument from the Arts and Grounds Commission Subcommittee (Dkt. No. 260-36; 269-1, at 55) and that the language in the prior version of Act 274 provided that "[a]ny monument on the State Capitol grounds approved by the [Capitol] commission *must* be authorized by an act of the General Assembly." (Dkt. No. 260-37). On the record before the Court, there was no request from the Arts and Grounds Commission Subcommittee or the Arkansas legislature to "correct" the order in which parties sought approval of monuments to create greater efficiency.

144

In *United States Department of Agriculture v. Moreno*, the Supreme Court considered whether there was a rational basis for an amendment to the federal Food Stamp program that prevented "hippie communes" from participating in the program. 413 U.S. 528, 534 (1973). The Supreme Court determined that the challenged classification—households of related persons versus households of unrelated persons—was clearly not related to the stated purpose of the law. *Id*. The Supreme Court stated, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id*. *See also Romer v. Evans,* 517 U.S. 620, 635 (1996) (holding that Colorado statute banning state or local laws forbidding sexual-orientation discrimination was not rationally related to legitimate governmental objective); *City of Cleburne,* 473 U.S. at 450 (applying rational basis review, Supreme Court invalidated zoning discrimination against mentally retarded as based on "irrational prejudice"). In *Moreno*, the Supreme Court employed a highly contextual, fact-based analysis balancing private rights and public interests even while ostensibly applying minimal rational basis review.

Similarly, based on undisputed record evidence before the Court, Act 274's passage is not related to its stated purpose of government efficiency. Here the General Assembly's desire not to permit TST equal footing to place the Baphomet monument on State Capitol grounds cannot be a legitimate government interest on which to claim a rational basis for Equal Protection Clause purposes.

### D.    Conclusion:  Equal Protection

Based on the undisputed record evidence, the Court concludes that the Intervenor plaintiffs are a suspect class for Equal Protection purposes under controlling Eighth Circuit law.  Intervenor plaintiffs have established that the Display Act insulated the Ten Commandments Monument from

competition, while the Display Act in conjunction with Act 274 impinged upon TST's fundamental right to compete on equal footing. For these reasons, the Court denies Secretary Jester's motion for summary judgment on Intervenor plaintiffs' Equal Protection claim (Dkt. No. 257) and grants Intervenor plaintiffs' motion for summary judgment on their Equal Protection claim (Dkt. No. 268).

Because the Court finds Act 274 which amended Arkansas Code Annotated § 22-3-503(c) to be facially neutral but to have burdened a fundamental right, targeted a suspect class, and had a disparate impact on a protected class that was motivated by a discriminatory intent, the Court declines to enjoin ongoing enforcement of Act 274. Instead, the Court determines that removal of the Ten Commandments Monument is the appropriate remedy in this case, given the Court's determination regarding Intervenor plaintiffs' Equal Protection Clause claim and the remaining claims. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 632 (2020) ("When the constitutional violation is unequal treatment, . . . a court theoretically can cure that unequal treatment either by extending the benefits or burdens to the exempted class, or by nullifying the benefits or burdens for all."); *see also Heckler v. Mathews*, 465 U.S. 728, 737–40 (1984) (plaintiff suffering unequal treatment had standing to seek "withdrawal of benefits from the favored class").

## IX. Conclusion

"It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants." *Pierson v. Ray,* 386 U.S. 547, 554 (1967). This Court does not take lightly a request to declare that a state law is unconstitutional. Statutes are passed by the duly elected representatives of the people. It is not on a whim that the Court supplants the will of the voters or the decisions of the legislature. Here, the Court is asked to examine the Establishment Clause of the First Amendment and the Equal

146

Protection Clause of the Fourteenth Amendment as applied to the summary judgment record. As

the Supreme Court has explained:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638 (1943); *see also City of Cleburne,* 473

U.S. at 448 ("It is plain that the electorate as a whole, whether by referendum or otherwise, could

not order city action violative of the Equal Protection Clause, and the City may not avoid the

strictures of that Clause by deferring to the wishes or objections of some fraction of the body

politic.") (citation omitted); *Palmer v. Thompson,* 403 U.S. 217, 226 (1971) ("Citizens may not be

compelled to forgo their constitutional rights because officials fear public hostility. . . .").

The Court concludes that the Orsi, Cave, and Intervenor plaintiffs have met their burden to

obtain declaratory and permanent injunctive relief on their First Amendment Establishment Clause

claims against Secretary Jester in his official capacity. For the reasons explained in this Opinion

and Order, the Court concludes that, because the General Assembly's passage of the Display Act

requiring the permanent placement of the Ten Commandments Monument on the State Capitol

grounds by Secretary Jester violates the Establishment Clause, the Court grants the Orsi, Cave,

and Intervenor plaintiffs' motions for summary judgment (Dkt. Nos. 254; 264; 268) and denies

Secretary Jester's motion for summary judgment (Dkt. No. 257) on the Establishment Clause

claim. The Court denies as moot the motion to quash and for protective order filed by non-party

witness senator Jason Rapert (Dkt. No. 74).

The Court also concludes that the Intervenor plaintiffs have met their burden to obtain

declaratory and injunctive relief on their Equal Protection claim against Secretary Jester in his

official capacity because, as set forth in this Opinion and Order, TST was prevented from competing with Christianity on an equal footing for placement of its Baphomet monument on State Capitol grounds due to the passage of both the Display Act and Act 274 with an emergency clause. Accordingly, the Court grants the Intervenor plaintiffs' motion for summary judgment (Dkt. No. 268) and denies Secretary Jester's motion for summary judgment (Dkt. No. 257) on the Equal Protection Clause claim.

For these reasons, the Court orders the following injunctive relief:

1.      Secretary Jester, in his official capacity as Arkansas Secretary of State, together with his agents, servants, and employees, and all persons in active concert or participation with him, are enjoined from enforcing the Display Act, Arkansas Code Annotated § 22-3-221.  The Court does not stay this portion of the injunction.

2.      Secretary Jester, in his official capacity as Arkansas Secretary of State, together with his agents, servants, and employees, and all those persons in active concert or participation with him must remove immediately from the State Capitol grounds the Ten Commandments Monument mandated by the Display Act, Arkansas Code Annotated § 22-3-221.  The Court specifically stays execution of this portion of the injunction requiring the removal of the Ten Commandments Monument pending the final disposition of any timely appeal to the Eighth Circuit Court of Appeals or until the time for filing a notice of appeal expires.

It is so ordered this the 31st day of March, 2026.


_Kristine G. Baker_
Kristine G. Baker
Chief United States District Judge